Ruby Wayne Wood (SBN 229538)
rwood@goodwinprocter.com
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, CA  90017
Tel.:  213.426.2500
Fax:   213.623.1673

Attorneys for Defendants
**WISDOM TREE INVESTMENTS,
INC.; WISDOM TREE TRUST;
WISDOM TREE ASSET
MANAGEMENT, INC.; WISDOM
TREE RETIREMENT SERVICES,
INC.; MELLON CAPITAL
MANAGEMENT CORP.; and ALPS
DISTRIBUTORS, INC.**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| Research Affiliates, LLC,<br><br>      Plaintiff,<br><br>    v.<br><br>Wisdom Tree Investments, Inc.,<br>Wisdom Tree Trust, Wisdom Tree Asset<br>Management, Inc., Wisdom Tree<br>Retirement Services, Inc., Mellon<br>Capital Management Corp., and ALPS<br>Distributors, Inc.,<br><br>      Defendants. | Case No. SACV11-01846 DOC (ANx)<br><br>**DEFENDANTS' NOTICE OF<br>MOTION AND MOTION FOR<br>JUDGMENT ON THE PLEADINGS<br>BASED ON UNPATENTABLE<br>SUBJECT MATTER;<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT<br>THEREOF**<br><br>Date:    April 2, 2012<br>Time:    8:30 a.m.<br>Place:   Santa Ana Courthouse<br>         Courtroom 9D<br>         411 West Fourth Street<br>         Santa Ana, CA 92701-4516<br><br>Judge  Hon. David O. Carter<br>Date Action Filed:  December 1, 2011 |

## NOTICE OF MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 2, 2012 at 8:30 am, or as soon thereafter as this matter may be heard by the above-entitled Court, located at 411 West Fourth Street, Santa Ana, California 92701, Defendants WisdomTree Investments, Inc., WisdomTree Trust, WisdomTree Asset Management, Inc., WisdomTree Retirement Services, Inc., Mellon Capital Management Corp., and ALPS Distributors, Inc. (collectively "Defendants"), will, and hereby do, move for an order granting judgment on the pleadings and dismissing with prejudice the Complaint in this action without leave to amend, in favor of Defendants. Defendants' motion is made pursuant to Fed. R. Civ. P. 12(c) on the grounds that the patents asserted in this patent infringement action constitute unpatentable subject matter under 35 U.S.C. § 101.

This motion is based upon the Memorandum of Points and Authorities, Plaintiff's Complaint, and the [Proposed] Order submitted herewith, and such further papers and argument as may be submitted to the Court in connection with this motion. This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place by telephone conference on February 9, 2012.

Dated: February 22, 2012                    Respectfully submitted,

By: /s/ Ruby Wayne Wood
Ruby Wayne Wood
*rwood@goodwinprocter.com*
**GOODWIN PROCTER** LLP

Attorneys for Defendants
**WISDOM TREE INVESTMENTS, INC., WISDOM TREE TRUST, WISDOM TREE ASSET MANAGEMENT, INC., WISDOM TREE RETIREMENT SERVICES, INC., MELLON CAPITAL MANAGEMENT CORP., AND ALPS DISTRIBUTORS, INC.**

1

# <u>TABLE OF CONTENTS</u>

2

<u>PAGE</u>

3

I.      INTRODUCTION .................................................................................. 1

4

II.     BACKGROUND .................................................................................. 3

5

        A.      The Asserted Patents ............................................................... 3

6

        B.      The Claims Identified in the Complaint ................................... 6

7

        C.      The Accused Products ............................................................. 9

8

III.    ARGUMENT ...................................................................................... 9

9

        A.      Statutory Subject Matter Does Not Extend To Abstract Ideas,
10              Mental Processes, Or Mathematical Formulae ..................... 11

11      B.      The Patents-in-Suit Broadly Claim Either Abstract Ideas, Mental
                Processes, And Mathematical Formulae, And They Are
12              Therefore Unpatentable Subject Matter ................................ 17

13              1.      The '502 Patent claims constitute unpatentable subject
                        matter. .......................................................................... 18

14
15              2.      The '719 Patent claims constitute unpatentable subject
                        matter. .......................................................................... 21

16              3.      The '740 Patent claims constitute unpatentable subject
                        matter. .......................................................................... 23

17      IV.     CONCLUSION ............................................................................ 25

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**PAGE(S)**

3

**FEDERAL CASES**

4

*CLS Bank Int'l v. Alice Corp.*

5
   768 F.Supp.2d 221, 231 (D.D.C. 2009) ........................................... 19, 22

6

*Cybersource Corp. v. Retail Decisions, Inc.*

7
   654 F.3d 1366 (Fed. Cir. 2011) ........................................ 1, 2, 14, 15, 17, 18, 19

8

*Dealertrack, Inc. v. Huber*

9
   --- F.3d ----, 2012 WL 164439
   (Fed. Cir. Jan. 20, 2012) ........................................ 1, 2, 3, 11, 15, 16, 19

10

*Diamond v. Chakrabarty*

11
   447 U.S. 303 (1980) ........................................................... 11

12

*Diamond v. Diehr*

13
   450 U.S. 175 (1981) ........................................................ 13, 14, 16

14

*Funk Bros. Seed Co. v. Kalo Inoculant Co.*

15
   333 U.S. 127 (1948) ........................................................... 11

16

*Gottschalk v. Benson*

17
   409 U.S. 63 (1972) ...................................................... 11, 12, 13

18

*Graff/Ross Holdings LLP v. Fed. Home Loan Mortg. Corp.*

19
   2010 U.S. Dist. LEXIS 141399 (D. D.C. Aug. 27, 2010) ..................... 19

20

*Hal Roach Studios, Inc., v. Richard Feiner & Co.*

21
   896 F.2d 1542 (9th Cir. 1989) ................................................ 10

22

*Havoco of Am., Ltd. v. Shell Oil Co.*

23
   626 F.2d 549 (7th Cir. 1980) ................................................ 10

24

*In re Bilski*

25
   130 S.Ct. 3218 (2010) ........................................ 1, 2, 11, 13, 14, 16, 18

26

*In re Bilski*

27
   545 F.3d 943 (Fed. Cir. 2008) (en banc) .......................... 14, 16, 18, 19

28

*In re Comiskey*

   554 F.3d 967 (Fed. Cir. 2009) ............................................ 16, 17

ii

*In re Grams*
    888 F.2d 835 (Fed. Cir. 1989) ........................................................................ 17

*In re Maucorps*
    609 F.2d 481 (C.C.P.A. 1979) ....................................................................... 17

*In re Meyer*
    688 F.2d 789 (C.C.P.A. 1982) ....................................................................... 17

*In re Schrader*
    22 F.3d 290 (Fed. Cir. 1994) ......................................................................... 17

*In re Warmerdam*
    33 F.3d 1354 (Fed. Cir. 1994) ...................................................................... 17

*Jensen Family Farms, Inc. v. Monterey Bay Unified Air*
    *Pollution Control Dist.*
    ___ F.3d ___, 2011 WL 2090829 (9th Cir. May 27, 2011) ........................... 9, 10

*Ott v. Home Savings & Loan Assoc.*
    265 F.2d 643 (9th Cir. 1958) ....................................................................... 10

