1   J. Anthony Downs (pro hac vice)
    jdowns@goodwinprocter.com
2   **GOODWIN PROCTER LLP**
    53 State Street
3   Boston, MA  02109
    Tel.:  617.570.1000
4   Fax:  617.523.1231

5   Stephen Schreiner (pro hac vice)
    sschreiner@goodwinprocter.com
6   Ce Li (pro hac vice)
    cli@goodwinprocter.com
7   **GOODWIN PROCTER LLP**
    901 New York Avenue NW
8   Washington, DC  20001
    Tel.:  202.346.4000
9   Fax:  202.346.4444

10  Ruby Wayne Wood (SBN 229538)
    rwood@goodwinprocter.com
11  **GOODWIN PROCTER LLP**
    601 S. Figueroa Street, 41st Floor
12  Los Angeles, CA  90017
    Tel.:  213.426.2500
13  Fax:  213.623.1673

14  Attorneys for Defendants
    **WISDOM TREE INVESTMENTS, INC.;**
15  **WISDOM TREE TRUST; WISDOM TREE**
    **ASSET MANAGEMENT, INC.; WISDOM**
16  **TREE RETIREMENT SERVICES, INC.;**
    **MELLON CAPITAL MANAGEMENT**
17  **CORP.; and ALPS DISTRIBUTORS, INC.**

18              **UNITED STATES DISTRICT COURT**

19             **CENTRAL DISTRICT OF CALIFORNIA**

20                     **SOUTHERN DIVISION**

21  Research Affiliates, LLC,              Case No. SACV11-01846 DOC (ANx)

22              Plaintiff,                 **NOTICE OF SUPPLEMENTAL**
                                           **AUTHORITY**
23          v.

24  Wisdom Tree Investments, Inc.,         Date:    April 2, 2012
    Wisdom Tree Trust, Wisdom Tree Asset   Time:    8:30 a.m.
25  Management, Inc., Wisdom Tree          Place:   411 West Fourth St., Crtrm. 9D
    Retirement Services, Inc., Mellon               Santa Ana, CA 92701-4516
26  Capital Management Corp., and ALPS
    Distributors, Inc.,                    Judge:  Hon. David O. Carter
27                                         Date Action Filed:  December 1, 2011
                Defendants.
28

LIBA/2272821.1

1      The day after Defendants filed their Reply Brief in support of the pending

2  Motion for Judgment on the Pleadings Based on Unpatentable Subject Matter, the

3  U.S. Supreme Court issued *Mayo v. Prometheus*, 566 U.S. ---- (2012) (No. 10-1150)

4  (attached hereto as Exhibit A).  *Mayo* applies to the pending Motion in several ways.

5      First, the unanimous opinion in *Mayo* describes the standards to be used to

6  assess whether the claims of the patents-in-suit here are unpatentable under Section

7  101.  Although *Mayo* involved medical diagnostics claims that were invalidated by

8  the Court based on the "principles of nature" exception, its reasoning and holding

9  also apply to claims incorporating an "abstract idea."  In *Mayo*, the Court

10  determined that the claimed invention relies upon a "law of nature," which by itself

11  would be unpatentable.  Slip op. at 8.  The Court then looked to the remainder of the

12  claim to determine if the language added anything meaningful or instead added only

13  conventional steps for using the law of nature, or by extension, the abstract idea.  *Id.*

14  at 8-14.  The Court cited *Bilski's* statement that "the prohibition against patenting

15  abstract ideas 'cannot be circumvented by attempting to limit the use of the formula

16  to a particular technological environment' or adding 'insignificant postsolution

17  activity.'"  *Id.* at 4.  The Court adopted the view "that simply appending

18  conventional steps, specified at a high level of generality, to laws of nature, natural

19  phenomena and abstract ideas cannot make those laws, phenomena, and ideas

20  patentable." *Id.* at 14.  The Court cited *Flook* to confirm that patent eligibility

21  should not "depend simply on the draftsman's art" and warned against upholding

22  patents that too broadly preempt natural laws or abstract ideas.  *Id.* at 3.

23      Second, the *Mayo* decision supports Defendants position that this issue is ripe

24  to be decided.  The Supreme Court rejected a proposal by the Solicitor General that

25  the other conditions for patentability should be used to screen patents for invalidity

26  instead of Section 101.  *Mayo*, slip op. at 20-22 (declining "the Government's

27  invitation to substitute §§102, 103, and 112 inquiries for the better established

28  inquiry under §101").

1    Defendants ask this Court to consider the *Mayo* decision in connection with

2    the pending Motion.

3

4    Dated:   March 21, 2012                         Respectfully submitted,

5

6                                                    By: /s/ Ruby Wayne Wood
                                                     Ruby Wayne Wood
7                                                    *rwood@goodwinprocter.com*
                                                     **GOODWIN PROCTER LLP**

8                                                    Attorneys for Defendants
                                                     **WISDOM TREE INVESTMENTS,**
9                                                    **INC.; WISDOM TREE TRUST;**
                                                     **WISDOM TREE ASSET**
10                                                   **MANAGEMENT, INC.; WISDOM**
                                                     **TREE RETIREMENT**
11                                                   **SERVICES, INC.; MELLON**
                                                     **CAPITAL MANAGEMENT**
12                                                   **CORP.; and ALPS**
                                                     **DISTRIBUTORS, INC**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# EXHIBIT A

# EXHIBIT A

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–1150

## MAYO COLLABORATIVE SERVICES, DBA MAYO MEDICAL LABORATORIES, ET AL., PETITION-ERS *v.* PROMETHEUS LABORATORIES, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[March 20, 2012]

JUSTICE BREYER delivered the opinion of the Court.

Section 101 of the Patent Act defines patentable subject matter.  It says:

> "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U. S. C. §101.

