1    113.   Mr. Arnott had knowledge of the aforementioned article and the

2    product commercialized by Paul Wood and Counsel Trust when he submitted his

3    sworn Declaration.

4    114.   Mr. Arnott made similar false statements in the other applications, *e.g.*,

5    the '577, '502, and '740 Patent applications.

6    115.   At least named inventor Robert Arnott and Research Affiliates'

7    prosecuting attorney, Ralph Albrecht owed the USPTO a duty of candor and good

8    faith in connection with the applications that led to the patents-in-suit.

9    116.   On March 5, 2005, Robert Arnott executed a Combined Declaration

10   for Patent Application and Power of Attorney in connection with the application for

11   the '719 Patent ("the '719 Patent Inventors' Declaration"), in which he stated that he

12   had reviewed and understood the contents of the specification, including the claims.

13   By signing the '719 Patent Inventors' Declaration, Robert Arnott explicitly

14   acknowledged his duty to disclose to the USPTO information that is material to the

15   examination of the application for the '719 Patent in accordance with 37 C.F.R.

16   § 1.56.

17   117.   On November 17, 2006, Robert Arnott executed a Combined

18   Declaration for Patent Application and Power of Attorney in connection with the

19   application for the '502 Patent ("the '502 Patent Inventors' Declaration"), in which

20   he stated that he had reviewed and understood the contents of the specification,

21   including the claims.  By signing the '502 Patent Inventors' Declaration, Robert

22   Arnott explicitly acknowledged his duty to disclose to the USPTO information that

23   is material to the examination of the application for the '502 Patent in accordance

24   with 37 C.F.R. § 1.56.

25   118.   On November 15, 2007, Robert Arnott executed a Combined

26   Declaration for Patent Application and Power of Attorney in connection with the

27   application for the '740 Patent ("the '740 Patent Inventors' Declaration"), in which

28   he stated that he had reviewed and understood the contents of the specification,

ANSWER, AFFIRMATIVE                          Case No. SACV11-01846 DOC (ANx)
DEFENSES AND COUNTERCLAIMS

1   including the claims.  By signing the '740 Patent Inventors' Declaration, Robert

2   Arnott explicitly acknowledged his duty to disclose to the USPTO information that

3   is material to the examination of the application for the '740 Patent in accordance

4   with 37 C.F.R. § 1.56.

5        119.   Robert Arnott was not unsophisticated about IP matters including the

6   inventor's duty of disclosure to the USPTO.  For example, on November 8, 2004, in

7   an email to several individuals including Paul Wood, Robert Arnott demonstrated

8   full appreciation of the duty of candor and good faith to the USPTO when he

9   warned the inventor of a competing patent application:  "[H]e has a *legal*

10  obligation to note prior art (GSAM and Morris) in his patent applications…else the

11  patent is likely to be voided on fraudulent misrepresentation grounds." (Exh. A,

12  Nov. 8, 2004 email from Arnott).  Robert Arnott was well aware of his duty to

13  disclose prior art to the USPTO.

14       120.   By prosecuting and ultimately obtaining allowance of claims directed

15  to methods of selecting and weighting assets on factors other than price to create an

16  index, the Robert Arnott and Ralph Albrecht asserted that they were entitled to those

17  claims, and that those claims met the statutory requirements of patentability.  Upon

18  information and belief, at least Robert Arnott and Ralph Albrecht knew before the

19  issuance of the patents-in-suit that the Dow Jones Select Dividend Index and the

20  iShares Dow Jones Select Dividend Index Fund selected and weighted assets on a

21  factor other than price.

22       121.   At least Robert Arnott and Ralph Albrecht breached their duty of

23  candor and good faith with intent to deceive the US PTO by failing to disclose the

24  Dow Jones Select Dividend Index and the iShares Dow Jones Select Dividend Index

25  Fund.  Additional facts about the intent of Robert Arnott and Ralph Albrecht to

26  deceive the USPTO are believed to be in the exclusive control of Research Affiliates

27  and its attorneys and cannot be reasonably known to Defendants without discovery.

28

ANSWER, AFFIRMATIVE                          Case No. SACV11-01846 DOC (ANx)
DEFENSES AND COUNTERCLAIMS

122.  But for Robert Arnott's and Ralph Albrecht's failure to disclose the iShares Dow Jones Select Dividend Index Fund and its underlying Dow Jones Select Dividend Index to the USPTO, at least claims 1-4, 15, 18-20, 23, 31, 33-34, 38-41, 49 and 52-55 of the '502 Patent, claims 1 and 34-36 of the '719 Patent and claims 1, 6, 8, 10, 23-25 and 73 of the '740 Patent would not have been issued or allowed by Patent Office.

123.  In sum, on information and belief, at least claims 1-4, 15, 18-20, 23, 31, 33-34, 38-41, 49 and 52-55 of the '502 Patent; claims 1 and 34-36 of the '719 Patent; and claims 1, 6, 8, 10, 23-25 and 73 of the '740 Patent would not have issued or been allowed but for Robert Arnott's and Ralph Albrecht's foregoing material misrepresentations and omissions, and Robert Arnott and Ralph Albrecht made each of the foregoing misrepresentations and omissions with a specific intent to deceive the USPTO.

## Robert Arnott's Failure to Disclose the work of David Morris using the FTSE for the GWA Wealth-Based Index to the USPTO

124.  Robert Arnott engaged in inequitable conduct during the prosecution of the applications for the '502, '719 and '740 patents (collectively, the "patents-in-suit") in the United States Patent and Trademark Office ("USPTO") by withholding David Morris' work using FTSE for the GWA Wealth-based Indexes from the Examiner during prosecution.  That inequitable conduct renders the patents-in-suit and each of their claims unenforceable.

125.  But for Robert Arnott's failure to disclose David Morris's work and the FTSE GWA Indexes to the USPTO, at least claim 1 of the '502 Patent, claim 1 of the '719 Patent, and claim 1 of the '740 Patent would not have issued or been allowed by Patent Office.