*Parker v. Flook*
    437 U.S. 584 (1978) ........................................................................ 12, 13, 19

*Research Corp. Tech., Inc. v. Microsoft Corp.*
    627 F.3d 859 (Fed. Cir. 2010) .................................................................. 19, 20

*Rutman Wine Co. v. E. & J. Gallo Winery*
    829 F.2d 729 (9th Cir. 1987) ....................................................................... 10

*SiRF Tech., Inc. v. Int'l Trade Comm'n*
    601 F.3d 1319 (Fed. Cir. 2010) ................................................................ 11, 16

*Sprewell v. Golden State Warriors*
    266 F.3d 979 (9th Cir. 2001) ...................................................................... 10

*Thompson v. Illinois Dep't of Prof. Reg.*
    300 F.3d 750 (7th Cir. 2002) ...................................................................... 10

*Ultramercial, LLC v. Hulu, LLC*
    657 F.3d 1323 (Fed. Cir. 2011) ................................................................ 11, 20

*United States v. General Dynamics C4 Sys., Inc.*
    637 F.3d 1047 (9th Cir. 2011) ................................................................. 9

**FEDERAL STATUTES**

35 U.S.C. § 100(b) ..................................................................................... 11

35 U.S.C. § 101 ...................................................................... 1, 11, 14, 25

Fed. R. Civ. Proc, Rule 12(c) .................................................................. 9

Fed. R. Civ. Proc, Rule 12(b)(6) ....................................................... 9, 10

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

In this case, Plaintiff Research Affiliates, LLC ("Plaintiff") charges Defendants with infringing method claims in three related patents in the field of securities indexing.  Defendants move for judgment on the pleadings at the outset of this case because the asserted claims from these patents are invalid as a matter of law for claiming unpatentable subject matter under Section 101 of the Patent Statute, 35 U.S.C. § 101.  Recent decisions by the U.S. Supreme Court in *In re Bilski*, 130 S.Ct. 3218, 3231 (2010), and by the Federal Circuit in *Cybersource Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1371 (Fed. Cir. 2011) and *Dealertrack, Inc. v. Huber*, --- F.3d ---, 2012 WL 164439, at *16-18 (Fed. Cir. Jan. 20, 2012), for example, have recognized that inventions which are essentially nothing more than abstract ideas, mathematical algorithms or formulae cannot be patented, even if they are couched in language asserting that the ideas, algorithms or formulae are carried out by a processor or are "computer implemented."

Here, all of the claims at issue relate to methods that use well-known financial metrics readily obtained from company financial reports and other public disclosures to select the assets to be included in a securities index and to weight those assets within the index.  Plaintiff calls these financial metrics "fundamental factors" because they are based on corporate fundamentals that are supposedly substantially independent of the price and/or market capitalization of the securities. Although the claims are "computer implemented," the involvement of a computer lends nothing to subject matter patentability because it merely provides a more convenient means by which to perform mathematical calculations that could be performed in the mind and/or by hand.  Otherwise, there is no "machine" set forth in any of the claims, nor do the claims transform anything representing or constituting a physical object.  At bottom, the patents improperly attempt to claim a monopoly on the basic investing concept of using any of a broad range of fundamental factors

1  to build a securities index and associated portfolios.

2      Asserted Claim 1 of the '719 Patent exemplifies the issue with all of the

3  asserted patents.  It is a "method for constructing an index of assets."  The primary

4  steps of the method are:

5      (a) "*accessing*" databases to obtain data about entities (e.g., companies) and

6  the assets (e.g., stocks) they issue;

7      (b) "*receiving* … at least one objective measure of scale" (e.g., revenue,

8  profitability or sales) regarding the entities or assets;

9      (c) "*retrieving*" the data;

10     (d) "*selecting*" from the assets to create an index, using the objective measure

11  of scale; and

12     (e) "*calculating*" proportional weights for the index to be "objective measure

13  of scale weights … substantially independent of market prices … and market

14  capitalization …"

15     These are nothing more than abstract concepts calling for the use of basic

16  mathematical formulas that even the patents admit can be carried out by an

17  individual analyst.  Stripping away the window dressing, the claim is directed to the

18  abstract idea of creating a securities index using virtually any metric that is

19  "substantially independent of market prices … and market capitalization."  As to the

20  involvement of a "machine," the claim simply provides that the method is

21  implemented by "at least one analysis host processor . . . comprising at least one

22  computer processor" – in essence, any general purpose computer.  Similar claims

23  were ruled unpatentable in *Bilski,* where the U.S. Supreme Court rejected claims

24  that covered the fundamental investment concept of hedging, 130 S.Ct. at 3231, in

25  *Cybersource*, where the Federal Circuit invalidated claims for a mental process that

26  was couched as a "computer readable medium" to be executed "by one or more

27  processors of a computer system," 654 F.3d at 1373-75, and most recently in

28  *Dealertrack¸* where the Federal Circuit held that the fundamental concept of

1   clearinghouse processing cannot be patented, even if the claim recites that the
2   processing is done on a computer, because that would amount to patenting an
3   abstract idea.  2012 WL 164439, at *16-18.

4        Accordingly, and as a matter of law, the claims of the patents-in-suit are not
5   drawn to patent eligible subject matter.  Plaintiff's claims must therefore be
6   dismissed with prejudice.

7   **II.    BACKGROUND**

8        This motion is based solely on the Complaint and the patents-in-suit, all of
9   which were attached to and incorporated by reference into Plaintiff's Complaint
10  (Dkt. No. 1).  A copy of the Complaint and the patents-in-suit is attached hereto as
11  Exhibit 1.

12       **A.    The Asserted Patents**

13       Plaintiff's Complaint alleges that each of the Defendants have infringed and
14  are continuing to infringe at least one method claim from at least one of the three
15  patents-in-suit, which are U.S. Patent Nos. 7,747,502 ("'502 Patent"), entitled
16  "Using Accounting Data Based Indexing To Create A Portfolio Of Assets," (Ex.
17  1(A)); 7,792,719 ("'719 Patent"), entitled "Valuation Indifferent Non-Capitalization
18  Weighted Index And Portfolio," (Ex. 1(B)); and 8,005,740 ("'740 Patent"), entitled
19  "Using Accounting Data Based Indexing To Create A Portfolio Of Financial
20  Objects" (Ex. 1(C)).  All three patents claim priority to the same provisional
21  application dated February 4, 2004.

22       Per their titles, the patents are directed to creating indexes and portfolios of
23  assets using "accounting data" divorced from asset price and market capitalization.
24  An index is a selection of assets, such as securities, representing a particular market
25  or portion of a market.  *See* '502 Patent, col. 1:56-59 ("A securities market index, by
26  intent, reflects an entire market or a segment of a market.  A passive portfolio based
27  on an index may also reflect the entire market or segment."); col. 2:5-6 ("Indexes
28  are generally all-inclusive of the securities within their defined markets or market

3

segments.").  Of course, the inventors did not, and could not, claim to have invented the concept of indexes *per se*, or managing portfolios based on those indexes, that is, by selecting securities to be used in the index and deciding how much weight each security should have within the index.  The Background of the Invention section of the specification clearly states that methods of selecting and weighting assets for indexes were present in the prior art:

> Another conventional category [of securities portfolio management] is passive management, also called indexing, wherein the securities in a portfolio duplicate those that make up an index.  The securities in a passively managed portfolio are conventionally weighted by relative market capitalization weighting or equal weighting.