The Court has long held that this provision contains an important implicit exception.  "[L]aws of nature, natural phenomena, and abstract ideas" are not patentable.  *Diamond* v. *Diehr*, 450 U. S. 175, 185 (1981); see also *Bilski* v. *Kappos*, 561 U. S. ___, ___ (2010) (slip op., at 5); *Diamond* v. *Chakrabarty*, 447 U. S. 303, 309 (1980); *Le Roy* v. *Tatham*, 14 How. 156, 175 (1853); *O'Reilly* v. *Morse*, 15 How. 62, 112–120 (1854); cf. *Neilson* v. *Harford*, Webster's Patent Cases 295, 371 (1841) (English case discussing same).  Thus, the Court has written that "a new mineral discovered in the earth or a new plant found in the wild is not patentable subject matter.  Likewise, Einstein could

not patent his celebrated law that E=mc²; nor could New-
ton have patented the law of gravity.  Such discoveries are
'manifestations of . . . nature, free to all men and reserved
exclusively to none.'"  *Chakrabarty*, *supra*, at 309 (quoting
*Funk Brothers Seed Co.* v. *Kalo Inoculant Co.*, 333 U. S.
127, 130 (1948)).

"Phenomena of nature, though just discovered, mental
processes, and abstract intellectual concepts are not pa-
tentable, as they are the basic tools of scientific and tech-
nological work."  *Gottschalk* v. *Benson*, 409 U. S. 63, 67
(1972).  And monopolization of those tools through the
grant of a patent might tend to impede innovation more
than it would tend to promote it.

The Court has recognized, however, that too broad an
interpretation of this exclusionary principle could eviscer-
ate patent law.  For all inventions at some level embody,
use, reflect, rest upon, or apply laws of nature, natural
phenomena, or abstract ideas.  Thus, in *Diehr* the Court
pointed out that "'a process is not unpatentable simply
because it contains a law of nature or a mathematical
algorithm.'"  450 U. S., at 187 (quoting *Parker* v. *Flook*,
437 U. S. 584, 590 (1978)).  It added that "an *application*
of a law of nature or mathematical formula to a known
structure or process may well be deserving of patent pro-
tection."  *Diehr*, *supra,* at 187.  And it emphasized Justice
Stone's similar observation in *Mackay Radio & Telegraph
Co.* v. *Radio Corp. of America,* 306 U. S. 86 (1939):

"'While a scientific truth, or the mathematical ex-
pression of it, is not a patentable invention, a novel
and useful structure created with the aid of
knowledge of scientific truth may be.'"  450 U. S., at
188 (quoting *Mackay Radio*, *supra*, at  94).

See also *Funk Brothers*, *supra*, at 130 ("If there is to be
invention from [a discovery of a law of nature], it must
come from the application of the law of nature to a new

Opinion of the Court

and useful end").

　Still, as the Court has also made clear, to transform an unpatentable law of nature into a patent-eligible *application* of such a law, one must do more than simply state the law of nature while adding the words "apply it."  See, *e.g., Benson, supra*, at 71–72.

　The case before us lies at the intersection of these basic principles.  It concerns patent claims covering processes that help doctors who use thiopurine drugs to treat patients with autoimmune diseases determine whether a given dosage level is too low or too high.  The claims purport to apply natural laws describing the relationships between the concentration in the blood of certain thiopurine metabolites and the likelihood that the drug dosage will be ineffective or induce harmful side-effects.  We must determine whether the claimed processes have transformed these unpatentable natural laws into patent-eligible applications of those laws.  We conclude that they have not done so and that therefore the processes are not patentable.

　Our conclusion rests upon an examination of the particular claims before us in light of the Court's precedents.  Those cases warn us against interpreting patent statutes in ways that make patent eligibility "depend simply on the draftsman's art" without reference to the "principles underlying the prohibition against patents for [natural laws]."  *Flook, supra*, at 593.  They warn us against upholding patents that claim processes that too broadly preempt the use of a natural law.  *Morse, supra*, at 112–120; *Benson, supra*, at 71–72.  And they insist that a process that focuses upon the use of a natural law also contain other elements or a combination of elements, sometimes referred to as an "inventive concept," sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself.  *Flook, supra*, at 594; see also *Bilski, supra*, at ___ (slip op.,

at 14) ("[T]he prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity'" (quoting *Diehr*, *supra*, at 191–192)).

We find that the process claims at issue here do not satisfy these conditions. In particular, the steps in the claimed processes (apart from the natural laws themselves) involve well-understood, routine, conventional activity previously engaged in by researchers in the field. At the same time, upholding the patents would risk disproportionately tying up the use of the underlying natural laws, inhibiting their use in the making of further discoveries.

# I
## A

The patents before us concern the use of thiopurine drugs in the treatment of autoimmune diseases, such as Crohn's disease and ulcerative colitis. When a patient ingests a thiopurine compound, his body metabolizes the drug, causing metabolites to form in his bloodstream. Because the way in which people metabolize thiopurine compounds varies, the same dose of a thiopurine drug affects different people differently, and it has been difficult for doctors to determine whether for a particular patient a given dose is too high, risking harmful side effects, or too low, and so likely ineffective.

At the time the discoveries embodied in the patents were made, scientists already understood that the levels in a patient's blood of certain metabolites, including, in particular, 6-thioguanine and its nucleotides (6–TG) and 6-methyl-mercaptopurine (6–MMP), were correlated with the likelihood that a particular dosage of a thiopurine drug could cause harm or prove ineffective. See U. S. Patent No. 6,355,623, col. 8, ll. 37–40, 2 App. 10. ("Previ-

Opinion of the Court

ous studies suggested that measurement of 6–MP metabo-
lite levels can be used to predict clinical efficacy and tol-
erance to azathioprine or 6–MP" (citing Cuffari, Théorêt,
Latour, & Seidman, 6-Mercaptopurine Metabolism in
Crohn's Disease: Correlation with Efficacy and Toxicity,
39 Gut 401 (1996))).  But those in the field did not know
the precise correlations between metabolite levels and
likely harm or ineffectiveness.  The patent claims at issue
here set forth processes embodying researchers' findings
that identified these correlations with some precision.