126.  The FTSE All-Share Index was originally called the FT Actuaries All-Share Index at its inception in 1962.  The Index was then enhanced with the addition

27

1  of two new sub-indices, namely the FTSE 100 and FTSE 250 in January 1984 and
2  October 1992 respectively. (FTSE All-Share Index Fact Sheet at 1).

3      127.  David Morris of Global Wealth Allocation ("GWA") reached an
4  agreement with the FTSE to launch an active index that reweights the underlying
5  FTSE market capitalization index by company book value, cash flow and net profit.
6  (D. Morris and T. Leake, *Where Next For The Index Business Model?*, JOURNAL OF
7  INDEXES, May/June 2006 at 25).

8      128.  On July 14, 2005 FTSE and GWA announced seven new "non-price"
9  based indexes. The new indexes were weighted "not by market capitalisation, but
10  by net income, cash flow, and book value." (July, 14, 2005 Press Release "New
11  non-price indices from FTSE Group and GWA").

12      129.  In his 2006 article, Mr. Arnott distinguished the earlier work of David
13  Morris but acknowledged that Mr. Morris's work starting in 2003 reweighting the
14  FTSE All-Share Index was "the **functional equivalent** of a **true Fundamental**
15  **Index™** of all companies." (Arnott, *An Overwrought Orthodoxy*, INSTITUTIONAL
16  INVESTOR, Dec. 2006 at 40, (emphasis added)).

17      130.  "Fundamental Index™" referred to the fundamental indexes marketed
18  by Robert Arnott and Research Affiliates. On information and belief, "Fundamental
19  Index™" referred to the fundamental indexes Robert Arnott and Research Affiliates
20  were seeking to patent. Therefore, upon belief and understanding, Robert Arnott's
21  statement that the Morris FTSE GWA Index work was the "functional equivalent"
22  meant that he understood that work to be highly relevant to the applications leading
23  to the patents-in-suit.

24      131.  Publications by David Morris regarding his work in 1997 and 2001 on
25  an EAFE GWA Index were cited to the USPTO examiner during prosecution of the
26  patents-in-suit. However, no disclosure was made regarding David Morris's work
27  using FTSE that Robert Arnott called the "functional equivalent" of his own.

28

ANSWER, AFFIRMATIVE
DEFENSES AND COUNTERCLAIMS                    Case No. SACV11-01846 DOC (ANx)

1      132.  Upon information and belief, the asserted claims of the patents-in-suit

2  have a priority date no earlier than February 2004.

3      133.  On information and belief, David Morris's work and the FTSE GWA

4  Indexes, therefore are prior art to the Patents-in-Suit under, at least, 35 U.S.C.

5  §§ 102(a) and 102(g).

6      134.  David Morris's work and the FTSE GWA Indexes are but for material

7  under 35 U.S.C. §§ 102 and 103 for at least claim 1 of the '502 Patent, claim 1 of

8  the '719 Patent, and claim 1 of the '740 Patent.  Moreover, the FTSE GWA Indexes

9  in combination with other prior art renders the asserted claims of the Patents-in-Suit

10  obvious.  Had the USPTO Examiner known of the FTSE GWA Indexes, these

11  claims would not have issued.

12      135.  Based on Robert Arnott's admission that Mr. Morris's work on the

13  FTSE GWA Indexes was "the functional equivalent" to the indexes created by

14  Research Affiliates, on information and belief, the FTSE GWA Indexes are but-for

15  material references that are but for material under 35 U.S.C. §§ 102 and 103 for at

16  least one claim from each of the Patents-in-Suit.

17      136.  Furthermore, any differences between the asserted claims of the

18  Patents-in-Suit and David Morris's work on the FTSE GWA Indexes are such that

19  the subject matter as a whole would have been obvious to a person of ordinary skill

20  in the art at the time the invention was made.

21      137.  Because David Morris's work on the FTSE GWA Indexes discloses

22  each of the limitations of claim 1 of the '502, '719 and '740 Patents, the FTSE

23  GWA Indexes are therefore but-for material prior art.

24      138.  Mr. Morris's work on the FTSE GWA Indexes was not cumulative of

25  references cited during the prosecution of the applications leading to the patents-in-

26  suit.  The prosecution record of the patents-in-suit does not reflect disclosure by Mr.

27  Arnott or consideration by the patent examiner of the Morris FTSE GWA Indexes.

28

ANSWER, AFFIRMATIVE              Case No. SACV11-01846 DOC (ANx)
DEFENSES AND COUNTERCLAIMS

139.   As reflected by the statement in the 2006 article referenced above, Mr. Arnott knew during the prosecution of the applications that led to the patents-in-suit that Mr. Morris's work on FTSE GWA Indexes was material prior art.

140.   On November 7, 2004 the New York Times published an article entitled "Why your stock index fund is lagging the market" that attributed Robert Arnott as the "creator" of the idea to weight stock according to variables other than market cap.  (M. Hulbert, *Why Your Stock Index Fund Is Lagging The Market*, N.Y. TIMES, Nov. 7, 2004).

141.   In response to that article, a colleague of Paul Wood, Richard Evans, notified the New York Times that Mr. Wood in fact was the "creator" of this approach, not Mr. Arnott.  Responding to this allegation, Mr. Arnott stated:

> "[A]s I've already noted to Paul [Wood], **he has a \*legal\* obligation to note prior art (GSAM and Morris) in his patent applications**.
> This prior art, coupled with the fact that his 'patent' is so broad as to encompass investment strategies based on P/E or ROE, will almost certainly mean that no patent will be granted.  We have already amended our far narrower patent application to acknowledge Paul's work (and the reasons that we think it's not applicable).  He has a legal obligation to do the same with his applications, else the patent is likely to be voided on fraudulent misrepresentation grounds."

(Exh. A, Nov. 8, 2004 email from Arnott (emphasis added)).

142.   Despite Mr. Arnott's knowledge of Mr. Morris's work and the FTSE GWA Indexes, and his clear understanding that material prior art must be disclosed to the USPTO, he failed to disclose Mr. Morris's work on FTSE GWA Indexes to the USPTO with the intent to deceive the USPTO.