'502 Patent, col. 1:43-56.  The specification further states:

> Conventionally, passive portfolios are built based on an index weighted using one of market capitalization weighting, equal weighting, and share price weighting.  Most commonly used stock market indices are constructed using a methodology that is based upon either the relative share prices of a sample of companies (such as the Dow Jones Industrial Average) or the relative market capitalization of a sample of companies (such as the S&P 500 Index or the FTSE 100 Index).

*Id.* at col. 2:17-26.

The patentee posits that there are disadvantages to the manner in which indexes are typically weighted.  The patentee therefore claims to have invented a method of constructing an index and weighting a portfolio by instead using, *e.g.*, "accounting data based indexing, i.e., accounting data based measures of firm size," or using "four specific metrics … book equity value; income (free cash flow); sales; and gross dividends."  *Id.* at col. 2:21-col. 4:48.  Because the index is built using such corporate fundamentals, the patentee refers to the index as a "fundamental index."  *Id.* at page 3 (citing "Robert Arnott et al., 'Fundamental Indexation',

Research Affiliates"); col. 1:10-11 (prior application named "Using a Fundamental Index to Create a Portfolio of Assets"); col. 14:17-20.

While the asserted claims all recite the use of a computer, the claims and the specifications describe that the computer does no more than carry out an algorithm chosen by a person, and which could readily be carried out by the person in their mind or by using pen and paper.  The real decision-making is clearly carried out by an individual.  *See id.* at col. 15:36-41 ("Once *the index manager* has decided and entered *which accounting data based criteria to use* and *how many constituents* the manager may decide that *he or she* wants to include in the index, the computing device *may* create the index in the following way …."); *id.* at col. 15:62-col. 16:17 ("The computing device may then rebalance the index weightings as the accounting data … change over time *as desired by the investor* ….  The computing device, *under the direction of an investor,* may choose to rebalance the weightings in the index ….") (emphases added).

As a further example, the following passage from the '502 Patent specification describes method steps that could easily be carried out without the use of the computer:

> For example, in an exemplary embodiment of the invention a method of constructing a non-capitalization weighted portfolio of financial objects may include, e.g., gathering data about various financial objects; selecting a group of financial objects to create the index of financial objects; and weighting each of the group of financial objects selected in the index based on an objective measure of scale of each member of the groups of financial objects, where the weighting may include weighting all or a subset of the group of financial objects, and weighting based on other than market capitalization, equal weighting, or share price weighting.

*Id.*, col. 12:36-46.

Indeed, the specification repeatedly demonstrates that nothing about the claimed methods inherently requires the use of a computer; the inventor simply adds the "computer-implemented" limitation perhaps to perform the steps in a more expedient manner.  For example, the patent states: "The exemplary inventive method may create a new class of stock market indices and index funds that *may be implemented on, e.g., but not limited to, a computing device or a processor,* or as a computer software or hardware, *or as an algorithm*."  *Id.,* col. 14:37-41 (emphasis added).  *See also id.,* col. 10:4-6 ("An exemplary embodiment of the invention *may* be implemented on a computing device(s), processor(s), computer(s) and/or communications device(s).") (emphasis added); '740 Patent, col. 25:29-36; col. 30:36-39; '719 Patent, col. 9:5-7.  Indeed, none of the "process" flow diagrams shown in Figures 2 through 5 of the '502 Patent shows a computer.

## B.    The Claims Identified in the Complaint

The Complaint alleges that the Defendants infringe "by using the methods claimed … and/or [by] selling products created by using said methods."  Complaint, ¶¶ 31, 45, 53.  For each of the three patents, the Complaint identifies only one asserted claim by number.  For convenience, the full text of each of the identified claims is appended at the end of this brief.

Count One of the Complaint, which covers the '502 patent, identifies only Claim 53 as an asserted claim.  Claim 53 is discussed in detail below, but briefly, Claim 53 claims "a computer-implemented method for construction of a portfolio based on an index," where the selection and weighting of the assets to be included in the index is based upon "at least one accounting data" of the assets, rather than the price of the assets.  The method is comprised of the following two intuitive steps: (a) creating, by a computer, a financial portfolio reflecting the index; and (b) managing the portfolio by buying or selling the assets as necessary to reflect the index.  The "creating" step provides that the index is provided by an index provider that has selected and weighted financial assets to be included in the index based

1 upon at least one of: cash flow, sales, book value, or dividends, but not price.  The

2 "managing" step includes purchasing financial assets added to the index and selling

3 those that are removed from the index.

4      Thus, the claim recites an algorithm for constructing and managing a financial

5 portfolio based on an index, which index is created and weighted by evaluating an

6 asset's cash flow, sales, book value or dividends, but not price.  The claim requires

7 the use of "at least one computer," but recites no limitation on the type of computer

8 and the computer serves no apparent purpose other than to more easily make the

9 basic mathematical calculations or to facilitate transactions.

10      The asserted claims of the '719 and '740 Patents are even more broadly aimed

11 at "constructing an index of assets" and "constructing data indicative of a financial

12 object index."  Count Two of the Complaint alleges that three of the Defendants

13 infringe Claim 1 of the '719 Patent.  Complaint, ¶46.  As noted, this claim is for a

14 method of constructing an index, using at least one computer processor, with the

15 steps of the method comprising: (a) accessing databases pertaining to entities and

16 the assets issued by them; (b) receiving at least one "objective measure of scale"

17 regarding the assets or entities; (c) retrieving the data; (d) selecting the assets to be

18 included in an index using the data; and (e) calculating the proportional weights for

19 the index of assets.  The "selection" step is performed using "quantitative data" that

20 is "substantially independent" of the market prices or market capitalization of the

21 assets or entities, but is rather based on either "a demographic measure," a "financial

22 metric," or essentially *any* metric from a public information disclosure (*e.g.*, an SEC

23 Form 10-K).  The selection step also requires that the assets be "rank[ed] by the

24 quantitative data."  The "calculating" step provides for adding the total of the

25 quantitative data, and thereby determining the relative weighting of the assets to be

26 included in the index.

27      Here again, the claim broadly recites an algorithm for constructing an index

28 of assets, in which the index is created and weighted by evaluating well-known

1   forms of financial data about an asset.  As before, the computer serves no purpose
2   other than perhaps to more easily make the basic mathematical calculations.

3       With respect to the '740 patent, Count Three of the Complaint identifies only
4   Claim 1 for its allegation of infringement against three of the Defendants.  As noted
5   above, this claim is for a computer-implemented "method for constructing data
6   indicative of a financial object index."  The method is comprised of the steps of:
7   (a) selecting the data "based upon at least one accounting data" other than price,
8   relating to at least one entity; (b) weighting the data; and (c) storing the data on a
9   computer storage device.  The financial objects to be included in the index comprise
10  at least one of 37 instruments (*e.g*., a bond, a stock, etc.) enumerated in the claim,
11  and the "accounting data" includes at least one financial metric or other metric from
12  an entity's information disclosures.

13      Again, the claim is nothing more than an algorithm for "constructing data
14  indicative" of an index, based upon a selection process and criteria that are mere
15  logical processes that can be performed in the human mind.  The claim again utilizes
16  well-known types of data about an asset.  This claim also requires the use of a
17  computer, but it serves no purpose other than to make the basic mathematical
18  calculations.