   More specifically, the patents—U. S. Patent No.
6,355,623 ('623 patent) and U. S. Patent No. 6,680,302
('302 patent)—embody findings that concentrations in a
patient's blood of 6–TG or of 6–MMP metabolite beyond a
certain level (400 and 7000 picomoles per $8\times10^8$ red blood
cells, respectively) indicate that the dosage is likely too
high for the patient, while concentrations in the blood of
6–TG metabolite lower than a certain level (about 230
picomoles per $8\times10^8$ red blood cells) indicate that the
dosage is likely too low to be effective.

   The patent claims seek to embody this research in a set
of processes.  Like the Federal Circuit we take as typical
claim 1 of the '623 Patent, which describes one of the
claimed processes as follows:

   "A method of optimizing therapeutic efficacy for
   treatment of an immune-mediated gastrointestinal
   disorder, comprising:
   "(a) administering a drug providing 6-thioguanine to
   a subject having said immune-mediated gastrointesti-
   nal disorder; and
   "(b) determining the level of 6-thioguanine in said
   subject having said immune-mediated gastrointesti-
   nal disorder,
   "wherein the level of 6-thioguanine less than about
   230 pmol per $8\times10^8$ red blood cells indicates a need to

increase the amount of said drug subsequently admin-
istered to said subject and
"wherein the level of 6-thioguanine greater than about
400 pmol per $8 \times 10^8$ red blood cells indicates a need to
decrease the amount of said drug subsequently ad-
ministered to said subject." '623 patent, col. 20, ll. 10–
20, 2 App. 16.

For present purposes we may assume that the other
claims in the patents do not differ significantly from
claim 1.

## B

Respondent, Prometheus Laboratories, Inc. (Prome-
theus), is the sole and exclusive licensee of the '623 and
'302 patents. It sells diagnostic tests that embody the
processes the patents describe. For some time petitioners,
Mayo Clinic Rochester and Mayo Collaborative Services
(collectively Mayo), bought and used those tests. But in
2004 Mayo announced that it intended to begin using and
selling its own test—a test using somewhat higher metab-
olite levels to determine toxicity (450 pmol per $8 \times 10^8$ for
6–TG and 5700 pmol per $8 \times 10^8$ for 6–MMP). Prometheus
then brought this action claiming patent infringement.

The District Court found that Mayo's test infringed
claim 7 of the '623 patent. App. to Pet. for Cert. 110a–
115a. In interpreting the claim, the court accepted Prome-
theus' view that the toxicity-risk level numbers in Mayo's
test and the claim were too similar to render the tests
significantly different. The number Mayo used (450) was
too close to the number the claim used (400) to matter
given appropriate margins of error. *Id.*, at 98a–107a. The
District Court also accepted Prometheus' view that a
doctor using Mayo's test could violate the patent even if he
did not actually alter his treatment decision in the light of
the test. In doing so, the court construed the claim's lan-
guage, "indicates a need to decrease" (or "to increase"), as

Opinion of the Court

not limited to instances in which the doctor actually de-
creases (or increases) the dosage level where the test
results suggest that such an adjustment is advisable. *Id.,*
at 107a–109a; see also Brief for Respondent i (describing
claimed processes as methods "for improving . . . treat-
ment . . . by using individualized metabolite measure-
ments *to inform* the calibration of . . . dosages of . . .
thiopurines" (emphasis added)).

Nonetheless the District Court ultimately granted
summary judgment in Mayo's favor. The court reasoned
that the patents effectively claim natural laws or natural
phenomena—namely the correlations between thiopurine
metabolite levels and the toxicity and efficacy of thiopu-
rine drug dosages—and so are not patentable. App. to Pet.
for Cert. 50a–83a.

On appeal, the Federal Circuit reversed. It pointed out
that in addition to these natural correlations, the claimed
processes specify the steps of (1) "administering a [thiopu-
rine] drug" to a patient and (2) "determining the [resulting
metabolite] level." These steps, it explained, involve the
transformation of the human body or of blood taken from
the body. Thus, the patents satisfied the Circuit's "ma-
chine or transformation test," which the court thought
sufficient to "confine the patent monopoly within rather
definite bounds," thereby bringing the claims into compli-
ance with §101. 581 F. 3d 1336, 1345, 1346–1347 (2009)
(internal quotation marks omitted).

Mayo filed a petition for certiorari. We granted the
petition, vacated the judgment, and remanded the case for
reconsideration in light of *Bilski*, 561 U. S. ___, which
clarified that the "machine or transformation test" is not a
definitive test of patent eligibility, but only an important
and useful clue. *Id.,* at ___–___ (slip op., at 7–8). On
remand the Federal Circuit reaffirmed its earlier conclu-
sion. It thought that the "machine-or-transformation
test," understood merely as an important and useful clue,

nonetheless led to the "clear and compelling conclusion . . . that the . . . claims . . . do not encompass laws of nature or preempt natural correlations."  628 F. 3d 1347, 1355 (2010).  Mayo again filed a petition for certiorari, which we granted.

## II

Prometheus' patents set forth laws of nature—namely, relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm. Claim 1, for example, states that *if* the levels of 6–TG in the blood (of a patient who has taken a dose of a thiopurine drug) exceed about 400 pmol per $8 \times 10^8$ red blood cells, *then* the administered dose is likely to produce toxic side effects.  While it takes a human action (the administration of a thiopurine drug) to trigger a manifestation of this relation in a particular person, the relation itself exists in principle apart from any human action.  The relation is a consequence of the ways in which thiopurine compounds are metabolized by the body—entirely natural processes. And so a patent that simply describes that relation sets forth a natural law.