143.   As discussed above in paragraphs 115-118, Robert Arnott, owed the USPTO a duty of candor and good faith in connection with the applications that led to the Patents-in-Suit.

30

144.   By prosecuting and ultimately obtaining allowance of claims directed to methods of selecting and weighting assets on factors other than price, the Applicants including Robert Arnott asserted that they were entitled to those claims, and that those claims met the statutory requirements of patentability.  Upon information and belief, however, the Applicants, including Robert Arnott, knew before the issuance of the Patents-in-Suit that David Morris's work and the FTSE GWA Indexes weighted assets on a factor other than price.

145.   At least Mr. Arnott breached his duty of candor and good faith with intent to deceive the US PTO by failing to disclose Mr. Morris's work on the FTSE GWA Indexes which he had conceded was the "functional equivalent" to his own.  Additional facts about the intent of Mr. Arnott to deceive the USPTO are believed to be in the exclusive control of Research Affiliates and its attorneys and cannot be reasonably known to Defendants without discovery.

146.   But for Robert Arnott's failure to disclose David Morris's work and the FTSE GWA Indexes to the USPTO Examiner, at least claims 1 of the '502 Patent, '719 Patent and the '740 Patent would not have issued or been allowed by Patent Office.

147.   In sum, on information and belief, at least 1 claim of each of the patents-in-suit would not have been issued or allowed but for Robert Arnott's foregoing material omissions, and Robert Arnott made each of the foregoing omissions with a specific intent to deceive the USPTO.

**Robert Arnott's  Failure to Disclose Robert C. Jones's Earning-Weighted Index and GSAM's Earnings-Weighted Index Fund to the USPTO**

148.   As a named inventor, Robert Arnott engaged in inequitable conduct during the prosecution of the applications for the '502, '719 and '740 patents (collectively, the "patents-in-suit") in the United States Patent and Trademark Office ("USPTO") by withholding the Earnings-Weighted Index developed by Robert C. Jones of Goldman Sachs Asset Management ("GSAM") and GSAM's Earnings-

31

1   Weighted Index Fund from the examiner during prosecution.  That inequitable

2   conduct renders the patents-in-suit and each of their claims unenforceable.

3        149.  But for Robert Arnott's failure to disclose Robert C. Jones's Earnings-

4   Weighted Index and GSAM's Earnings-Weighted Index Fund , at least claims 1-4,

5   15, 18-20, 23, 31, 33-34, 38-41, 49 and 52-55 of the '502 Patent; claims 1 and 34-36

6   of the '719 Patent; and claims 1, 6, 8, 10, 23-25 and 73 of the '740 Patent would not

7   have issued or been allowed by the USPTO.

8        150.  On August 31, 1988, Robert C. Jones authored an article Portfolio

9   Strategy:  Stock Selection.  (Goldman Sachs Portfolio Strategy, Aug. 31, 1988

10   (hereinafter "Jones-88")).

11        151.  On August 6, 1990, Robert C. Jones was interviewed for an article in

12   Pensions & Investments entitled "Earnings Basis for Weighting Stock Portfolios."

13   (PENSIONS & INVESTMENTS, *Earnings basis for weighting stock portfolios*, Aug. 6,

14   1990 (hereinafter "Jones-90")).

15        152.  In 1990, Mr. Jones also publicly disclosed a presentation entitled

16   "Quantitative Equity:  Earnings Weighted Index" (hereinafter "Jones-EWI").

17        153.  Because Robert C. Jones's Earnings-Weighted Index and GSAM's

18   Earnings-Weighted Index Fund was the subject of publications and was also

19   commercially available in the United States in the 1990s, it is prior art to the

20   Patents-in-Suit under at least 35 U.S.C. §§ 102(a) and (b).  (Jones-90 (noting "the

21   firm manages about $50 million for one pension fund client using the earnings-

22   weighted index fund approach.").

23        154.  Robert C. Jones's Earnings-Weighted Index and GSAM's Earnings-

24   Weighted Index Fund  are but for material under 35 U.S.C. §§ 102 and 103 for at

25   least claims 1-4, 15, 18-20, 23, 31, 33-34, 38-41, 49 and 52-55 of the '502 Patent;

26   claims 1 and 34-36 of the '719 Patent; and claims 1, 6, 8, 10, 23-25 and 73 of the

27   '740 Patent.  Moreover, Robert C. Jones's Earnings-Weighted Index and GSAM's

28   Earnings-Weighted Index Fund in combination with other prior art renders the

ANSWER, AFFIRMATIVE
DEFENSES AND COUNTERCLAIMS
        Case No. SACV11-01846 DOC (ANx)

1  asserted claims of the Patents-in-Suit obvious. Had the USPTO Examiner known of

2  Robert C. Jones's Earnings-Weighted Index and GSAM's Earnings-Weighted Index

3  Fund, these claims would not have issued.

4      155.   For example, Claim 1 of the '502 Patent claims a method of creating an

5  index by selecting constituents of the index based upon at least one accounting data

6  other than price; weighting the constituents of the index based upon at least one

7  accounting data other than price; and managing the index. ('502 Patent at 21:1-36).

8      156.   Robert C. Jones's Earnings-Weighted Index and GSAM's Earnings-

9  Weighted Index Fund disclose an "index of financial objects" constructed with a

10  computer-implemented method meeting all the elements of claim 1 of the '502

11  Patent.

12     157.   The method of claim 1of the '502 Patent creates, by at least one

13  computer, the index of the financial objects. ('502 Patent at 21:5-6). Robert C.

14  Jones disclosed such a method: "Goldman Sachs Asset Management, New York

15  has developed a method for weighting stocks in an equity portfolio based on a

16  company's adjusted earnings in relation to the total U.S. corporate earnings. The

17  concept is the brainchild of Robert C. Jones, quantitative equity strategies manager

18  at GSAM, who conceived of the weighting methodology while running some

19  backtests in 1987. The firm manages about $50 million for one pension fund client

20  using the earnings-weighted index fund approach. For the six months the firm has

21  run an actual portfolio, the strategy has returned 2.5% vs. 2.2% for a model using

22  reported earnings and 3.1% for the Standard & Poor's 500 stock index." (Jones-90,

23  p. 1).