19      None of the claims specify any particular number of "financial objects" or
20  "assets" (which are extremely broadly defined and include, e.g., a stock or bond, as
21  to which published data is readily available) that must be used in compiling the
22  claimed index or portfolio.  And the selection criteria (e.g., "objective measure of
23  scale" or "accounting data") can be as simple as "revenue, profitability, total sales
24  …[or] dividends" of the issuing entity.  *See* '502 Patent, col. 12:58-col. 13:20
25  (including roughly 70 different possible accounting measures that could be used);
26  *see also* '719 Patent, col. 4:27-50 (same); '740 Patent, col. 10:3-col. 11:11
27  (identifying numerous accounting measures of a company associated with the
28  financial object).

1

    **C.**   **The Accused Products**

2        The named defendants in this case are WisdomTree Investments, Inc.,

3 WisdomTree Trust, WisdomTree Asset Management, Inc., Wisdom Tree Retirement

4 Services, Inc., Mellon Capital Management Corp., and ALPS Distributors, Inc.  The

5 Complaint alleges that, in various capacities, the named defendants perform the

6 claimed methods by "making, using, selling, licensing, and/or offering to sell …

7 financial products" that are "based on <u>fundamental</u> factors."  Complaint, ¶ 32

8 (emphases added).  Plaintiff repeatedly contends that the alleged infringement

9 consists of the financial products "based on fundamental factors," and it identifies

10 more than 30 index funds and exchange traded funds that are purportedly subject to

11 the infringement allegations.  *Id*, ¶ 32; ¶ 35 ("WT Trust issues WT ETFs[1] based on

12 the WT Indexes … related to financial products that are based on fundamental

13 factors"); ¶ 37; ¶¶ 39-41 (same with respect to '502 Patent); ¶¶ 46,  54 (alleging

14 infringement of '740 Patent by virtue of "financial products that are based on

15 fundamental factors").  Among other things, Plaintiff requests damages and

16 permanent injunctive relief.  *Id.* at 22.

17 **III.**   **ARGUMENT**

18        Rule 12(c) of the Federal Rules of Civil Procedure provides that, "[a]fter the

19 pleadings are closed but within such time as not to delay the trial, any party may

20 move for judgment on the pleadings."  The standard governing a Rule 12(c) motion

21 is "functionally identical" to that governing a Rule 12(b)(6) motion.  *United States*

22 *v. General Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1054 n.4 (9th Cir. 2011).  Thus,

23 like a motion to dismiss under Rule 12(b)(6), this motion tests the legal sufficiency

24 of the Plaintiff's claims, and "[j]udgment … is proper when the moving party

25 establishes on the face of the pleadings that there is no material issue of fact and that

26 the moving party is entitled to judgment as a matter of law."  *Jensen Family Farms,*

27

---

28        [1] ETF stands for "Exchange Traded Fund," in this case a portfolio of assets that is created based on an index and traded on exchanges like individual stocks.

1  *Inc. v. Monterey Bay Unified Air Pollution Control Dist.,* ___ F.3d ___, 2011 WL

2  2090829, *2 n.1 (9th Cir. May 27, 2011); *Hal Roach Studios, Inc., v. Richard Feiner*

3  *& Co.,* 896 F.2d 1542, 1550 (9th Cir. 1989).

4      This rule exists, in part, to prevent litigation from moving forward when a

5  plaintiff states a facially defective claim.  "The purpose of F.R.Civ.P. 12(b)(6) is to

6  enable defendants to challenge the legal sufficiency of complaints without

7  subjecting themselves to discovery."  *Rutman Wine Co. v. E. & J. Gallo Winery,* 829

8  F.2d 729, 738 (9th Cir. 1987).  Indeed, the Ninth Circuit has stated that "if the

9  allegations of the complaint fail to establish the requisite elements of the cause of

10  action, our requiring costly and time consuming discovery and trial work would

11  represent an abdication of our judicial responsibility."  *Id.* (quoting *Havoco of Am.,*

12  *Ltd. v. Shell Oil Co.,* 626 F.2d 549, 553 (7th Cir. 1980)).

13      In considering a motion to dismiss or for judgment on the pleadings, courts

14  may consider material attached as exhibits to the complaint, in this case, the patents-

15  in-suit.  *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001)

16  (examining exhibit to complaint).  Moreover, "where a plaintiff attaches documents

17  and relies upon the documents to form the basis for a claim or part of a claim,

18  dismissal is appropriate if the document negates the claim."  *Thompson v. Illinois*

19  *Dep't of Prof. Reg.,* 300 F.3d 750, 754 (7th Cir. 2002) ( "well-settled rule that when

20  a written instrument contradicts allegations in a complaint to which it is attached,

21  the exhibit trumps the allegations."); *see also Ott v. Home Savings & Loan Assoc.,*

22  265 F.2d 643, 648 n.1 (9th Cir. 1958).

23      In this case, there is no reason to force the parties and the Court to endure the

24  time and expense of litigation when no evidence beyond the face of the patents-in-

25  suit is necessary to conclude that the Complaint is deficient because it is based on

26  patents claiming unpatentable inventions as a matter of law.

27

28

A.    **Statutory Subject Matter Does Not Extend To Abstract Ideas, Mental Processes, Or Mathematical Formulae**

The categories of patent-eligible subject matter are set forth in Section 101 of the patent statute, which provides, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title." 35 U.S.C. § 101. Section 100(b) of the Patent Act defines "process" as "process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material." 35 U.S.C. § 100(b). Patent eligibility under Section 101 is a "threshold test." *Dealertrack,* 2012 WL 164439, at *14, n.3 (citing *Bilski,* 130 S.Ct. at 3225). And, whether a patent claim is drawn to patent-eligible subject matter is an issue of law. *SiRF Tech., Inc. v. Int'l Trade Comm'n,* 601 F.3d 1319, 1331 (Fed. Cir. 2010). Claim construction is not necessary for a Section 101 analysis. *See, e.g., Ultramercial, LLC v. Hulu, LLC,* 657 F.3d 1323, 1325 (Fed. Cir. 2011); *see also Bilski,* 130 S.Ct. at 3231 (finding subject matter ineligible for patent protection without claim construction).

Although "Congress plainly contemplated that the patent laws would be given wide scope," the Supreme Court has repeatedly made clear that there are specific exceptions to the eligibility principles: "'laws of nature, physical phenomena, and abstract ideas.'" *Bilski*, 130 S.Ct. at 3225 (quoting *Diamond v. Chakrabarty,* 447 U.S. 303, 309 (1980)). As the *Bilski* Court explained, these judicially created exceptions "have defined the reach of the statute as a matter of statutory *stare decisis* going back 150 years," and these exceptions are "'part of the storehouse of knowledge of all men … free to all men and reserved exclusively to none.'" *Id.* (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.,* 333 U.S. 127, 130 (1948)).

Among the Supreme Court cases that recognized the exceptions to patentability for mental processes, algorithms and abstract ideas is *Gottschalk v.*

*Benson*, 409 U.S. 63 (1972).  "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work."  *Id.* at 67.  The Court ruled that attempts to patent mathematical formulae or algorithms fall within the abstract ideas exception: "It is conceded that one may not patent an idea.  But in practical effect that would be the result if the formula . . . were patented in this case. . . . [I]f the judgment below is affirmed, the patent would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself."  *Id.* at 71-72.