The question before us is whether the claims do significantly more than simply describe these natural relations. To put the matter more precisely, do the patent claims add *enough* to their statements of the correlations to allow the processes they describe to qualify as patent-eligible processes that *apply* natural laws?  We believe that the answer to this question is no.

### A

If a law of nature is not patentable, then neither is a process reciting a law of nature, unless that process has additional features that provide practical assurance that the process is more than a drafting effort designed to

Opinion of the Court

monopolize the law of nature itself.  A patent, for example, could not simply recite a law of nature and then add the instruction "apply the law."  Einstein, we assume, could not have patented his famous law by claiming a process consisting of simply telling linear accelerator operators to refer to the law to determine how much energy an amount of mass has produced (or vice versa).  Nor could Archimedes have secured a patent for his famous principle of flotation by claiming a process consisting of simply telling boat builders to refer to that principle in order to determine whether an object will float.

What else is there in the claims before us?  The process that each claim recites tells doctors interested in the subject about the correlations that the researchers discovered.  In doing so, it recites an "administering" step, a "determining" step, and a "wherein" step.  These additional steps are not themselves natural laws but neither are they sufficient to transform the nature of the claim.

First, the "administering" step simply refers to the relevant audience, namely doctors who treat patients with certain diseases with thiopurine drugs.  That audience is a pre-existing audience; doctors used thiopurine drugs to treat patients suffering from autoimmune disorders long before anyone asserted these claims.  In any event, the "prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment.'"  *Bilski, supra,* at ___ (slip op., at 14) (quoting *Diehr,* 450 U. S., at 191–192).

Second, the "wherein" clauses simply tell a doctor about the relevant natural laws, at most adding a suggestion that he should take those laws into account when treating his patient.  That is to say, these clauses tell the relevant audience about the laws while trusting them to use those laws appropriately where they are relevant to their decisionmaking (rather like Einstein telling linear accelerator

operators about his basic law and then trusting them to
use it where relevant).

Third, the "determining" step tells the doctor to deter-
mine the level of the relevant metabolites in the blood,
through whatever process the doctor or the laboratory
wishes to use. As the patents state, methods for determin-
ing metabolite levels were well known in the art. '623
patent, col. 9, ll. 12–65, 2 App. 11. Indeed, scientists
routinely measured metabolites as part of their investiga-
tions into the relationships between metabolite levels and
efficacy and toxicity of thiopurine compounds. '623 patent,
col. 8, ll. 37–40, *id.,* at 10. Thus, this step tells doctors
to engage in well-understood, routine, conventional activity
previously engaged in by scientists who work in the field.
Purely "conventional or obvious" "[pre]-solution activity" is
normally not sufficient to transform an unpatentable law
of nature into a patent-eligible application of such a law.
*Flook,* 437 U. S., at 590; see also *Bilski,* 561 U. S., at ___
(slip op., at 14) ("[T]he prohibition against patenting ab-
stract ideas 'cannot be circumvented by' . . . adding 'insig-
nificant post-solution activity'" (quoting *Diehr, supra,* at
191–192)).

Fourth, to consider the three steps as an ordered combi-
nation adds nothing to the laws of nature that is not al-
ready present when the steps are considered separately.
See *Diehr, supra,* at 188 ("[A] new combination of steps in
a process may be patentable even though all the constitu-
ents of the combination were well known and in common
use before the combination was made"). Anyone who
wants to make use of these laws must first administer a
thiopurine drug and measure the resulting metabolite
concentrations, and so the combination amounts to noth-
ing significantly more than an instruction to doctors to
apply the applicable laws when treating their patients.

The upshot is that the three steps simply tell doctors to
gather data from which they may draw an inference in

Opinion of the Court

light of the correlations.  To put the matter more suc-
cinctly, the claims inform a relevant audience about
certain laws of nature; any additional steps consist of well-
understood, routine, conventional activity already engaged
in by the scientific community; and those steps, when
viewed as a whole, add nothing significant beyond the sum
of their parts taken separately.  For these reasons we
believe that the steps are not sufficient to transform un-
patentable natural correlations into patentable applica-
tions of those regularities.

### B
#### 1

A more detailed consideration of the controlling prece-
dents reinforces our conclusion.  The cases most directly
on point are *Diehr* and *Flook,* two cases in which the Court
reached opposite conclusions about the patent eligibility of
processes that embodied the equivalent of natural laws.
The *Diehr* process (held patent eligible) set forth a method
for molding raw, uncured rubber into various cured, mold-
ed products.  The process used a known mathematical
equation, the Arrhenius equation, to determine when
(depending upon the temperature inside the mold, the
time the rubber had been in the mold, and the thickness of
the rubber) to open the press.  It consisted in effect of the
steps of: (1) continuously monitoring the temperature on
the inside of the mold, (2) feeding the resulting numbers
into a computer, which would use the Arrhenius equation
to continuously recalculate the mold-opening time, and (3)
configuring the computer so that at the appropriate mo-
ment it would signal "a device" to open the press.  *Diehr*,
450 U. S., at 177–179.

The  Court  pointed  out  that  the  basic  mathematical
equation, like a law of nature, was not patentable.  But
it found the overall process patent eligible because of
the way the additional steps of the process integrated the

equation into the process as a whole.  Those steps included
"installing rubber in a press, closing the mold, constantly
determining the temperature of the mold, constantly re-
calculating the appropriate cure time through the use of
the formula and a digital computer, and automatically
opening the press at the proper time."  *Id.,* at 187.  It
nowhere suggested that all these steps, or at least the
combination of those steps, were in context obvious, al-
ready in use, or purely conventional.  And so the patentees
did not "seek to pre-empt the use of [the] equation," but
sought "only to foreclose from others the use of that equa-
tion in conjunction with all of the other steps in their
claimed process."  *Ibid.*  These other steps apparently
added to the formula something that in terms of patent
law's objectives had significance—they transformed the
process into an inventive application of the formula.