24     158.   On information and belief, Robert C. Jones's Earnings-Weighted Index

25  and GSAM's Earnings-Weighted Index Fund was created and managed by using at

26  least one computer or processor. In fact, Research Affiliates admitted during

27  prosecution of App. No. 10/159,610 "that computers and processing systems were

28  well known in the art in relation to construction and management of a financial

33

1  index or investment instruments..." (Response to Office Action in App. No.

2  10/159,610, submitted 6/9/2008 (pp.13-15), 5/4/2009 (pp. 13-14), and 2/8/2010 (pp.

3  18-19)). Thus, in the unlikely event Robert C. Jones's Earnings-Weighted Index

4  and GSAM's Earnings-Weighted Index Fund was found not to be created with a

5  computer, it would have been obvious to create the index "by at least one computer"

6  as claimed.

7      159.  In the method of claim 1 of the '502 Patent the index is created by

8  "selecting, by at least one computer, financial objects as constituents of the index

9  based upon at least one accounting data regarding entities issuing the financial

10  objects rather than price of the financial objects." ('502 Patent at 21:7-10).  Robert

11  C. Jones's Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund

12  disclose such a selection:  "If you can identify the ones that are undervalued and

13  overvalued, then perhaps a stock selection system on top of this weighting system

14  would make sense."  (Jones-90, p. 2).

15      160.  In the method of claim 1 of the '502 Patent the selection criteria of

16  constituent financial objects must include at least one of several accounting data,

17  including "cash flow of the entities issuing the financial objects, sales of the entities

18  issuing the financial objects, book value of the entities issuing the financial objects

19  or any dividends of the entities issuing the financial objects." ('502 Patent at 21:11-

20  16).  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted

21  Index Fund discloses such a selection: "The rationale for EWIs is contained in a

22  1980 article by Fischer Black entitled 'The Magic in Earnings' (available on

23  request).  In that study, Fischer demonstrates that earnings, rather than book value,

24  is the best accounting estimate of a company's worth.  We have recently updated this

25  research to show that earnings is a better measure of value than any other readily-

26  available accounting figure -- including cash flow, free cash flow, dividends, sales,

27  assets, and EBITD.  Earnings was also found to be a better, less volatile estimate of

28  value than price itself."  (Jones-EWI, p. 1).

34

161.   In addition to "selecting," the index is created in the method of claim 1 of the '502 Patent by "weighting, by the at least one computer, the constituents of the index based upon at least one accounting data regarding the entities issuing the financial objects rather than price of the financial objects, to obtain constituent weightings of the constituents of the index." ('502 Patent at 21:17-22).  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund disclose such a weighting: "any cap-weighting scheme like an index fund will, almost by definition, mathematically over-weight the overvalued stocks and underweight the undervalued stocks.  If you assume prices eventually will tend toward fair value, that would make an [market-cap-weighted] index fund a suboptimal portfolio.  Our idea is to weight using another measure that is a better representation of the economic importance of the company [than market cap]." (Jones-90, pp. 1-2).

162.   Like the selecting criteria, in the method of claim 1 of the '502 Patent, the weighting criteria of constituent financial objects must include at least one of several accounting data, including "cash flow of the entities issuing the financial objects, sales of the entities issuing the financial objects, book value of the entities issuing the financial objects or any dividends of the entities issuing the financial objects." ('502 Patent at 21:22-26).  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund discloses such weighting criteria.  The Earnings-Weighted Index "weight[s] stocks in an equity portfolio based on a company's adjusted earnings in relation to the total U.S. corporate earnings." (Jones-90, p. 1).

163.   The method of claim 1 of the '502 Patent also includes a managing step providing for "managing, by the at least one computer, the index, and managing at least one portfolio of financial objects based on the index." ('502 Patent at 21:28-30).  It was well known that Robert C. Jones and GSAM managed the Earnings-Weighted Index: "Goldman Sachs Asset Management, New York has developed a

35

1  method for weighting stocks in an equity portfolio based on a company's adjusted
2  earnings in relation to the total U.S. corporate earnings.  The concept is the
3  brainchild of Robert C. Jones, quantitative equity strategies manager at GSAM, who
4  conceived of the weighting methodology while running some backtests in 1987.
5  The firm manages about $50 million for one pension fund client using the earnings-
6  weighted index fund approach.  For the six months the firm has run an actual
7  portfolio, the strategy has returned 2.5% vs. 2.2% for a model using reported
8  earnings and 3.1% for the Standard & Poor's 500 stock index." (Jones-90, p. 1).

9       164.  The managing step of the method of claim 1 of the '502 Patent also
10  includes "altering, by the at least one computer, the relative weightings of the
11  financial objects within said at least one portfolio of financial objects based on the
12  index as the at least one accounting data concerning the entities of the financial
13  objects changes or the constituents of the index change over time" ('502 Patent at
14  21:31-36), which is also disclosed by the withheld prior art.  For example, "How
15  often is the portfolio rebalanced?  We rebalance quarterly, pretty much in
16  conjunction with the earnings cycle for companies on a calendar quarter." (Jones-
17  90, p. 2).  On information and belief, Robert C. Jones' Earnings-Weighted Index and
18  GSAM's Earnings-Weighted Index Fund was rebalanced or re-weighted by using at
19  least one computer or processor.

20       165.  Any differences between the asserted claims of the '502 Patent and
21  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index
22  Fund are such that the subject matter as a whole would have been obvious to a
23  person of ordinary skill in the art at the time the invention was made.  Because
24  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index
25  Fund discloses each of the limitations of claim 1 and claims 2-4, 15, 18-20, 23, 31,
26  33-34, 38-41, 49 and 52-55of the '502 Patent, Robert C. Jones' Earnings-Weighted
27  Index and GSAM's Earnings-Weighted Index Fund were therefore but-for material
28  prior art.

ANSWER, AFFIRMATIVE                          Case No. SACV11-01846 DOC (ANx)
DEFENSES AND COUNTERCLAIMS

1    166.   Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-

2    Weighted Index Fund also disclose "a method of constructing an index of assets"

3    meeting all the elements of claim 1 of the '719 Patent.