The invention in *Gottschalk v. Benson* was a method of programming a general-purpose computer to convert binary-coded decimal numbers into pure binary numbers through the use of a mathematical algorithm.  Applying the principles on abstract ideas, the Supreme Court held the claim invalid, focusing on the mental character of the claimed method and the fact that it could be performed without a computer:

> The conversion of BCD numbers to pure binary numerals can be done mentally…  The method sought to be patented varies the ordinary arithmetic steps a human would use by changing the order of the steps, changing the symbolism …, and by taking subtotals after each successive operation.  The mathematical procedures can be carried out in existing computers long in use, no new machinery being necessary.  And, as noted, they can also be performed without a computer.

*Id.* at 67.

A few years later, in *Parker v. Flook*, 437 U.S. 584 (1978), the Supreme Court reaffirmed and extended these principles when it found unpatentable a method for calculating and updating values of "alarm limits" for alarms used to monitor process variables (e.g., temperature) during catalytic chemical conversion.  The Court characterized the method as "simply provid[ing] a new and presumably better

12

method for calculating alarm limit values." *Id.* at 594-95.  The Court stated: "mathematical formula . . . like a law of nature, cannot be the subject of a patent." *Id.* at 589.  The Court further held that the application of a mathematical formula through "post-solution activity" could not "transform an unpatentable [mathematical formula] into a patentable process." *Id.* at 590.

In *Diamond v. Diehr*, 450 U.S. 175 (1981), the Supreme Court addressed subject matter eligibility for an invention on curing rubber, in the Court's words, a "physical and chemical process for molding precision synthetic rubber products . . . involv[ing] the transformation of an article, in this case raw, uncured synthetic rubber, into a different state or thing." *Id*. at 183.  On the basis of that physical transformation, the Court found the invention to be statutory.  The Court reaffirmed that inventions directed to laws of nature, abstract ideas and mathematical formula are not patentable. *Id*. at 185-187.  The Court stated that a "mathematical formula as such is not accorded the protection of our patent laws (citing *Gottschalk v. Benson*), and additionally, that "this principle cannot be circumvented by attempting to limit the use of the formula to a particular . . . environment" or by adding "insignificant post-solution activity" (citing *Parker v. Flook*).  *Id.* at 191-192.

In the 2010 *Bilski* decision, the Supreme Court affirmed the unpatentability of claimed methods for buyers and sellers of commodities in the energy market to protect against, or hedge, price fluctuations.  *Id.* at 3231.  In language directly applicable to the present case, the Court stated that: "[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class," and that "[a]llowing petitioners to patent risk hedging would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Id.* at 3230-31 (citation omitted).

In *Bilski*, the Supreme Court also addressed the Federal Circuit's previous conclusion that, to define the limits of the "abstract ideas" exception to patentability, courts should use the so-called "machine-or-transformation" test as "the exclusive

metric" for determining the subject matter eligibility of processes.  130 S.Ct. at 3226-27.  That test provides that an invention is a patentable "process" only if "'(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.'"  *Bilski,* 130 S.Ct. at 3225-26 (quoting *In re Bilski,* 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc)).  The Supreme Court recognized that this test was "a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under §101," but rejected it as the sole test.  *Bilski*, 130 S.Ct. at 3227.

After the *Bilski* decision, the Federal Circuit has twice upheld findings of unpatentability under Section 101 with respect to claims that – like the claims at issue here – fundamentally attempt to patent an abstract idea or algorithm, using as a fig leaf the assertion that the method at issue was performed by a processor or "computer implemented."

In *Cybersource Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1371 (Fed. Cir. 2011), the Federal Circuit held invalid a claim to a method for detecting fraud in a credit card transaction using Internet address information (e.g., IP or e-mail addresses).  *Id.* at 1373-77.  Analogous to the claims in this case for methods of constructing indexes and portfolios based on well-known financial metrics inherent in the operation of businesses, the invalid claims in *Cybersource* were "broad and essentially purport[ed] to encompass any method for detecting credit card fraud which utilizes information relating credit card transactions to particular 'Internet address[es].'"  *Id.* at 1368.

Focusing on the abstract ideas exception, the Federal Circuit noted that the Supreme Court "appeared to endorse the view that methods which can be performed mentally . . . are unpatentable abstract ideas – the 'basic tools of scientific and technological work' that are open to all."  *Id.* at 1371 (citing *Diamond v. Diehr*). The court thus concluded that the invention was directed to a "subcategory of unpatentable abstract ideas," namely, "an unpatentable mental process."  *Id.*  The

analysis that followed is equally applicable here:

> All … method steps can be performed in the human mind, or by a
> human using a pen and paper.  [The claim] does not limit its scope to
> any particular fraud detection algorithm . . .  Rather, the broad scope of
> [the claim] extends to essentially any method of detecting credit card
> fraud based on information relating past transactions to a particular
> "Internet address," even methods that can be performed in the human
> mind.

*Id.* at 1372.

Regarding the machine-or-transformation inquiry, the *Cybersource* court
applied rules that are directly on point for the investing concept at issue in this case.
"[T]o impart patent-eligibility . . . under the theory that the process is linked to a
machine, . . . the machine '*must play a significant part in permitting the claimed
method to be performed*.'" *Id.* at 1375 (emphasis added).  The mere "incidental use
of a computer to perform the mental process of [the claim] does not impose a
sufficiently meaningful limit on the claim's scope" and is therefore insufficient.  *Id.*
If the theory is that a method is patent-eligible because it is transformative, the court
held that the "mere manipulation or reorganization of data does not satisfy the
transformation prong."  *Id.*

Even more recently, in *Dealertrack*, the Federal Circuit affirmed a district
court's determination that a computer-aided method for processing credit
applications over electronic networks was "invalid as being directed to *an abstract
idea preemptive of a fundamental concept or idea that would foreclose innovation
in this area*."  *Dealertrack,* 2012 WL 164439, at **14-18 (emphasis added).  Like
the claims here, which attempt to monopolize the fundamental concept of building
indexes and portfolios based on well-known financial metrics, the patent in
*Dealertrack* claimed the basic concept of processing information using a
clearinghouse, albeit through the use of the computer, and tied to the specific

1    purpose of processing credit applications.  The Federal Circuit ruled that the facts

2    that the claims were tied to a particular purpose, or were implemented through a

3    computer, did not render them patentable.  As to the former, the Federal Circuit

4    stated, citing *Bilski* and *Diamond v. Diehr,* "[t]he notion of using a clearinghouse

5    generally and using a clearinghouse specifically to apply for car loans, like the

6    relationship between hedging and hedging in the energy market in *Bilski II*, is of no

7    consequence without more."  *Id.* at *18.  As the Supreme Court stated in *Diamond v.*

8    *Diehr*, the principle that a mathematical formula "is not accorded the protection of

9    our patent laws … cannot be circumvented by attempting to limit the use of the

10   formula to a particular technological environment."  450 U.S. at 191.

11        And as to the use of a computer for performing the method, the Federal

12   Circuit held "[s]imply adding a 'computer aided' limitation to a claim covering an

13   abstract concept, without more, is insufficient to render the claim patent eligible."