   The process in *Flook* (held not patentable) provided a
method for adjusting "alarm limits" in the catalytic con-
version of hydrocarbons.   Certain operating conditions
(such as temperature, pressure, and flow rates), which are
continuously monitored during the conversion process,
signal inefficiency or danger when they exceed certain
"alarm limits."  The claimed process amounted to an im-
proved system for updating those alarm limits through the
steps of: (1) measuring the current level of the variable,
*e.g.,* the temperature; (2) using an apparently novel math-
ematical algorithm to calculate the current alarm limits;
and (3) adjusting the system to reflect the new alarm-limit
values.  437 U. S., at 585–587.

   The Court, as in *Diehr,* pointed out that the basic math-
ematical equation, like a law of nature, was not patenta-
ble.   But it characterized the claimed process as doing
nothing other than "provid[ing] a[n unpatentable] formula
for computing an updated alarm limit."  *Flook, supra,* at
586. Unlike the process in *Diehr,* it did not "explain how
the variables used in the formula were to be selected, nor

Opinion of the Court

did the [claim] contain any disclosure relating to chemical processes at work or the means of setting off an alarm or adjusting the alarm limit." *Diehr, supra,* at 192, n. 14; see also *Flook,* 437 U. S., at 586.  And so the other steps in the process did not limit the claim to a particular application. Moreover, "[t]he chemical processes involved in catalytic conversion of hydrocarbons[,] . . . the practice of monitoring the chemical process variables, the use of alarm limits to trigger alarms, the notion that alarm limit values must be recomputed and readjusted, and the use of computers for 'automatic monitoring-alarming'" were all "well known," to the point where, putting the formula to the side, there was no "inventive concept" in the claimed application of the formula.  *Id.,* at 594.  "[P]ost-solution activity" that is purely "conventional or obvious," the Court wrote, "can[not] transform an unpatentable principle into a patentable process."  *Id.,* at 589, 590.

The claim before us presents a case for patentability that is weaker than the (patent-eligible) claim in *Diehr* and no stronger than the (unpatentable) claim in *Flook.* Beyond picking out the relevant audience, namely those who administer doses of thiopurine drugs, the claim simply tells doctors to: (1) measure (somehow) the current level of the relevant metabolite, (2) use particular (unpatentable) laws of nature (which the claim sets forth) to calculate the current toxicity/inefficacy limits, and (3) reconsider the drug dosage in light of the law.  These instructions add nothing specific to the laws of nature other than what is well-understood, routine, conventional activity, previously engaged in by those in the field.  And since they are steps that must be taken in order to apply the laws in question, the effect is simply to tell doctors to apply the law somehow when treating their patients.  The process in *Diehr* was not so characterized; that in *Flook* was characterized in roughly this way.

2

Other cases offer further support for the view that simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable.  This Court has previously discussed in detail an English case, *Neilson,* which involved a patent claim that posed a legal problem very similar to the problem now before us.  The patent applicant there asserted a claim

> "for the improved application of air to produce heat in fires, forges, and furnaces, where a blowing apparatus is required.  [The invention] was to be applied as follows: The blast or current of air produced by the blowing apparatus was to be passed from it into an air-vessel or receptacle made sufficiently strong to endure the blast; and through or from that vessel or receptacle by means of a tube, pipe, or aperture into the fire, the receptacle be kept artificially heated to a considerable temperature by heat externally applied." *Morse*, 15 How., at 114–115.

The English court concluded that the claimed process did more than simply instruct users to use the principle that hot air promotes ignition better than cold air, since it explained how the principle could be implemented in an inventive way.  Baron Parke wrote (for the court):

> "It is very difficult to distinguish [Neilson's claim] from the specification of a patent for a principle, and this at first created in the minds of some of the court much difficulty; but after full consideration, we think that the plaintiff does not merely claim a principle, but a machine embodying a principle, and a very valuable one.  We think the case must be considered as if the principle being well known, the plaintiff had first

Opinion of the Court

invented a mode of applying it by a mechanical appa-
ratus to furnaces; and his invention then consists in
this—by interposing a receptacle for heated air be-
tween the blowing apparatus and the furnace.  In this
receptacle he directs the air to be heated by the appli-
cation of heat externally to the receptacle, and thus he
accomplishes the object of applying the blast, which
was before of cold air, in a heated state to the fur-
nace."  *Neilson* v. *Harford*, Webster's Patent Cases, at
371.

Thus, the claimed process included not only a law of
nature but also several unconventional steps (such as
inserting the receptacle, applying heat to the receptacle
externally, and blowing the air into the furnace) that
confined the claims to a particular, useful application of the
principle.

In *Bilski* the Court considered claims covering a process
for hedging risks of price changes by, for example, con-
tracting to purchase commodities from sellers at a fixed
price, reflecting the desire of sellers to hedge against a
drop in prices, while selling commodities to consumers at a
fixed price, reflecting the desire of consumers to hedge
against a price increase.  One claim described the process;
another reduced the process to a mathematical formula.
561 U. S., at ___–___ (slip op., at 2–3).  The Court held
that the described "concept of hedging" was "an unpatent-
able abstract idea."  *Id.,* at ___ (slip op., at 15).  The fact
that some of the claims limited hedging to use in commod-
ities and energy markets and specified that "well-known
random analysis techniques [could be used] to help estab-
lish some of the inputs into the equation" did not under-
mine this conclusion, for "*Flook* established that limiting
an abstract idea to one field of use or adding token postso-
lution components did not make the concept patentable."
*Id.,* at ___, ___ (slip op., at 16, 15).