4    167.   The method of claim 1 of the '719 Patent constructs an index by first

5    "**accessing** by the at least one analysis host processor of one or more databases

6    storing and permitting retrieval of data (D) about a plurality of entities (E) and a

7    plurality of corresponding assets (A) each issued by or having been issued by at

8    least one of the plurality of entities (E)." ('719 Patent at 10:47-51).  Second, the

9    method of claim 1 of the '719 Patent constructs an index by "**receiving** by the at

10   least one analysis host processor at least one objective measure of scale (O)

11   regarding one or more of the plurality of said assets, or one or more of the plurality

12   of said entities (E) associated with said corresponding assets (A)." ('719 Patent at

13   10:53-56).  Third, the method of claim 1 of the '719 Patent constructs the index by

14   "**retrieving** by the at least one analysis host processor one or more of said data (D)

15   about said plurality of said entities (E) and said corresponding assets (A)." ('719

16   Patent at 10:57-59).  On information and belief, Robert C. Jones' Earnings-

17   Weighted Index and GSAM's Earnings-Weighted Index Fund was created and/or

18   managed by accessing a database and receiving/retrieving data.  Also, as Applicant

19   has admitted that the use of computers for construction and management of indices

20   or funds was well known in the art (Response to Office Action in App. No.

21   10/159,610, submitted 6/9/2008 (pp.13-15), 5/4/2009 (pp. 13-14), and 2/8/2010 (pp.

22   18-19)), it necessarily follows that the "accessing," "receiving," "retrieving," and

23   "storing" of related data/information steps recited in claim 1 are also firmly in the

24   prior art because these are all required computing operations.

25   168.   Construction of the index claimed in method claim 1 of the '719 Patent

26   also includes a "selecting" step:  "selecting by the at least one analysis host

27   processor a selection from said plurality of said assets (A) and said entities (E) to

28   comprise a plurality of constituent index assets (IA) comprising the index of assets

37

ANSWER, AFFIRMATIVE                          Case No. SACV11-01846 DOC (ANx)
DEFENSES AND COUNTERCLAIMS

1   (I)." ('719 Patent at 10:60-64).  As discussed above for the '502 Patent, Robert C.

2   Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund

3   disclose such a selection: "If you can identify the ones that are undervalued and

4   overvalued, then perhaps a stock selection system on top of this weighting system

5   would make sense." (Jones-90, p. 2).  On information and belief, a selection of

6   "financial objects as constituents of the index" is performed to generate the EWI

7   because the creation of EWI started with S&P500 components but ended up with

8   499 constituents.  (See Jones-EWI, p. 11).

9         169.   The "selecting" step of the method claim 1 of the '719 Patent further

10  comprises:

11         "selecting by the at least one analysis host processor said one or more

12         data (D) to be a quantitative data (Q) reflecting the amount of said at

13         least one objective measure of scale (O) associated with each of said

14         entities . . .  wherein said at least one objective measure of scale (O)

15         comprises a measure of size (SZ) of each said entity (E) associated

16         with each said given asset (A), and wherein said measure of the size

17         (SZ) of each said entity (E) corresponding to each said asset (A)

18         comprises at least one of: a demographic measure of a said entity (E)

19         associated with said asset (A); a financial metric of a said entity (E)

20         associated with said asset (A); a metric from information disclosures

21         of a publicly traded entity; or a metric from information about a said

22         entity (E) associated with said asset (A)"

23  ('719 Patent at 10:65-11:20).  As discussed above, Robert C. Jones' Earnings-

24  Weighted Index and GSAM's Earnings-Weighted Index Fund discloses such a

25  selection: "The rationale for EWIs is contained in a 1980 article by Fischer Black

26  entitled 'The Magic in Earnings' (available on request).  In that study, Fischer

27  demonstrates that earnings, rather than book value, is the best accounting estimate of

28  a company's worth.  We have recently updated this research to show that earnings is

38

1  a better measure of value than any other readily-available accounting figure --

2  including cash flow, free cash flow, dividends, sales, assets, and EBITD.  Earnings

3  was also found to be a better, less volatile estimate of value than price itself."

4  (Jones-EWI, p. 1).  Thus, in selecting high earning companies for Earnings-

5  Weighted Index, the various earnings data constitute "a financial metric of a said

6  entity (E) associated with said asset (A)" and therefore "a measure of size (SZ)", as

7  claimed.

8       170.   Furthermore, the "selecting" step of method of claim 1comprises

9  "ranking by the at least one analysis host processor said entities (E) based upon at

10  least one of a said quantitative data (Q) associated with the at least one objective

11  measure of scale (O) of each of said entities (E) and selecting by the at least one

12  analysis host processor said selection from said plurality of said assets (A) or said

13  entities (E) to comprise said plurality of constituent index assets (IA) based on said

14  ranking." ('719 Patent at 11:21-29).  As discussed above, Robert C. Jones'

15  Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund disclose

16  such a ranking:  "If you can identify the ones that are undervalued and overvalued,

17  then perhaps a stock selection system on top of this weighting system would make

18  sense." (Jones-90, p. 2).

19       171.   Finally, construction of the index claimed in the method claim 1 of the

20  '719 Patent includes a "calculating" step:

21       "calculating by the at least one analysis host processor proportional

22       weights for the index of assets to be objective measure of scale

23       weights (OW) substantially independent of the market prices (P) of

24       any of said assets (A) and substantially independent of a market

25       capitalization (MC) of any of said entities (E), wherein said

26       calculating comprises:  (i) adding by the at least one analysis host

27       processor the quantitative data (Q) of each of said at least one

28       objective measure of scale (O) for all of said constituent index assets

39

1    (IA) to yield a sum total quantitative data (SUMQ) for said at least

2    one objective measure of scale (O); and (ii) determining by the at least

3    one analysis host processor a relative size of the quantitative data (Q)

4    of a said at least one objective measure of scale (O) for each said

5    constituent index asset (IA) as a proportion of said sum total

6    quantitative data (SUMQ) for said at least one objective measure of

7    scale (O) to yield the objective measure of scale weight (OW) of each

8    of the constituent index assets (IA) comprising the index of assets (I),

9    wherein said at least one objective measure of scale (O) comprises a

10   measure of size (SZ) of each said entity (E) associated with each said

11   given constituent index asset (IA), and wherein said measure of the

12   size (SZ) of each said entity (E) corresponding to each said

13   constituent index asset (IA) comprises at least one of: a demographic

14   measure of a said entity (E) associated with said constituent index

15   asset (IA); a financial metric of a said entity (E) associated with said

16   constituent index asset (IA); a metric from information disclosures of

17   a publicly traded entity; or a metric from information about a said

18   entity (E) associated with said constituent index asset (IA)."