14   *Dealertrack*, 2012 WL 164439, at *17.  In this respect, the *Dealertrack* case echoed

15   both *Cybersouce* and the Federal Circuit's 2010 decision in *SiRF Technology,* where

16   the Court stated: "In order for the addition of a machine to impose a meaningful

17   limit on the scope of a claim, it must play a significant part in permitting the claimed

18   method to be performed, rather than function solely as an obvious mechanism for

19   permitting a solution to be achieved more quickly, i.e., through the utilization of a

20   computer for performing calculations."  601 F.3d at 1333.

21        Not only in these cases, but in other cases as well, the Federal Circuit and its

22   predecessor the CCPA have consistently rejected the patentability of claims such as

23   those asserted here that seek exclusive rights over abstract concepts, mental

24   processes, and mathematical formulae.  In the 2009 decision, *In re Comiskey*, the

25   Federal Circuit invalidated claims directed to a process of mandatory arbitration for

26   users of legal services, stating: "[I]t is established that the application of human

27   intelligence to the solution of practical problems is not in and of itself patentable."

28   *In re Comiskey,* 554 F.3d 967, 980 (Fed. Cir. 2009) (quoted with approval in

1   *Cybersource*, 654 F.3d at 1372).  Other cases also addressing this issue include:  *In*
2   *re Schrader,* 22 F.3d 290, 291 (Fed. Cir. 1994) (invalidating a "method
3   constitut[ing] a novel way of conducting auctions" to maximize total sales revenue);
4   *In re Warmerdam*, 33 F.3d 1354, 1355, 1360 (Fed. Cir. 1994) (invalidating process
5   for controlling objects to avoid collisions which described "nothing more than the
6   manipulation of basic mathematical constructs, the paradigmatic 'abstract idea'"); *In*
7   *re Grams,* 888 F.2d 835, 836, 840-41 (Fed. Cir. 1989) ("a method of diagnosing an
8   abnormal condition in an individual" that comprised performing clinical tests and
9   thinking about the results); *In re Meyer*, 688 F.2d 789, 795-96 (C.C.P.A. 1982) ( "a
10  mental process that a neurologist should follow"); *In re Maucorps,* 609 F.2d 481,
11  482, 486 (C.C.P.A. 1979) (method of "optimizing the organization of sales
12  representatives in a business.").

13        **B.    The Patents-in-Suit Broadly Claim Either Abstract Ideas, Mental**
              **Processes, And Mathematical Formulae, And They Are Therefore**
14            **Unpatentable Subject Matter**

15        In light of the foregoing principles and case law, it is readily evident that the
16  alleged inventions of the asserted claims are not patentable.  As the Complaint
17  repeatedly contends, the claims are alleged to provide the exclusive right to make,
18  use, sell, etc., "financial products based on fundamental factors."  The "fundamental
19  factors" to which the patents-in-suit refer are basic economic metrics long known
20  and used, such as the following which are identified in the patents, *e.g.*, cash flow,
21  sales, book value, dividends, or many other common financial metrics.  '502 Patent,
22  col. 4:32-34; col. 7:25-37.  An analysis of the specific steps of the claimed methods
23  shows that the claims are based on nothing more than an algorithm or mental
24  process for creating an index, for which the use of a computer adds nothing more
25  than an expedient way to perform the recited calculations.  Like the claims in
26  *Cybersource*, the "incidental use of a computer to perform the mental process of [the
27  claim] does not impose a sufficiently meaningful limit on the claim's scope" to
28  render it statutory.  *Cybersource,* 654 F.3d at 1375.

### 1.   The '502 Patent claims constitute unpatentable subject matter.

Claim 53 of the '502 Patent is for a computer-implemented method "for construction of a portfolio based on an index," wherein the "***select[ion]***" and "***weighting***" of the assets of the index is "based upon at least one ***accounting data … rather than price data* ….*" '502 Patent, col. 29:5-10.  The primary steps are simply those of "creating" and "managing" the portfolio, steps which are neither novel nor patentable.  *Id.,* col. 29:12, 38.  The "creating" step further requires that the index has been created by an "index provider," having "selected" financial objects based upon "at least one accounting data regarding entities issuing the financial objects [e.g., stocks, etc.] ***rather than price …*** wherein the at least one accounting data comprises at least one of: ***cash flow*** …, ***sales*** …, ***book value*** …, or ***dividends*** …" *Id.,* col. 29:17-26 (emphases added).  Similarly, the index provider also "weight[s]" the constituents of the index "based on at least one accounting data … rather than price," including at least one of cash flow, sales, book value, or dividends.  *Id.,* col. 29:27-37.

The "managing step" simply adds that the portfolio is to be managed in the most obvious of ways inherent to any index fund, namely, through the "purchasing" and "selling" of constituents of the index, *i.e.*, the assets that comprise the index. *Id.,* col. 29:38-44.  The sole involvement of a computer is that it is utilized to perform the method steps.  *See id.,* col. 29:12, 17, 27, 39, 42 ("creating [selected, weighted, purchasing, selling], by the at least one computer").

Preliminarily, we note that this claim does not satisfy the "machine-or-transformation" test.  *Bilski,* 130 S.Ct. at 3227.  As noted above, that test provides that an invention is a patentable "process" only if "'(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.'"  *Id.* at 3225-26.  In addition, to satisfy the machine prong, the use of the machine "must impose meaningful limits on the claim's scope."  *Cybersource,* 654 F.3d at 1369 (quoting *Bilski,* 545 F.3d at 961)).

1    Here, the claimed invention is not tied to any particular machine or apparatus

2    other than that it employs a computer to perform the steps, nor does it transform a

3    particular article into a different state or thing.  The claim's reference to "at least one

4    computer" could not be more generic and does not tie the invention to a "***particular***

5    machine or apparatus."  And as to the employment of the computer, the incidental

6    use of a computer to perform the unpatentable mental process does not impose a

7    sufficiently meaningful limit on the claim's scope.  *Dealertrack,* 2012 WL 164439,

8    at *17 ("Simply adding a 'computer aided' limitation to a claim covering an abstract

9    concept, without more, is insufficient to render the claim patent eligible.");

10   *Cybersource,* 654 F.3d at 1375 ("merely claiming a software implementation of a

11   purely mental process that could otherwise be performed without the use of a

12   computer does not satisfy the machine prong of the machine-or-transformation

13   test"); *see also Bilski,* 545 F.3d at 961-62 ("the involvement of the machine or

14   transformation in the claimed process must not merely be insignificant extra-

15   solution activity"); *Graff/Ross Holdings LLP v. Fed. Home Loan Mortg. Corp.,*

16   2010 U.S. Dist. LEXIS 141399 (D.D.C. Aug. 27, 2010) (quoting *Parker v. Flook,*

17   437 U.S. at 590) ("Furthermore, according to the Court, '[t]he notion that post-

18   solution activity, no matter how conventional or obvious in itself, can transform an

19   unpatentable principle into a patentable process exalts form over substance.  A

20   competent draftsman could attach some form of post-solution activity to almost any

21   mathematical formula.'").