Finally, in *Benson* the Court considered the patentability of a mathematical process for converting binary-coded decimal numerals into pure binary numbers on a general purpose digital computer. The claims "purported to cover any use of the claimed method in a general-purpose digital computer of any type." 409 U. S., at 64, 65. The Court recognized that "'a novel and useful structure created with the aid of knowledge of scientific truth'" might be patentable. *Id.,* at 67 (quoting *Mackay Radio*, 306 U. S., at 94). But it held that simply implementing a mathematical principle on a physical machine, namely a computer, was not a patentable application of that principle. For the mathematical formula had "no substantial practical application except in connection with a digital computer." *Benson*, *supra*, at 71. Hence the claim (like the claims before us) was overly broad; it did not differ significantly from a claim that just said "apply the algorithm."

3

The Court has repeatedly emphasized this last mentioned concern, a concern that patent law not inhibit further discovery by improperly tying up the future use of laws of nature. Thus, in *Morse* the Court set aside as unpatentable Samuel Morse's general claim for "'the use of the motive power of the electric or galvanic current . . . however developed, for making or printing intelligible characters, letters, or signs, at any distances,'" 15 How., at 86. The Court explained:

> "For aught that we now know some future inventor, in the onward march of science, may discover a mode of writing or printing at a distance by means of the electric or galvanic current, without using any part of the process or combination set forth in the plaintiff's specification. His invention may be less complicated—less liable to get out of order—less expensive in construction, and in its operation. But yet if it is covered by

Opinion of the Court

this patent the inventor could not use it, nor the public have the benefit of it without the permission of this patentee." *Id.*, at 113.

Similarly, in *Benson* the Court said that the claims before it were "so abstract and sweeping as to cover both known and unknown uses of the [mathematical formula]." 409 U. S., at 67, 68. In *Bilski* the Court pointed out that to allow "petitioners to patent risk hedging would preempt use of this approach in all fields." 561 U. S., at ___ (slip op., at 15). And in *Flook* the Court expressed concern that the claimed process was simply "a formula for computing an updated alarm limit," which might "cover a broad range of potential uses." 437 U. S., at 586.

These statements reflect the fact that, even though rewarding with patents those who discover new laws of nature and the like might well encourage their discovery, those laws and principles, considered generally, are "the basic tools of scientific and technological work." *Benson*, *supra*, at 67. And so there is a danger that the grant of patents that tie up their use will inhibit future innovation premised upon them, a danger that becomes acute when a patented process amounts to no more than an instruction to "apply the natural law," or otherwise forecloses more future invention than the underlying discovery could reasonably justify. See generally Lemley, Risch, Sichelman, & Wagner, Life After *Bilski,* 63 Stan. L. Rev. 1315 (2011) (hereinafter Lemley) (arguing that §101 reflects this kind of concern); see also C. Bohannan & H. Hovenkamp, Creation without Restraint: Promoting Liberty and Rivalry in Innovation 112 (2012) ("One problem with [process] patents is that the more abstractly their claims are stated, the more difficult it is to determine precisely what they cover. They risk being applied to a wide range of situations that were not anticipated by the patentee"); W. Landes & R. Posner, The Economic Struc-

ture of Intellectual Property Law 305–306 (2003) (The
exclusion from patent law of basic truths reflects "both . . .
the enormous potential for rent seeking that would be
created if property rights could be obtained in them and
. . . the enormous transaction costs that would be imposed
on would-be users [of those truths]").

The laws of nature at issue here are narrow laws that
may have limited applications, but the patent claims that
embody them nonetheless implicate this concern.  They
tell a treating doctor to measure metabolite levels and to
consider the resulting measurements in light of the statis-
tical relationships they describe.  In doing so, they tie up
the doctor's subsequent treatment decision whether that
treatment does, or does not, change in light of the infer-
ence he has drawn using the correlations.   And they
threaten to inhibit the development of more refined treat-
ment recommendations (like that embodied in Mayo's
test), that combine Prometheus' correlations with later
discovered features of metabolites, human physiology or
individual patient characteristics.  The "determining" step
too is set forth in highly general language covering all
processes that make use of the correlations after measur-
ing metabolites, including later discovered processes that
measure metabolite levels in new ways.

We need not, and do not, now decide whether were the
steps at issue here less conventional, these features of
the claims would prove sufficient to invalidate them.  For
here, as we have said, the steps add nothing of signifi-
cance to the natural laws themselves.   Unlike, say, a
typical patent on a new drug or a new way of using an
existing drug, the patent claims do not confine their reach
to particular applications of those laws.  The presence here
of the basic underlying concern that these patents tie up
too much future use of laws of nature simply reinforces
our conclusion that the processes described in the patents
are not patent eligible, while eliminating any temptation

Opinion of the Court

to depart from case law precedent.

### III

We have considered several further arguments in support of Prometheus' position.  But they do not lead us to adopt a different conclusion.  First, the Federal Circuit, in upholding the patent eligibility of the claims before us, relied on this Court's determination that "[t]ransformation and reduction of an article 'to a different state or thing' is *the clue* to the patentability of a process claim that does not include particular machines." *Benson*, *supra*, at 70–71 (emphasis added); see also *Bilski*, *supra*, at ___ (slip op., at 6–7); *Diehr*, 450 U. S., at 184; *Flook*, *supra*, at 588, n. 9; *Cochrane* v. *Deener*, 94 U. S. 780, 788 (1877).  It reasoned that the claimed processes are therefore patent eligible, since they involve transforming the human body by administering a thiopurine drug and transforming the blood by analyzing it to determine metabolite levels.  628 F. 3d, at 1356–1357.