19   ('719 Patent at 11:30-65). As discussed above, Robert C. Jones' Earnings-Weighted

20   Index and GSAM's Earnings-Weighted Index Fund discloses such a step.

21   "Goldman Sachs Asset Management, New York has developed a method for

22   weighting stocks in an equity portfolio based on a company's adjusted earnings in

23   relation to the total U.S. corporate earnings. The concept is the brainchild of Robert

24   C. Jones, quantitative equity strategies manager at GSAM, who conceived of the

25   weighting methodology while running some backtests in 1987. The firm manages

26   about $50 million for one pension fund client using the earnings-weighted index

27   fund approach. For the six months the firm has run an actual portfolio, the strategy

28

ANSWER, AFFIRMATIVE                              Case No. SACV11-01846 DOC (ANx)
DEFENSES AND COUNTERCLAIMS

1  has returned 2.5% vs. 2.2% for a model using reported earnings and 3.1% for the

2  Standard & Poor's 500 stock index." (Jones-90, p. 1).

3       172.  Any differences between the asserted claims of the '719 Patent and

4  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index

5  Fund are such that the subject matter as a whole would have been obvious to a

6  person of ordinary skill in the art at the time the invention was made.  Because

7  Robert C. Jones' Earnings-Weighted Index discloses each of the limitations of

8  claims 1 and 34-36 of the '719 Patent, the Robert C. Jones' Earnings-Weighted

9  Index and GSAM's Earnings-Weighted Index Fund were therefore but-for material

10  prior art.

11       173.  The Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-

12  Weighted Index Fund also disclose "a computer-implemented method for

13  constructing data indicative of a financial object index" meeting all the elements of

14  claim 1 of the '740 Patent.

15       174.  The method of claim 1of the '740 Patent "construct[s], by at least one

16  computer processor, data indicative of the financial object index comprising

17  selecting . . .data indicative of constituent financial objects of the financial object

18  index based upon at least one accounting data. . . said at least one accounting data

19  regarding at least one entity relating to each of said financial objects, the at least one

20  entity comprising at least one of a region, a country, a company, or a sovereign

21  associated with said each of said financial objects." ('740 Patent at 78:6-16).

22  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index

23  Fund discloses such a method.  "Goldman Sachs Asset Management, New York has

24  developed a method for weighting stocks in an equity portfolio based on a

25  company's adjusted earnings in relation to the total U.S. corporate earnings.  The

26  concept is the brainchild of Robert C. Jones, quantitative equity strategies manager

27  at GSAM, who conceived of the weighting methodology while running some

28  backtests in 1987.  The firm manages about $50 million for one pension fund client

41

1  using the earnings-weighted index fund approach. For the six months the firm has

2  run an actual portfolio, the strategy has returned 2.5% vs. 2.2% for a model using

3  reported earnings and 3.1% for the Standard & Poor's 500 stock index." (Jones-90,

4  p. 1).

5      175.  In addition to "selecting," the index is constructed in the method of

6  claim 1 of the '740 Patent by "weighting, by the at least one computer processor,

7  data indicative of said constituent financial objects based upon at least one

8  accounting data . . . said at least one accounting data regarding the at least one

9  entity, to obtain data indicative of constituent weightings for each of said constituent

10  financial objects." ('740 Patent at 17-23).  As discussed above, Robert C. Jones'

11  Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund disclose

12  such a weighting: "any cap-weighting scheme like an index fund will, almost by

13  definition, mathematically over-weight the overvalued stocks and underweight the

14  undervalued stocks.  If you assume prices eventually will tend toward fair value,

15  that would make an [market-cap-weighted] index fund a suboptimal portfolio.  Our

16  idea is to weight using another measure that is a better representation of the

17  economic importance of the company [than market cap]." (Jones-90, pp. 1-2).

18      176.  The method of claim 1 of the '740 Patent also includes a storing step

19  whereby "storing, by the at least one computer processor, said data indicative of said

20  constituent financial objects and said constituent weightings on at least one

21  computer storage device." ('740 Patent at 78:24-27).  On information and belief,

22  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index

23  Fund was constructed and/or managed by using at least one computer or processor,

24  including for the purposes of storing said data on a computer storage device.

25  Applicants repeatedly admitted during prosecution of Application Number

26  10/159,610 "that computers and processing systems were well known in the art in

27  relation to construction and management of a financial index or investment

28  instruments..." (Response to Office Action in App. No. 10/159,610, submitted

42

ANSWER, AFFIRMATIVE
DEFENSES AND COUNTERCLAIMS

Case No. SACV11-01846 DOC (ANx)

6/9/2008 (pp.13-15), 5/4/2009 (pp. 13-14), and 2/8/2010 (pp. 18-19)).  Thus, even if Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund were not found to be constructed with a computer, it would have been obvious to construct the index and store data "by at least one computer" as claimed.

177.   Claim 1 of the '740 Patent also broadly recites that the "financial "objects" . . . include one or more of the following:

> "a bond; a fixed income debt instrument; a debt instrument; an
> emerging market debt instrument; a high yield debt instrument; a
> corporate debt instrument; an investment grade debt instrument; a
> debenture; a bank loan; a convertible bond; a senior debt; a
> subordinated debt; a term loan; a government debt instrument; a
> government bond; a corporate bond; a high yield bond; an emerging
> market bond; a municipal bond debt instrument; a treasury bond debt
> instrument; a treasury bill debt instrument; a mortgage based debt
> instrument; a securitized debt instrument; a security; **a stock**; a
> commodity; a futures contract; a mutual fund; a hedge fund; a fund of
> funds; an exchange traded fund (ETF); a derivative; a negative
> weighting on any asset; an asset account; a separate account; a pooled
> trust; or a limited partnership."