22   The steps of "creating" and "managing" add nothing to subject matter

23   eligibility because there is no practical application of the concept unless a portfolio

24   can be created and managed, meaning a patent on the invention is a patent on the

25   abstract idea of fundamentals indexing itself.  *See CLS Bank Int'l v. Alice Corp.*, 768

26   F.Supp.2d 221, 231 (D.D.C. 2009) (citing *Benson* at 71-72).

27   Neither is the claim patentable under any other analysis employed by the

28   Federal Circuit.  In *Research Corp. Tech., Inc. v. Microsoft Corp.*, 627 F.3d 859,

868-69 (Fed. Cir. 2010), the Federal Circuit reasoned that inventions having "functional and palpable applications in the field of computer technology" and "applications or improvements to technologies in the marketplace" are not likely to be abstract ideas unless that characteristic is "manifestly" evident. *Id.*; *Ultramercial,* 657 F.3d at 1327-28 (invention "improve[s] existing technology in the marketplace . . . [and] . . . invokes computers and applications of computer technology."). *Research Corp.* involved technology for improving the display of images by computers. *Ultramercial* involved an improvement to advertising delivery to computers via the Internet. Both were improvements *to computer technology* in the marketplace. In contrast, the claimed invention is not directed to computer technology or for that matter any technology in the marketplace. This claimed invention is manifestly directed to abstract ideas.

The claims depending from Claim 53 of the '502 Patent add no patent-eligible subject matter. Claim 54 provides that the "at least one accounting data . . . comprises net income." Claim 55 provides that the entity creating and managing the portfolio is the "same . . . or . . . separate" from the index provider. Furthermore, the other independent method claims in this patent are also directed to unpatentable abstract concepts much like Claim 53. '502 Patent, col. 21:1-36 (Claim 1 for "creating" an index using "at least one accounting data . . . rather than price" comprising cash flow/sales/book value/dividends and "managing" the index and a portfolio based on it); col. 29:53-col. 30:46 (Claim 56 for "creating" an index based on cash flow/sales/book value/dividends and "creating" a portfolio based on it).

In summary, the '502 Patent claims inventive rights to the basic process of creating and maintaining a portfolio based on an index, where the index utilizes basic accounting data inherent to any public company such as cash flow, sales, book value, or dividends. Clearly, under the governing law set forth above, such abstract concepts or mental processes are not patentable. Otherwise, ownership of the concepts could preempt entire fields of financial indexing and related portfolio

management.

### 2.  The '719 Patent claims constitute unpatentable subject matter.

Asserted Claim 1 of the '719 Patent is for a "method for constructing an index of assets," with the method to be implemented by "at least one analysis host processor … comprising at least one computer processor." '719 Patent, col. 10:43-46.  As noted above in the Introduction, the primary steps of the method are: (a) "***accessing***" databases pertaining to data about entities and their corresponding assets; (b) "***receiving …*** at least one ***objective measure of scale***" regarding the assets or entities; (c) "***retrieving***" the data; (d) "***selecting***" from the assets to comprise an index; and (e) "***calculating***" proportional weights for the index.  *Id.,* col. 10:47-col. 11:65.

The "selecting" step requires that the data be "a quantitative data (Q) reflecting the amount of … at least one objective measure of scale (O) … [that is] substantially independent of the market prices … and market capitalization …"  *Id.,* col. 10:65-col. 11:6.  The "objective measure of scale" is a "measure of size" that can be any of "a demographic measure [of the entity]," a "financial metric" of the entity, a "metric from information disclosures of a publicly traded entity," or "a metric from information about" an entity.  *Id.,* col. 11:7-20.  At col. 4:25-50, the '719 patent lists over 70 different standard metrics that constitute "objective measure[s] of scale."  The method then "rank[s]" the entities based on the objective measure of scale chosen, and "select[s]" the entities.  *Id.,* col. 11:21-29.

Similarly, the "calculating" step requires that the proportional weights for the index be "objective measure of scale weights (OW) substantially independent of the market prices … and market capitalization …"  *Id.,* col. 11:30-36.  The calculating simply involves "adding" the quantitative data for all of the index assets to yield a sum total for the objective measure of scale, and determining the relative size for each constituent as a portion of the total (again, with respect to the objective measure of scale) to yield a weight.  *Id.,* col. 11:37-51.  Again, the "objective

measure of scale" is a "measure of size" that is at least one of "a demographic measure [of the entity]," a "financial metric" of the entity, a "metric from information disclosures of a publicly traded entity," or "a metric from information about" an entity. *Id.,* col. 11:52-65.

All of these steps are inherent in the creation of any index, except that the patent specifies that the selection and weighting of the index assets is to be performed "substantially independent of market prices … and market capitalization." *Id.,* col. 11:2-5, 31-35.  But the notion of creating an index based on criteria other than these is nonetheless an abstract concept that cannot be patented for the reasons already stated.

Once again, this claim does not satisfy the "machine-or-transformation" test. The claimed invention is not tied to any particular machine or apparatus other than that it employs a computer to perform the steps, nor does it transform a particular article into a different state or thing.  These steps, again, are nothing more than a sequence of mental processes and mathematical calculations.  The notion of accessing, receiving, and retrieving data about entities, selecting data pertaining to an entity, and calculating proportional weights for the index constituents, is inherent in the idea of any index creation based on financial metrics.  Moreover, those steps ("accessing" and "retrieving" data, "selecting" and "weight[ing]" index assets) add nothing to subject matter eligibility because there is no practical application of the abstract concept of fundamental indexing without them.  *See CLS Bank Int'l*, 768 F.Supp.2d at 231 (citing *Benson* at 71-72).

The gloss that the criteria to be used are "limited"[2] as requiring "at least one objective measure of scale" (namely, demographic, financial, or other disclosed information about at least one "measure of size,"), and as "substantially independent

---

[2] That the selection criteria, the "objective measure of scale", encompasses any "financial" or "other information" about a company is hardly a limitation at all--it would encompass most any information in an SEC Form 10-K report.

of … market prices … and market capitalization," lends nothing to its patentability. This is simply stating that we shall create an index of assets, but we will employ one set of criteria instead of another.  For subject matter patentability purposes, it remains the same unpatentable mental process and abstract concept.

Moreover, the "calculating" step is a basic mathematical exercise of adding the quantitative data [regarding the constituent index assets] to yield a sum and then determining a relative size for each constituent index asset.  That an "analysis host processor (comprising "at least one computer processor") is invoked to perform this calculation adds nothing to its patentability.  All of the steps, including the calculating step, could be performed by hand or in the human mind.  The use of a computer simply makes the process more expedient.

The dependent claims of the '719 Patent, Claims 2-41, add no patent-eligible subject matter.  A number of them, e.g., Claims 2-11 and 15, merely recite that the assets and entities in the index can be various things (stocks, bonds, mutual funds, etc.).  Others recite predictable and often non-limiting variations on the selection criteria or on the mathematics applied to it.  *See, e.g.*, Claim 14 (criteria relates to an "underlying attribute" of the asset); Claims 16-17 (criteria can be ratios); Claim 18 (criteria "comprises an economic indicator").  Other claims provide for creating and managing a portfolio of assets based on the index of Claim 1.  *See, e.g.,* Claims 20-28.  Dependent Claim 32 is startling evidence of the potential field-preempting nature of these patents:  This claim states that the criteria used to create the index can be *any* of **145** types of data in a list that extends more than four columns in the patent.  None of dependent Claims 21-41 adds any structure that ties the concept to a machine or recites limitations that cure the subject matter defects of Claim 1.