The first of these transformations, however, is irrelevant.  As we have pointed out, the "administering" step simply helps to pick out the group of individuals who are likely interested in applying the law of nature.  See *supra,* at 9.  And the second step could be satisfied without transforming the blood, should science develop a totally different system for determining metabolite levels that did not involve such a transformation.  See *supra*, at 18.  Regardless, in stating that the "machine-or-transformation" test is an "*important and useful clue*" to patentability, we have neither said nor implied that the test trumps the "law of nature" exclusion.  *Bilski*, *supra*, at ___ (slip op., at 6–7) (emphasis added).  That being so, the test fails here.

Second, Prometheus argues that, because the particular laws of nature that its patent claims embody are narrow and specific, the patents should be upheld.  Thus, it encourages us to draw distinctions among laws of nature

based on whether or not they will interfere significantly
with innovation in other fields now or in the future.  Brief
for Respondent 42–46; see also Lemley 1342–1344 (mak-
ing similar argument).

But the underlying functional concern here is a *relative*
one: how much future innovation is foreclosed relative to
the contribution of the inventor.  See *supra,* at 17.  A
patent upon a narrow law of nature may not inhibit future
research as seriously as would a patent upon Einstein's
law of relativity, but the creative value of the discovery is
also considerably smaller.  And, as we have previously
pointed out, even a narrow law of nature (such as the
one before us) can inhibit future research.  See s*upra*, at
17–18.

In any event, our cases have not distinguished among
different laws of nature according to whether or not the
principles they embody are sufficiently narrow.  See, *e.g.,*
*Flook*, 437 U. S. 584 (holding narrow mathematical formu-
la unpatentable).  And this is understandable.  Courts and
judges are not institutionally well suited to making the
kinds of judgments needed to distinguish among differ-
ent laws of nature.  And so the cases have endorsed a
bright-line prohibition against patenting laws of nature,
mathematical formulas and the like, which serves as a
somewhat more easily administered proxy for the underlying
"building-block" concern.

Third, the Government argues that virtually any step
beyond a statement of a law of nature itself should trans-
form an unpatentable law of nature into a potentially
patentable application sufficient to satisfy §101's de-
mands.  Brief for United States as *Amicus Curiae*.  The
Government does not necessarily believe that claims that
(like the claims before us) extend just minimally beyond a
law of nature should receive patents.  But in its view,
other statutory provisions—those that insist that a
claimed process be novel, 35 U. S. C. §102, that it not be

"obvious in light of prior art," §103, and that it be "full[y], clear[ly], concise[ly], and exact[ly]" described, §112—can perform this screening function. In particular, it argues that these claims likely fail for lack of novelty under §102.

This approach, however, would make the "law of nature" exception to §101 patentability a dead letter. The approach is therefore not consistent with prior law. The relevant cases rest their holdings upon section 101, not later sections. *Bilski*, 561 U. S. ___; *Diehr*, *supra*; *Flook*, *supra*; *Benson*, 409 U. S. 63. See also H. R. Rep. No. 1923, 82d Cong., 2d Sess., 6 (1952) ("A person may have 'invent-ed' a machine or a manufacture, which may include any-thing under the sun that is made by man, *but it is not necessarily patentable under section 101* unless the condi-tions of the title are fulfilled" (emphasis added)).

We recognize that, in evaluating the significance of additional steps, the §101 patent-eligibility inquiry and, say, the §102 novelty inquiry might sometimes overlap. But that need not always be so. And to shift the patent-eligibility inquiry entirely to these later sections risks creating significantly greater legal uncertainty, while assuming that those sections can do work that they are not equipped to do.

What role would laws of nature, including newly discov-ered (and "novel") laws of nature, play in the Govern-ment's suggested "novelty" inquiry? Intuitively, one would suppose that a newly discovered law of nature is novel. The Government, however, suggests in effect that the novelty of a component law of nature may be disregarded when evaluating the novelty of the whole. See Brief for United States as *Amicus Curiae* 27. But §§102 and 103 say nothing about treating laws of nature as if they were part of the prior art when applying those sections. Cf. *Diehr,* 450 U. S., at 188 (patent claims "must be consid-ered as a whole"). And studiously ignoring *all* laws of nature when evaluating a patent application under §§102

and 103 would "make all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious." *Id.*, at 189, n. 12. See also Eisenberg, Wisdom of the Ages or Dead-Hand Control? Patentable Subject Matter for Diagnostic Methods After *In re Bilski,* 3 Case W. Res. J. L. Tech. & Internet 1, ___ (forthcoming, 2012) (manuscript, at 85–86, online at http://www.patentlyo.com/files/eisenberg.wisdomordeadhand.patentlyo.pdf (as visited Mar. 16, 2012, and available in Clerk of Court's case file)); 2 D. Chisum, Patents §5.03[3] (2005).

Section 112 requires only a "written description of the invention . . . in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." It does not focus on the possibility that a law of nature (or its equivalent) that meets these conditions will nonetheless create the kind of risk that underlies the law of nature exception, namely the risk that a patent on the law would significantly impede future innovation. See Lemley 1329–1332 (outlining differences between §§101 and 112); Eisenberg, *supra,* at ___ (manuscript, at 92–96) (similar). Compare Risch, Everything is Patentable, 75 Tenn. L. Rev. 591 (2008) (defending a minimalist approach to §101) with Lemley (reflecting Risch's change of mind).

These considerations lead us to decline the Government's invitation to substitute §§102, 103, and 112 inquiries for the better established inquiry under §101.

Fourth, Prometheus, supported by several *amici,* argues that a principle of law denying patent coverage here will interfere significantly with the ability of medical researchers to make valuable discoveries, particularly in the area of diagnostic research. That research, which includes research leading to the discovery of laws of nature, is expensive; it "ha[s] made the United States the world leader in this field"; and it requires protection. Brief for

Opinion of the Court

Respondent 52.