('740 Patent at 78:32-79:1 (emphasis added)).  It was well known that Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund were based on and comprised of stocks:  "Goldman Sachs Asset Management, New York has developed a method for weighting stocks in an equity portfolio based on a company's adjusted earnings in relation to the total U.S. corporate earnings.  (Jones-90, p. 1).

178.   Lastly, the method of claim 1 of the '740 Patent requires that at least one accounting data comprise at least of "at least one financial metric of the at least one entity associated with each of said constituent financial objects; or at least one

43

1  metric, level, rate, or expenditure amount from information disclosures of the at

2  least one entity." ('740 Patent at 79:1-6).  In selecting high earnings companies for

3  the Earnings-Weighted Index, the various earnings data constitute "at least one

4  financial metric of the at least one entity associated with each of said constituent

5  financial objects," and such data are well known to be from "information

6  disclosures" (e.g., SEC filings and press releases) of the companies.

7      179.  Any differences between the asserted claims of the '740 Patent and

8  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index

9  Fund are such that the subject matter as a whole would have been obvious to a

10  person of ordinary skill in the art at the time the invention was made.  Because

11  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index

12  Fund discloses each of the limitations of claim 1 and claims 6, 8, 10, 23-25 and 73

13  of the '740 Patent, Robert C. Jones' Earnings-Weighted Index and GSAM's

14  Earnings-Weighted Index Fund is therefore but-for material prior art.

15      180.  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-

16  Weighted Index Fund is not cumulative of references cited during the prosecution of

17  the applications leading to the Patents-in-Suit.  The prosecution record of the

18  Patents-in-Suit reflects no indication that the index and fund disclosed in Robert C.

19  Jones' Earnings-Weighted Index was considered by the patent examiner.  Moreover,

20  Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index

21  Fund discloses are but for material under 35 U.S.C. §§ 102 and 103 of the asserted

22  claims of the Patents-in-Suit.

23      181.  As reflected by the statement in the 2006 article referenced above,

24  Robert Arnott knew during the prosecution of the applications that led to the

25  Patents-in-Suit that Robert C. Jones' Earnings-Weighted Index and GSAM's

26  Earnings-Weighted Index Fund was material prior art.  Mr. Arnott's 2006 article

27  states "a number of money managers have experimented with fundamentally

28  weighted portfolios over the years. **Robert Jones at Goldman Sachs Asset**

44

1   **Management was, so far as I know, the first to do so,** reweighting the S&P 500

2   on the basis of adjusted operating earnings. From 1990 to 1996 he managed money

3   on this basis and beat the S&P 500 by 1.0 percentage point per year, but he never

4   attracted serious assets." (R. Arnott, INSTITUTIONAL INVESTOR, *An Overwrought*

5   *Orthodoxy* (Dec 2006) at 39 (emphasis added)).

6      182.   On November 7, 2004 the New York Times published an article

7   entitled "Why your stock index fund is lagging the market" that attributed Mr.

8   Arnott as the "creator" of the idea to weight stock according to variables other than

9   market cap. (M. Hubert, Why Your Stock Index Fund Is Lagging The Market, N.Y.

10   Times, Nov. 7, 2004).

11      183.   In response to that article, a colleague of Paul Wood, Richard Evans,

12   notified the New York Times that Mr. Wood in fact was the "creator" of this

13   approach, not Mr. Arnott.  Responding to this allegation, Mr. Arnott stated:

14      "[A]s I've already noted to Paul [Wood], **he has a \*legal\* obligation**

15      **to note prior art (GSAM and Morris) in his patent applications**.

16      This prior art, coupled with the fact that his 'patent' is so broad as to

17      encompass investment strategies based on P/E or ROE, will almost

18      certainly mean that no patent will be granted.  We have already

19      amended our far narrower patent application to acknowledge Paul's

20      work (and the reasons that we think it's not applicable).  He has a

21      legal obligation to do the same with his applications, else the patent is

22      likely to be voided on fraudulent misrepresentation grounds."

23   (Exh. A, Nov. 8, 2004 email from Arnott (emphasis added)).

24      184.   Despite Mr. Arnott's knowledge of Robert C. Jones' Earnings-

25   Weighted Index and GSAM's Earnings-Weighted Index Fund, and his clear

26   understanding that material prior art must be disclosed to the USPTO, he failed to

27   disclose Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-

28   Weighted Index Fund to the USPTO with the intent to deceive the USPTO.

ANSWER, AFFIRMATIVE                          Case No. SACV11-01846 DOC (ANx)
DEFENSES AND COUNTERCLAIMS

185.   Robert Arnott, owed the USPTO a duty of candor and good faith in connection with the applications that led to the Patents-in-Suit.  (See Paragraphs 115-118 above).

186.   By prosecuting and ultimately obtaining allowance of claims directed to methods of selecting and weighting assets on factors other than price, the Applicants including Robert Arnott asserted that they were entitled to those claims, and that those claims met the statutory requirements of patentability.  Upon information and belief, however, the Applicants, including Robert Arnott, knew before the issuance of the Patents-in-Suit that Robert C. Jones and GSAM had constructed an index based on a factor other than price (*i.e.*, the Earnings-Weighted Index and Fund).

187.   At least Mr. Arnott breached his duty of candor and good faith with intent to deceive the US PTO by failing to disclose Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund.  Additional facts about the intent of Robert Arnott to deceive the USPTO are believed to be in the exclusive control of Research Affiliates and its attorneys and cannot be reasonably known to Defendants without discovery.

188.   But for Robert Arnott's failure to disclose Robert C. Jones' Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund to the USPTO, at least claims 1-4, 15, 18-20, 23, 31, 33-34, 38-41, 49 and 52-55 of the '502 Patent; claims 1 and 34-36 of the '719 Paten; and claims 1, 6, 8, 10, 23-25 and 73 of the '740 Patent would not have issued or been allowed by the USPTO.