### 3.   The '740 Patent claims constitute unpatentable subject matter.

Claim 1 of the '740 Patent claims a "computer-implemented method for constructing data indicative of a financial object index."  '740 Patent, col. 78:4-5. The primary steps of the method, nominally performed using "at least one computer

processor," are: (a) "*selecting*" data of constituent assets "based upon at least one accounting data;" (b) "*weighting*" the data "based upon at least one accounting data *rather than price*"; and (c) "*storing*" the data on at least one "computer storage device".  *Id.,* col. 78:8-27.  The "at least one accounting data" may be "at least one *financial metric*" or "at least one *metric, level, rate, or expenditure amount from information disclosures [of the entity].*"  *Id.,* col. 79:2-6.

The "selecting" step also broadly provides that, of the entities from which the "at least one accounting data" is chosen, the "at least one entity compris[es] at least one of a region, a country, a company, or a sovereign associated with each of said financial objects …"  *Id.,* col. 78:8-16.  The claim also broadly provides that each financial object (asset) in the index is "at least one instrument" that "comprises at least one of" a long list of well-known financial instruments (e.g., bonds, stocks, commodities, funds, etc.).  *Id.,* col. 78:30-col. 79:1.

Here again, this claim does not recite patentable subject matter.  The vague reference to "at least one processor" and "at least one computer storage" is not limiting.  This claim again does not satisfy the "machine-or-transformation" test because it is not tied to a particular machine or apparatus, nor does it transform a particular article into a different state or thing.  The concept of selecting data indicative of an index, using the steps of selecting data for the constituent assets, weighting the data, and storing the data on a computer storage device, is an abstract concept and mental process which can hardly be described as novel.

That the claim is narrowed by requiring the use of accounting data other than price fails to render the claim patentable for the same reasons described above.  This is nothing more than the abstract idea and mental process of basing an index on one set of criteria rather than another.  Indeed, this point is made plain by the claim's requirement that the "at least one accounting data" be comprised of "at least one financial metric" of an entity, such as one chosen "from information disclosures of the … entity."  *Id.,* col.79:1-6.  Of course, such "financial metrics" about companies

have long existed and are inherent in a business' operation, for example, a tally of revenues.  And likewise, that the claim is purportedly narrowed by identifying well-known forms of financial instruments that are to comprise the index is, again, neither novel nor patentable.

Dependent Claims 2-72 add no patent-eligible subject matter.  These claims provide variations on what might be the selection criteria (*see, e.g.*, Claim 9, identifying nearly 80 types of accounting data; Claim 33, identifying more than 150 types of accounting data); what might be the financial objects (Claims 10, 16); how the index can be used to create a portfolio (Claim 27); how the index may be managed (Claim 51); and how the selection criteria may be based on an average over an accounting period (Claim 67).  Independent Claim 73 claims computer code for performing a method which is the same as Claim 1.  Independent method Claim 96 is similar to Claim 1 and statutorily defective for the same reasons.

## IV.   CONCLUSION

The asserted claims of the patents-in-suit do not recite patentable subject matter as required by 35 U.S.C. § 101.  For this and the foregoing reasons, the Court should grant this motion for judgment on the pleadings in favor of the Defendants and dismiss Plaintiff's Complaint with prejudice.

Dated:  February 22, 2012          Respectfully submitted,


                                   By: /s/ Ruby Wayne Wood
                                   Ruby Wayne Wood
                                   *rwood@goodwinprocter.com*
                                   **GOODWIN PROCTER** LLP

                                   Attorneys for Defendants
                                   **WISDOM TREE INVESTMENTS,
                                   INC., WISDOM TREE TRUST,
                                   WISDOM TREE ASSET
                                   MANAGEMENT, INC., WISDOM
                                   TREE RETIREMENT SERVICES,
                                   INC., MELLON CAPITAL
                                   MANAGEMENT CORP., AND
                                   ALPS DISTRIBUTORS, INC.**

1

<u>**PROOF OF SERVICE**</u>

2

I am employed in the County of Los Angeles, State of California.  I am over

3

the age of 18 and not a party to the within action.  My business address is Goodwin

4

Procter LLP, 601 S. Figueroa Street, 41st Floor, Los Angeles, California 90017.

5

On February 22, 2012, I served the **DEFENDANTS' NOTICE OF**

6

**MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS BASED**

7

**ON UNPATENTABLE SUBJECT MATTER; MEMORANDUM OF POINTS**

8

**AND AUTHORITIES IN SUPPORT THEREOF** on the person(s) listed below as

9

follows:

10

David S. Steuer                                                  Attorneys for Plaintiff
**WILSON SONSINI GOODRICH**        **RESEARCH AFFILIATES, LLC**

11

**& ROSATI, P.C.**
650 Page Mill Road

12

Palo Alto, CA 94304-1050
E-Mail: *dsteuer@wsgr.com*

13

Tel:  650.493.9300
Fax: 650.565-5100

14

Natalie J. Morgan                                                Attorneys for Plaintiff
15

**WILSON SONSINI GOODRICH**        **RESEARCH AFFILIATES, LLC**
**& ROSATI, P.C.**

16

12235 El Camino Real, Suite 200
San Diego, CA 92130

17

Email: *nmorgan@wsgr.com*
Tel.: 858.350.2303

18

Fax: 858.350-2399

19

☐    (MAIL) I placed the envelope for collection and mailing, following our
       ordinary business practices.  I am readily familiar with this firm's practice
20

       for collecting and processing correspondence for mailing.  On the same day
       that correspondence is placed for collection and mailing, it is deposited in
21

       the ordinary course of business with the United States Postal Service, in a
       sealed envelope with postage fully prepaid.  I am a resident or employed in
22

       the county where the mailing occurred.  The envelope or package was
       placed in the mail at Los Angeles, California.

23

☑    (CM/ECF Electronic Filing) I caused the above document(s) to be
24

       transmitted to the office(s) of the addressee(s) listed above by electronic
       mail at the e-mail address(es) set forth above pursuant to
25

       Fed.R.Civ.P.5(d)(1). "A Notice of Electronic Filing (NEF) is generated
       automatically by the ECF system upon completion of an electronic filing.
26

       The NEF, when e-mailed to the e-mail address of record in the case, shall
       constitute the proof of service as required by Fed.R.Civ.P.5(d)(1). A copy of
27

       the NEF shall be attached to any document served in the traditional manner
       upon any party appearing pro se."

28

1

☐   (EXPRESS MAIL) I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this firm's practice for collecting and processing Express Mail for mailing. On the same day that Express Mail is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a post office, mailbox, sub-post office, substation, mail chute, or other like facility regularly maintained by the United States Postal Service for receipt of Express Mail.

☐   (OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by Federal Express , an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, a true copy  of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for.

☐   (MESSENGER SERVICE) I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed and provided them to a professional messenger service for service.  A separate Personal Proof of Service provided by the professional messenger service will be filed under separate cover.

☐   (FACSIMILE) Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

☐   (E-MAIL or ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction this service was made and that the foregoing is true and correct.

Executed on February 22, 2012, at Los Angeles, California.

| | |
|---|---|
| Arianne Waldron | |
| (Type or print name) | (Signature) |