Other medical experts, however, argue strongly against a legal rule that would make the present claims patent eligible, invoking policy considerations that point in the opposite direction.  The American Medical Association, the American College of Medical Genetics, the American Hospital Association, the American Society of Human Genetics, the Association of American Medical Colleges, the Association for Molecular Pathology, and other medical organizations tell us that if "claims to exclusive rights over the body's natural responses to illness and medical treatment are permitted to stand, the result will be a vast thicket of exclusive rights over the use of critical scientific data that must remain widely available if physicians are to provide sound medical care."  Brief for American College of Medical Genetics et al. as *Amici Curiae* 7; see also App. to Brief for Association Internationale pour la Protection de la Propriété Intellectuelle et al. as *Amici Curiae* A6, A16 (methods of medical treatment are not patentable in most of Western Europe).

We do not find this kind of difference of opinion surprising.  Patent protection is, after all, a two-edged sword.  On the one hand, the promise of exclusive rights provides monetary incentives that lead to creation, invention, and discovery.  On the other hand, that very exclusivity can impede the flow of information that might permit, indeed spur, invention, by, for example, raising the price of using the patented ideas once created, requiring potential users to conduct costly and time-consuming searches of existing patents and pending patent applications, and requiring the negotiation of complex licensing arrangements.  At the same time, patent law's general rules must govern inventive activity in many different fields of human endeavor, with the result that the practical effects of rules that reflect a general effort to balance these considerations may differ from one field to another.  See Bohannan &

Hovenkamp, Creation without Restraint, at 98–100.

In consequence, we must hesitate before departing from
established general legal rules lest a new protective rule
that seems to suit the needs of one field produce unfore-
seen results in another.  And we must recognize the role of
Congress in crafting more finely tailored rules where
necessary.  Cf. 35 U. S. C. §§161–164 (special rules for
plant patents).  We need not determine here whether,
from a policy perspective, increased protection for discov-
eries of diagnostic laws of nature is desirable.

\*      \*      \*

For these reasons, we conclude that the patent claims at
issue here effectively claim the underlying laws of nature
themselves.  The claims are consequently invalid.  And the
Federal Circuit's judgment is reversed.

*It is so ordered.*

1

## PROOF OF SERVICE

2       I am employed in the County of Los Angeles, State of California. I am over

3   the age of 18 and not a party to the within action. My business address is Goodwin

4   Procter LLP, 601 S. Figueroa Street, 41st Floor, Los Angeles, California 90017.

5       On March 21, 2012, I served the **NOTICE OF SUPPLEMENTAL**

6   **AUTHORITY** on the person(s) listed below as follows:

7

8   David S. Steuer                            Attorneys for Plaintiff
    **WILSON SONSINI GOODRICH**    **RESEARCH AFFILIATES, LLC**

9           **& ROSATI, P.C.**
    650 Page Mill Road

10  Palo Alto, CA 94304-1050
    E-Mail: *dsteuer@wsgr.com*

11  Tel: 650.493.9300
    Fax: 650.565-5100

12  Natalie J. Morgan                          Attorneys for Plaintiff
    **WILSON SONSINI GOODRICH**    **RESEARCH AFFILIATES, LLC**

13          **& ROSATI, P.C.**
    12235 El Camino Real, Suite 200

14  San Diego, CA 92130
    Email: *nmorgan@wsgr.com*

15  Tel.: 858.350.2303
    Fax: 858.350-2399

16

17  ☐    (MAIL) I placed the envelope for collection and mailing, following our
         ordinary business practices. I am readily familiar with this firm's practice
         for collecting and processing correspondence for mailing. On the same day

18       that correspondence is placed for collection and mailing, it is deposited in
         the ordinary course of business with the United States Postal Service, in a

19       sealed envelope with postage fully prepaid. I am a resident or employed in
         the county where the mailing occurred. The envelope or package was

20       placed in the mail at Los Angeles, California.

21  ☑    **(CM/ECF Electronic Filing) I caused the above document(s) to be**
         **transmitted to the office(s) of the addressee(s) listed above by electronic**

22       **mail at the e-mail address(es) set forth above pursuant to**
         **Fed.R.Civ.P.5(d)(1). "A Notice of Electronic Filing (NEF) is generated**

23       **automatically by the ECF system upon completion of an electronic**
         **filing. The NEF, when e-mailed to the e-mail address of record in the**

24       **case, shall constitute the proof of service as required by**
         **Fed.R.Civ.P.5(d)(1). A copy of the NEF shall be attached to any**

25       **document served in the traditional manner upon any party appearing**
         **pro se."**

26

27

28

<div align="center">1</div>

1  ☐ (EXPRESS MAIL) I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this

2  firm's practice for collecting and processing Express Mail for mailing. On the same day that Express Mail is placed for collection and mailing, it is

3  deposited in the ordinary course of business with the United States Postal Service, in a post office, mailbox, sub-post office, substation, mail chute, or

4  other like facility regularly maintained by the United States Postal Service for receipt of Express Mail.

5

6  ☐ (OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by Federal Express , an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive

7  documents, a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated

8  above, with fees for overnight delivery paid or provided for.

9  ☐ (MESSENGER SERVICE) I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed and

10  provided them to a professional messenger service for service. A separate Personal Proof of Service provided by the professional messenger service

11  will be filed under separate cover.

12  ☐ (FACSIMILE) Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers

13  listed. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

14

15  ☐ (E-MAIL or ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail

16  addresses listed. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the

17  transmission was unsuccessful.

18
     I declare under penalty of perjury that I am employed in the office of a
19
member of the bar of this Court at whose direction this service was made and that
20
the foregoing is true and correct.
21
     Executed on March 21, 2012, at Los Angeles, California.
22

23

24  _____          _____
         Ruby Wayne Wood                      /s/ Ruby Wayne Wood
25        (Type or print name)                      (Signature)

26

27

28

LIBA/2272821.1