189.   In sum, on information and belief, at least claims 1-4, 15, 18-20, 23, 31, 33-34, 38-41, 49 and 52-55 of the '502 Patent; claims 1 and 34-36 of the '719 Patent; and claims 1, 6, 8, 10, 23-25 and 73 of the '740 Patent would not have been issued or allowed but for Robert Arnott's foregoing material misrepresentations and omissions, and Robert Arnott made each of the foregoing misrepresentations and omissions with a specific intent to deceive the USPTO.

46

**The Patents-in-Suit are Unenforceable Due to Intentional False Statements and Egregious Misconduct Concerning False Claims of Joint Inventorship**

190.   At least Robert Arnott, founder of Research Affiliates LLC ("RA") and its patent attorney, Ralph Albrecht, engaged in affirmative, egregious misconduct and inequitable conduct during the prosecution of the applications for the '502 Patent, the '740 Patent and U.S. Patent No. 7,620,577 (the "'577 patent") that renders at least the '502 Patent and the '740 Patent and each of their claims unenforceable.  In particular, during the prosecution of the '502, '740 and '577 patents Robert Arnott and Ralph Albrecht knowingly and intentionally falsely represented in the application for the '577 patent that Robert Arnott and Paul Wood were joint inventors of the subject matter disclosed and claimed therein.  That misrepresentation was perpetuated when the applications for the '502 and '740 patents asserted priority to the '577 patent.

191.   On or about June 3, 2002, U.S. Pat. Application No. 10/159,610 (the "'610 Application") was filed in the USPTO by Paul Wood.  It was entitled "Fundamental Stock Market Index and Index Fund or Funds".

192.   Paul Wood was the only named inventor on the '610 Application.

193.   At the time he filed the '610 Application in 2002, Paul Wood was unaware of any work by Robert Arnott on subject matter disclosed in the '610 Application.

194.   At the time Paul Wood filed the '610 Application in 2002, Robert Arnott was unaware that Paul Wood had filed that patent application.

195.   At the time Paul Wood filed the '610 Application in 2002, Robert Arnott was unaware of any work by Paul Wood on subject matter disclosed in the '610 Application.

196.   On or about May 24, 2002, Paul Wood executed a sworn declaration that was filed with the USPTO during the prosecution of the '610 Application

ANSWER, AFFIRMATIVE
DEFENSES AND COUNTERCLAIMS

Case No. SACV11-01846 DOC (ANx)

1   stating that he was the "original and first inventor of the subject matter" of that
2   which was claimed in the '610 Application.

3       197.   Robert Arnott did not invent any of the subject matter disclosed in the
4   '610 Application.

5       198.   Robert Arnott and Paul Wood did not collaborate on the invention of
6   any of the subject matter disclosed in the '610 Application.

7       199.   Robert Arnott and Paul Wood were not joint inventors with respect to
8   any of the subject matter disclosed in the '610 Application. .

9       200.   On information and belief, as of June 3, 2002, the time the '610
10  Application was filed, Robert Arnott and Paul Wood had never spoken to each other
11  or collaborated in any way with each other.

12      201.   Paul Wood was the first to file a patent application in the United States
13  directed to "fundamental indexes."

14      202.   Paul Wood's '610 Application described using fundamental factors to
15  not only weight the stocks in a fundamental index, but he also described using
16  fundamental factors to **select** the stocks in the first place.  (See 610 App., June 3,
17  2002 at para [009]).

18      203.   On or about October 12, 2004, U.S. Pat. Application No. 10/961,404
19  (the "'404 Application") was filed in the USPTO.  It was entitled "Valuation
20  Indifferent Non-Capitalization Weighted Index."

21      204.   Robert Arnott was named as the sole inventor of the subject matter of
22  the '404 Application.

23      205.   Ralph Albrecht, a patent attorney, was substantively involved in the
24  prosecution of the '404 Application on behalf of Research Affiliates and Robert
25  Arnott.

26      206.   On or about March 5, 2005, Robert Arnott executed a declaration that
27  was filed with the USPTO during the prosecution of the '404 Application stating
28  that he was the "original and sole inventor ... of the subject matter" claimed in the

48

1  '404 Application.  In that declaration, Robert Arnott acknowledged his duty of
2  candor and good faith to the USPTO.

3      207.   Robert Arnott and Paul Wood did not collaborate on the invention of
4  any subject matter disclosed in the '404 Application.

5      208.   Robert Arnott and Paul Wood were not joint inventors or co-inventors
6  of any of the subject matter claimed in the '404 Application.

7      209.   On information and belief, as of the time the '404 Application was filed
8  Robert Arnott and Paul Wood had never spoken to each other.

9      210.   Robert Arnott's '404 Application described using fundamental factors
10  to weight the stocks in a fundamental index, but failed to describe selecting the
11  stocks using fundamental factors.

12      211.   On or about January 18, 2005, Paul Wood assigned his '610
13  Application to Research Affiliates.

14      212.   At the time of the assignment of Paul Wood's patent application to
15  Research Affiliates, Robert Arnott was aware of the assignment of the '610
16  Application.

17      213.   At the time of the assignment of Paul Wood's patent application to
18  Research Affiliates, Robert Arnott was aware that he was not an inventor of the
19  subject matter disclosed and/or claimed in the '610 Application.

20      214.   At the time of the assignment of Paul Wood's patent application to
21  Research Affiliates, Robert Arnott was aware that he did not collaborate with Paul
22  Wood on any of the subject matter disclosed and/or claimed in the '610 Application.

23      215.   On or about January 18, 2005, Ralph Albrecht became aware of the
24  subject matter disclosed and claimed in the '610 Application.  At that time, he knew
25  that the subject matter disclosed and claimed in the '610 Application was not
26  invented by Robert Arnott, and that Robert Arnott had not collaborated with Paul
27  Wood on any of the subject matter disclosed and/or claimed in the '610 Application.

28

49

ANSWER, AFFIRMATIVE                          Case No. SACV11-01846 DOC (ANx)
DEFENSES AND COUNTERCLAIMS