DAVID S. STEUER, SBN 127059
dsteuer@wsgr.com
WILSON SONSINI GOODRICH &
ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:   (650) 493-9300
Facsimile:    (650) 565-5100

NATALIE J. MORGAN, SBN 211143
nmorgan@wsgr.com
WILSON SONSINI GOODRICH &
ROSATI, P.C.
12235 El Camino Real, Suite 200
San Diego, CA 92130
Telephone:   (858) 350-2303
Facsimile:    (858) 350-2399

JOSE C. VILLARREAL (*pro hac vice*)
jvillarreal@wsgr.com
BRIAN D. RANGE (*pro hac vice*)
brange@wsgr.com
ADEN M. ALLEN (*pro hac vice*)
aallen@wsgr.com
ROBERT A. DELAFIELD II (*pro hac vice*)
bdelafield@wsgr.com
WILSON SONSINI GOODRICH &
ROSATI, P.C.
900 South Capital of Texas Hwy.
Las Cimas IV, Fifth Floor
Austin, TX 78746
Telephone:   (512) 338-5400
Facsimile:    (512) 338-5499

Attorneys for Plaintiff and Counterdefendant
Research Affiliates, LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| Research Affiliates, LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>WisdomTree Investments, Inc.,<br>WisdomTree Trust,<br>WisdomTree Asset Management, Inc.,<br>WisdomTree Retirement Services, Inc.,<br>Mellon Capital Management Corp., and<br>ALPS Distributors, Inc.,<br><br>　　　　Defendants.<br>_____<br><br>AND RELATED COUNTERCLAIMS. | CASE NO.: SACV11-01846 DOC (ANx)<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO DISMISS AND STRIKE INEQUITABLE CONDUCT PLEADINGS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: Monday, October 15, 2012<br>Time: 8:30 a.m.<br>Dept: Santa Ana Courthouse<br>　　　Courtroom 9D<br>　　　411 West Fourth Street<br>　　　Santa Ana, CA  92701-4516<br><br>Judge Hon. David O. Carter<br><br>Complaint Filed:    December 1, 2011 |

## NOTICE OF MOTION

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that on Monday, October 15, 2012 at 8:30 a.m., or thereafter as this matter may be heard by the above-entitled Court, located at 411 West Fourth Street, Santa Ana, California 92701, Plaintiff Research Affiliates, LLC, ("Research Affiliates") will, and hereby does, move for an order dismissing with prejudice and/or striking Paragraphs 66 parts a-c, 67-192, 258-320, 379 parts a-c, 380-388, and 393-394 of the inequitable conduct counterclaims and defenses raised by Defendants and Counterclaimants WisdomTree Investments, Inc.; WisdomTree Trust; WisdomTree Asset Management, Inc.; WisdomTree Retirement Services, Inc.; Mellon Capital Management Corp.; and ALPS Distributors, Inc (collectively, "Defendants") in the Second Amended Answer, Affirmative Defenses and Counterclaims (Docket 75).  Research Affiliates' motion is made pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f) on the grounds that these paragraphs of Defendants' inequitable conduct defenses and counterclaims fail to sufficiently state a proper defense or claim.

This motion is based on the Memorandum of Points and Authorities, Defendants' Answer, Affirmative Defenses and Counterclaims to Plaintiff's First Amended Complaint, and such further paper and argument as may be submitted to the Court in connection with this motion.  This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place by telephone conference on July 10, July 11, and August 29, 2012.

Dated:  September 4, 2012

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/Natalie J. Morgan*
    David S. Steuer
    Jose C. Villarreal
    Natalie J. Morgan

Attorneys for Plaintiff and Counterdefendant
RESEARCH AFFILIATES, LLC

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................1

II.   PROCEDURAL BACKGROUND ........................................................2

III.  ARGUMENT ........................................................................................3

      A.    Supreme Court And Federal Circuit Law Combine To Set A High Standard For Inequitable Conduct Pleadings. ...........................3

            1.    Pleadings Should Be Dismissed Where Their Legal Conclusions Are Implausible Based On Pleaded Facts..............3

            2.    Implausible Inequitable Conduct Defenses Should Be Struck Under A Similar 12(b)(6) Standard. ..........................4

            3.    Inequitable Conduct Allegations Must Be Supported By Specific Facts...............................................................5

                  a.    Inequitable Conduct Pleadings Must Explain The Who, What, When, How, And Why Of the Material Misrepresentation Or Omission. ......................................6

                  b.    Inequitable Conduct Pleadings Must Allege Facts Permitting A Reasonable Inference That, But-For The Misrepresentation Or Omission, The Examiner Would Not Have Allowed The Patent Claims. ................7

                  c.    Inequitable Conduct Pleadings Must Allege Facts Permitting A Reasonable Inference That A Specific Individual Knowingly Acted With Intent To Deceive. ..........................................................................8

      B.    Each WT Inequitable Conduct Theory Is Inadequately Pleaded.........10

            1.    WT's First Theory: Morris and the GWA Index.....................11

                  a.    WT's First Theory Fails Because WT Cannot Answer "What" Wrong-Doing Exists............................11

                  b.    WT's First Theory Fails To Plead "Who" Withheld References. ...............................................................12

                  c.    WT's First Theory Fails To Plead Facts That Allow A Reasonable Inference Of "But-For" Issuance. ...........13

            2.    WT's Second Theory: Robert Jones Goldman Sachs...............14

                  a.    WT's Second Theory Fails To Explain Who Withheld References. ....................................................14

b.   WT's Second Theory Fails To Plead Facts Sufficient To Allow A Reasonable Inference That Anyone Deliberately Withheld Any Reference. ...........14

c.   WT's Second Theory Fails To Plead Facts That Allow A Reasonable Inference Of "But-For" Issuance. ......................................................15

d.   WT's Pleadings Demonstrate No Intent To Deceive.....16

3.   WT's Third Theory: iShares Dow Jones Select Dividend Index Fund ............................................................16

a.   WT Fails To Plead Facts Sufficient To Allow A Reasonable Inference Of "But-For" Issuance. ...............16

b.   WT's Allegations Do Not Establish Any Exception To The "But-for" Requirement. ....................................18

c.   WT Fails To Plead Facts Sufficient To Lead To A Plausible Inference Of Bad Intent. .................................19

4.   WT's Fourth Theory: Allegedly False Joint Inventorship .......19

a.   One Cannot Plausibly Conclude That The PTO Would Not Have Issued The '502 Or '740 Patent "But-for" Incorrect Inventorship Of The '577 Patent. .........................................................................19

b.   WT's Pleadings And The Patent File Histories Demonstrate Correct Inventorship. ................................21

c.   WT Does Not Allege False Inventorship Facts Sufficient To Support A Plausible Inference Of Bad Intent.................................................................................23

d.   WT's Allegation of "Egregious" Misconduct Likewise Has No Basis In Law Or Pleaded Facts..........24

5.   WT's Fifth Theory: "Redefining Indexation" .........................24

a.   WT Fails To Plead Facts Sufficient To Allow A Reasonable Inference Of "But-For" Issuance. ...............24

b.   WT Fails To Plead Facts Sufficient To Allow A Plausible Inference Of Bad Intent. .................................25

IV.   CONCLUSION ................................................................25

# TABLE OF AUTHORITIES

Page

## CASES

*Abaxis, Inc. v. Cepheid*, No. 10-CV-02840-LHK, 2011 WL 3741501 (N.D. Cal. Aug. 25, 2011) ................................................................. 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................... 3, 6, 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................... 4, 6, 12, 23

*Burlington Industries, Inc. v. Dayco Corp.*, 849 F.2d 1418 (Fed. Cir. 1988) ................................................................................................. 6

*Consolidated Aluminum Corp. v. Foseco Int'l, Ltd.*, 910 F.2d 804 (Fed. Cir. 1990) ........................................................................................ 20

*Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) ...................... 4

*Delano Farms Co. v. California Table Grape Com'n*, 655 F.3d 1337 (Fed. Cir. 2011) ............................................................................. 8, 10

*Encyclopaedia Britannica, Inc. v. Alpine Elecs. Of Am., Inc.*, 609 F.3d 1345 (Fed. Cir. 2010) ...................................................................... 20

*Enough For Everyone, Inc. v. Provo Craft & Novelty, Inc.*, No. SA CV 11-1161 DOC, 2012 WL 177576 (C.D. Cal. Jan. 20, 2012) .......................... 5

*Erickson v. Pardus*, 551 U.S. 89 (2007) ........................................... 4

*Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009) ........................................................... 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 18, 19

*Federal Sav. & Loan Ins. Corp. v. Gemini Management*, 921 F.2d 241 (9th Cir. 1990) ...................................................................... 4

*Greenstone v. Cambex Corp.*, 975 F.2d 22 (1st Cir. 1992) ...................... 16

*Hansen Mfg Corp. v. Enduro Sys., Inc.*, No. CIV. 11-4030, 2011 WL 5526627 (D.S.D. Nov. 14, 2011) .............................................. 9, 10

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ...................... 7

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ............................... 4

*Human Genome Sciences, Inc. v. Genentech, Inc.*, No. 2:11-cv-6519-MRP, 2011 WL 7461786 (C.D. Cal. Dec. 9, 2011) ................................ 2, 10

*I-Flow Corp. v. Wolf Medical Supply, Inc.*, No. SACV 09-0762 AG (MLGx), slip op. (C.D. Cal. Feb. 4, 2010) .................................................. 2, 5

*Iconfind, Inc. v. Google, Inc.*, No. 2:11-cv-0319-GEB-JFM, 2012 WL 158366 (E.D. Cal. Jan. 18, 2012) .............................................. 4, 11

*Johnson Outdoors, Inc. v. Navico, Inc.*, 774 F.Supp.2d 1191 (M.D. Ala. 2011) ....................................................................................... 2

*Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240 (1933) .................... 7

*Nilssen v. Osram Sylvania, Inc.*, 440 F.Supp. 2d 884 (N.D. Ill. 2006) .................. 20

*Ormco Corp. v. Align Tech.*, No. CV 03-16 CAS, 2009 WL 466070 (C.D. Cal. Feb. 23, 2009) ........................................................... 20

*Papasan v. Allain*, 478 U.S. 265 (1986) ................................................ 4

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 803 F.Supp.2d 409 (E.D. Va. 2011) ................................................................. 8, 9, 15

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806 (1945) ....................................................... 7

*Schering Corp. v. Mylan Pharm.*, No. 09-6383 (JLL), 2012 WL 1473329, (D.N.J. 2012) ............................................................. 20

*Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565 (Fed. Cir. 1991) ............................................................... 18

*Solder Removal Co. v. U.S. Intern. Trade Comm'n*, 582 F.2d 628 (C.C.P.A. 1978) .............................................................. 18

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001) ....................... 4

*Supermarket of Homes, Inc. v. San Fernando Bd. of Realtors*, 786 F.2d 1400 (9th Cir. 1986) ....................................................... 4

*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) ...................................................... 1, 7, 8, 9, 10, 18, 19, 20

*W.L. Gore & Assoc., Inc. v. Medtronic, Inc.*, No. 2:10-cv-441, 2012 WL 368272 (E.D. Va. Feb. 3, 2012) ........................................ 8, 10

**STATUTES**

35 U.S.C. § 102 ............................................................... , 23

35 U.S.C. § 120 ................................................................. 20

**RULES**

37 C.F.R. § 1.99 .............................................................. 17

Fed. R. Civ. P. 8 ..................................................................................5

Fed. R. Civ. P. 9 ...........................................................................1, 5, 6

Fed. R. Civ. P. 12 .........................................................................2, 3, 4

Fed. R. Evid. 201 ..............................................................................4

# TABLE OF ABBREVIATIONS

"Ans. ¶ __" refers to the indicated paragraph of Defendants' Second Amended Answer, Affirmative Defenses and Counterclaims, Dkt. No. 75.

"Allen Ex. __." refers to the indicated exhibit to the Declaration of Aden Allen, submitted herewith.

"MPEP" refers to the Manual of Patent Examining Procedure.

"PTO" refers to the United States Patent and Trademark Office.

"RA" refers to Research Affiliates, LLC.

"WT" collectively refers to Defendants WisdomTree Investments, Inc., WisdomTree Trust, WisdomTree Asset Management, Inc., WisdomTree Retirement Services, Inc., Mellon Capital Management Corp., and Alps Distributors, Inc.

"Rule" refers to Federal Rules of Civil Procedure unless otherwise noted.

"'502 Patent" refers to U.S. Patent No. 7,747,502.

"'719 Patent" refers to U.S. Patent No. 7,792,719.

"'740 Patent" refers to U.S. Patent No. 8,005,740.

"Patents-In-Suit" refers to the '502 Patent, '719 Patent, and '740 Patent, collectively.

***Citations omitted*** - Citations from cited cases are omitted unless otherwise noted.

*Emphasis* - All emphasis added unless otherwise noted.

## I.      INTRODUCTION

The various theories of the inequitable conduct claim and defense of Defendants' ("WT's") Second Amended Answer, Affirmative Defenses and Counterclaims fail to meet the Federal Circuit's high inequitable conduct pleading standard and should therefore be dismissed and struck.  Indeed, WT's allegations exemplify the inequitable conduct plague that the Federal Circuit has long lamented and has vigorously sought to curb.  *Cf. Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1289 (Fed. Cir. 2011) ("The habit of charging inequitable conduct in almost every major patent case has become an absolute plague.").  The inequitable conduct theories at issue[1] fail to meet the pleading standard of Fed. R. Civ. P. 9(b) because WT does not plead the "who, what, when, where, and how" of the alleged improper conduct, because WT does not allege facts sufficient for a plausible inference of bad intent, and/or because WT does not allege facts sufficient for a plausible inference that the PTO would not have granted the Patents-In-Suit "but-for" the alleged wrong doing.

The Court need not look beyond WT's pleadings and the public PTO records to reach this conclusion.  Rather, implausibility is readily apparent.  For example, WT alleges that failure to disclose the Morris reference to the PTO is inequitable conduct.  However, the face of the Patents-In-Suit establishes that RA **did disclose** the Morris reference to the PTO.  RA informed WT of its mistake prior to WT filing its amended answer and again during a meet and confer, but WT nonetheless pressed forward.  There is no doubt that WT has not and cannot plead facts to create a plausible inference of a bad intention to withhold the Morris reference because the reference was not withheld.  Similarly, WT has not and cannot plead facts to create

---

[1] RA is not moving to dismiss or strike WT's inequitable conduct allegations relating to the '448 Glickman Application.  RA reserves all rights to dispute these allegations in future proceedings.

1  a plausible inference that the PTO would not have issued RA patents "but-for"
2  failure to disclose the Morris reference because the PTO had the Morris reference
3  and still granted the Patents-In-Suit.

4      WT's failure to read the face of the patents or the patents' file histories
5  should not be taken lightly.  Rather, for each of WT's theories of inequitable
6  conduct, WT's disregard of the facts has led to erroneous allegations of fraud
7  against inventors and prosecuting attorneys.  While this Court cannot undo any
8  harm such allegations have inflicted on these professionals' reputations, the Court
9  can and should prevent these allegations from marring this litigation by holding WT
10  to the Federal Circuit's high pleading standard for inequitable conduct.

11      For these reasons, as explained in detail below, WT's inequitable conduct
12  counterclaims and defense allegations at issue should be dismissed and struck
13  pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f), respectively.  Alternatively, to the
14  extent the Court decides WT sufficiently pleaded some but not all of its inequitable
15  conduct theories, the Court should nonetheless dismiss and strike each and every
16  inadequately pleaded theory.  *See I-Flow Corp. v. Wolf Medical Supply, Inc.*, No.
17  SACV 09-0762 AG (MLGx), slip op. (C.D. Cal. Feb. 4, 2010), Allen Ex. A
18  (striking certain inequitable conduct theories while refusing to strike others);
19  *Johnson Outdoors, Inc. v. Navico, Inc.*, 774 F.Supp.2d 1191, 1202 (M.D. Ala.
20  2011) (same); *cf. Human Genome Sciences, Inc. v. Genentech, Inc.*, No. 2:11-cv-
21  6519-MRP (JEMx), 2011 WL 7461786, at *3-4 (C.D. Cal. Dec. 9, 2011) (J.
22  Pfaelzer) (assessing the merits of each inequitable conduct theory individually).

23  **II.    PROCEDURAL BACKGROUND**

24      On December 1, 2011, RA sued WT for infringement of the '502, '719, and
25  '740 Patents.  WT filed its Answer on January 17, 2012.  Dkt. 14.  Shortly
26  thereafter, WT filed a Rule 12(c) motion for judgment on the pleadings.  Dkt. 20.
27  The Court denied that motion without prejudice on April 26, 2012.  Dkt. 52.

28

On March 2, 2012, the parties met for their 26(f) conference, and discovery commenced.  On July 20, 2012, WT filed an answer responding to RA's first amended complaint that contained many of the inequitable conduct allegations now at issue.  Dkt. 67.  On July 24, 2012, WT filed a motion for leave to file the second amended answer now at issue in order to add additional inequitable conduct allegations.  Dkt. 68.  RA did not oppose the motion for leave to amend but has consistently reserved all rights to move to dismiss and/or strike the amended pleading once it was entered.  *See, e.g.,* Dkt. 60.  After obtaining leave, WT filed the Second Amended Answer not at issue on August 15, 2012.  Dkt. 75.  This motion is RA's first response to WT's inequitable conduct allegations.

As its Third Affirmative Defense, WT asserts:  "Applicants, including Robert Arnott and prosecution counsel Ralph Albrecht, engaged in inequitable conduct during the prosecution of the applications for the Patents-in-Suit in the USPTO. That inequitable conduct renders the Patents-in-Suit and each of its claims unenforceable."  Ans., ¶ 65; ¶¶ 66-320.  Based on the same factual allegations, incorporated by reference, Count VII of WT's Counterclaims seeks declaratory judgment that the Patents-In-Suit are "unenforceable due to inequitable conduct." Ans., ¶¶ 377-394.  For the reasons explained below, RA now moves to dismiss and strike the majority of WT's inequitable conduct theories.

## III.   ARGUMENT

### A.   Supreme Court And Federal Circuit Law Combine To Set A High Standard For Inequitable Conduct Pleadings.

#### 1.   Pleadings Should Be Dismissed Where Their Legal Conclusions Are Implausible Based On Pleaded Facts.

WT's declaratory claim of unenforceability due to inequitable conduct is the subject of RA's motion to dismiss.  Determining whether a claim will survive a Rule 12(b)(6) motion, assessing the allegations of a proposed pleading is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  This inquiry focuses

1   on the interplay between the factual allegations of the complaint and the dispositive

2   issues of law in the action.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

3   Importantly, **the facts alleged must push the "claims across the line from**

4   **conceivable to plausible[.]**"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

5          In a motion to dismiss context, the court must construe the pleading in the

6   light most favorable to the non-opposing party and accept as true the factual

7   allegations of the pleading.  *See Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007);

8   *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  However,

9   this rule does not apply to "a legal conclusion couched as a factual allegation."

10  *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (quoted in *Bell Atl.*, 550 U.S. at 555).

11         Also, the Court need not "accept as true allegations that contradict matters

12  properly subject to judicial notice" or material attached to or incorporated by

13  reference into the pleading.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-

14  89 (9th Cir. 2001).  For example, for this motion, the Court should take judicial

15  notice of the Patents-In-Suit, the file histories of those patents, and other relevant

16  PTO records.  *Cf. Iconfind, Inc. v. Google, Inc.*, No. 2:11-cv-0319-GEB-JFM, 2012

17  WL 158366 at *1 (E.D. Cal. 2012) ("Since the prosecution history is a public record

18  that is 'capable of accurate and ready determination by resort to sources whose

19  accuracy cannot reasonably be questioned the request [to take judicial notice] is

20  granted") (citing Fed. R. Evid. 201).

21              **2.    Implausible Inequitable Conduct Defenses Should Be
                        Struck Under A Similar 12(b)(6) Standard.**

22

23         WT's defense of unenforceability due to inequitable conduct is the subject of

24  RA's motion to strike.  A motion to strike under Fed. R. Civ. P. 12(f) is the proper

25  way to dispose of affirmative defenses that are invalid or insufficient.  *Federal Sav.*

26  *& Loan Ins. Corp. v. Gemini Management*, 921 F.2d 241 (9th Cir. 1990) (upholding

27  striking of legally insufficient defenses to action on promissory note); *Supermarket*

28  *of Homes, Inc. v. San Fernando Bd. of Realtors*, 786 F.2d 1400, 1409 (9th Cir.

1986) (upholding striking of various defenses to contract and copyright claims); *I-Flow*, Allen Ex. A (motions to strike should be granted when a defense is insufficient as a matter of law) (quotes omitted).

   This Court has previously held that defenses governed by Fed. Rule Civ. P. 8 are not subject to the *Twombly*/*Iqbal* pleading standards of claims governed by Fed. R. Civ. P. 8(a). *Enough For Everyone, Inc. v. Provo Craft & Novelty, Inc.*, No. SA CV 11-1161 DOC (MLGx), 2012 WL 177576, at *2 (C.D. Cal. Jan. 20, 2012). However, as further explained below, the Federal Circuit has held that, under Rule 9(b), a pleading of inequitable conduct "requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the patent office." *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009) (affirming denial of motion to amend pleadings to add inequitable conduct as a defense and counterclaim because pleadings failed to meet Fed. R. Civ. P. 9(b) standard).  As such, this Court should evaluate RA's motion to strike WT's inequitable conduct defense under the same standard as RA's motion to dismiss WT's inequitable conduct counterclaim.

### 3.   Inequitable Conduct Allegations Must Be Supported By Specific Facts.

   The Federal Circuit has long denounced patent defendants' common place inequitable conduct allegations:

   [T]he habit of charging inequitable conduct in almost every major patent case has become an **absolute plague**.  Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps. They get anywhere with the accusation in but a small percentage of the cases, but such charges are not inconsequential on that account.  They destroy the respect for one another's integrity, for being fellow members of an honorable profession, that used to make the bar a valuable help to the

courts in making a sound disposition of their cases, and to sustain the good name of the bar itself.

*Burlington Industries, Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988).

Since the time of *Burlington*, and in light of *Twombly* and *Iqbal*, the Federal Circuit has combated this "absolute plague" by requiring very high standards for the specific facts a defendant must plead to support an inequitable conduct allegation. *Exergen Corp*, 575 F.3d at 1318. These standards are explained below.

              **a.**      **Inequitable Conduct Pleadings Must Explain The Who, What, When, How, And Why Of the Material Misrepresentation Or Omission.**

Under Federal Circuit law, "to plead the circumstances of inequitable conduct with the requisite particularity under Rule 9(b), the pleading must identify the specific who, what, when, where, and how[2] of the material misrepresentation or omission committed before the PTO." *Id.* at 1327.

The Federal Circuit's analysis of the facts to the law in *Exergen*, which evaluated a motion for leave to add a claim of inequitable conduct, provides insight as to when a pleading is insufficient. First, as to "who," a pleading is insufficient if it "fails to name the specific individual associated with the filing or prosecution of the application…, who both knew of the material information and deliberately withheld or misrepresented it." *Id.* at 1329. Second, as to "what" and "where," a pleading is insufficient if it "fails to identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found." *Id.* Lastly, as to "why" and "how," a pleading is insufficient if it fails to "identify the particular claim limitations, or combination of claim limitations that are supposedly absent from the information of record." *Id.*

---

[2] "Even though the *Exergen* court did not list 'why' among the questions that a pleading must answer with particularity, it did require, later in the opinion, that the pleading allege why the withheld information is material and not cumulative." *Abaxis, Inc. v. Cepheid*, No. 10-CV-02840-LHK, 2011 WL 3741501, *4, n. 7 (N.D. Cal. Aug. 25, 2011) (citing *Exergen*, 575 F.3d at 1329).

"Such allegations are necessary to explain both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims." *Id.* Merely stating that the withheld references are "material" and "not cumulative to the information already of record" is insufficient. *See id.*

**b.     Inequitable Conduct Pleadings Must Allege Facts Permitting A Reasonable Inference That, But-For The Misrepresentation Or Omission, The Examiner Would Not Have Allowed The Patent Claims.**

After *Exergen*, the Federal Circuit, sitting en banc, clarified that materiality of prior art must meet a "but-for" standard. *Therasense,* 649 F.3d 1276.  Under *Therasense*, "[w]hen an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291.

*Therasense* recognizes a narrow exception to requiring "but-for" materiality only in the unusual case of affirmative egregious misconduct "such as the filing of an unmistakably false affidavit." *Id.* at 1292.  Egregious misconduct includes perjury and suppression of evidence, *id.* (citing *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816-20 (1945)), manufacture and suppression of evidence, *id.* (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)), and bribery and suppression of evidence, *id.* (citing *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 243 (1933)).  However, "[b]ecause neither mere disclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct, claims of inequitable conduct that are based on such omissions require proof of but-for materiality." *Id.*

Application of *Therasense*'s "but-for" materiality to *Exergen*'s pleading standard, leads to the current rule of inequitable conduct pleadings: **<u>an inequitable conduct pleading must set forth facts from which it may be plausibly inferred</u>**

1   **that the information not disclosed was "but-for material to the prosecution to**

2   **the patent**."  *See Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 803 F.Supp.2d 409, 432

3   (E.D. Va. 2011) (holding that "*Exergen* still states the correct elements for pleading

4   inequitable conduct after *Therasense*").[3]

5              c.      **Inequitable Conduct Pleadings Must Allege Facts**
                        **Permitting A Reasonable Inference That A Specific**
6                       **Individual Knowingly Acted With Intent To Deceive.**

7            In addition to the who, what, when, where, and how requirements, *Exergen*

8   requires "sufficient allegations of underlying facts from which a court may

9   reasonably infer that a specific individual (1) knew of the withheld material

10  information or of the falsity of the material misrepresentation, and (2) withheld or

11  misrepresented this information with a specific intent to deceive the PTO."

12  *Exergen*, 575 F.3d at 1328-29.  A "reasonable inference" is one that is plausible and

13  that flows logically from the facts alleged, including any objective indications of

14

15  [3]  The district court in *W.L. Gore* suggests that a standard less than that of *Pfizer,*
16  *Inc.* could be sufficient to plead inequitable conduct.  *W.L. Gore & Associates, Inc.*
    *v. Medtronic, Inc.*, No. 2:10-cv-441, 2012 WL 368272, *2, n.1 (E.D. Va. Feb. 3,
17  2012).  *W.L. Gore* reached this conclusion by relying upon the Federal Circuit's
    statement in *Delano Farms* that: "A charge of inequitable conduct based on a
18  failure to disclose will survive a motion to dismiss only if the Plaintiff's complaint
    recites facts from which the court may reasonably infer that a specific individual
19  knew of invalidating information that was withheld from the PTO and withheld that
    information with a specific intent to deceive the PTO."  *Delano Farms Co. v.*
20  *California Table Grape Com'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011) (holding that
    complaint sufficiently pleaded inequitable conduct).
21
           However, *W.L. Gore*'s interpretation of *Delano Farms Co.* is incorrect for at
22  least three reasons.  First, the *Delano Farms* quotation responds to an argument
    relating to intent, and only explains the minimum standard for pleading intent ("will
23  survive a motion to dismiss only if").  *Id.*  The *Delano Farms* court quotation was
    not made in the context of addressing other elements such as materiality.  Second,
24  *Delano Farms* does not purport to overrule *Exergen*, and *Exergen* expressly
    requires an explanation of "why" the withheld information is material and not
25  cumulative.  *Exergen Corp.*, 575 F.3d  at 1329-30.  Third, *Delano Farms Co.* notes
    that the inequitable conduct pleading could stand because "[a] reasonable jury could
26  infer that Dr. Ramming knew of the prior use, ***appreciated that the prior use was***
    ***material***, and decided not to disclose that information to the PTO, with deceptive
27  intent."  *Id.*  Thus, *Delano Farms* requires a pleading of materiality just as *Exergen*
    and *Pfizer, Inc.* require.  In other words, *Pfizer*'s recitation of *Exergen*'s pleading
28  standard after *Therasense* is not at all inconsistent with *Delano Farms.*

candor and good faith.  *Id.* at 1329 n. 5.  Pleading intent to deceive on "information and belief" is permissible only where "the pleading sets forth the specific facts upon which the belief is reasonably based." *Id.* at 1330.  If specifically-pleaded facts do not support a "strong inference of fraud," the pleading fails "even a relaxed pleading standard." *Id.* at 1330 n. 7.

*Therasense* further heightened the standard to prove bad intent.  Thus, to prove inequitable conduct "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew it was material, and made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290.  In addition, *Therasense* abolished any "sliding scale" between intent and materiality where, under prior law, high materiality could substitute for intent.  Rather, intent must be determined independent of the reference's materiality.  *Id.* ("Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive.").  Lastly, *Therasense* held that "to meet the clear and convincing evidence standard, the specific intent to deceive must be the 'single most reasonable inference able to be drawn from the evidence.'" *Id.*  "Indeed, the evidence must be sufficient to require a finding of deceitful intent in the light of all the circumstances." *Id.*

Although *Therasense* discussed the necessary elements to succeed on the merits, the underlying elements still **must** be adequately pleaded under *Exergen*. Thus, to plead inequitable conduct under *Exergen* after *Therasense*:

> [A] party must make an *initial* showing from which it may be *plausibly inferred* that: (1) the individual knew of the information not disclosed; (2) the information not disclosed was but-for material to the prosecution of the patent; and (3) the intent to deceive is the single most likely explanation of the non-disclosure.

*Pfizer, Inc.*, 803 F.Supp.2d at 432; *see also Hansen Mfg Corp. v. Enduro Sys., Inc.*, No. CIV. 11-4030, 2011 WL 5526627, at *4 (D.S.D. Nov. 14, 2011) (finding that

intent was insufficiently pleaded because "deceitful intent is not the only reasonable inference" which could be drawn from the facts); *but see W.L. Gore & Assoc., Inc.*, No. 2:10-cv-441, 2012 WL 368272, at *5-6, n.1 (holding that *Therasense* did not alter the *Exergen* pleading standard) (citing *Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011)); *Human Genome Sciences, Inc. v. Genentech, Inc.*, No. 2:11-cv-6519-MRP (JEMx), 2011 WL 7461786, at *3-4 (C.D. Cal. Dec. 9, 2011) (J. Pfaelzer) (stating that "[i]n relation to motions to dismiss, *Iqbal, Exergen,* and *Therasense* occupy a sort of middle ground between pleading conclusory statements alleging intent to deceive and pleading facts from which intent to deceive is the most reasonable inference available."). And plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

As explained below, each of WT's inequitable conduct allegations at issue fail to meet one or more of the requirements set forth in *Exergen* and *Therasense*. On that basis, these allegations should be dismissed and struck.

### B. Each WT Inequitable Conduct Theory Is Inadequately Pleaded.

WT alleges several different theories to support the inequitable conduct allegations of its Third Affirmative Defense and Seventh Declaratory Judgment Count. However, WT does not support any of the theories now at issue with (1) facts sufficient to establish the who, what, when, how, and why of the inequitable conduct, (2) facts sufficient to permit a reasonable inference that, but-for the misrepresentation or omission, the examiner would not have allowed the claims, and (3) facts sufficient to permit a reasonable inference that a specific person intended to deceive the PTO. Thus, each theory fails to state a claim and should be dismissed or struck.

**1.    WT's First Theory: Morris and the GWA Index**

      **a.    WT's First Theory Fails Because WT Cannot Answer "What" Wrong-Doing Exists.**

As one inequitable conduct theory, WT alleges that RA failed to disclose the publication titled "Where Next For The Index Business Model?" by Leake and Morris, 22 Journal of Indexes May/June 2006 ("Morris FTSE GWA") to the PTO. *See* Ans. ¶¶ 125-149.  However, this first theory fails because it is contradicted by the RA patent file histories.  *Cf. Iconfind, Inc.*, 2012 WL 158366, at *1.  The face of the Patents-In-Suit prove **RA disclosed this reference to the PTO**.  (*See* Dkt. 1, Ex. A p. 30, Ex. B p. 62, Ex. C p. 91).  The patents' file histories further show that, RA submitted information disclosure statements disclosing this reference. (Allen Ex. B, Ex. C, and Ex. D).

Despite the record showing that RA disclosed this reference and that the examiner was well aware of this reference, WT includes over 24 paragraphs of inaccurate allegations that hinge on Mr. Arnott's or Mr. Albrecht's failure to disclose the Morris FTSE GWA alleged prior art.  For example ¶ 128 and ¶ 144of the Amended Answer state:

128.  David Morris of Global Wealth Allocation ("GWA") reached an agreement with the FTSE to launch an active index that reweighs the underlying FTSE market capitalization index by company book value, cash flow and net profit.  (D. Morris and T. Leake, *Where Next For the Index Business Model?*, JOURNAL OF INDEXES, May/June 2006 at 25.).

                \*\*\*\*

144.  Despite Mr. Arnott's knowledge of Mr. Morris's work and the FTSE GWA Indexes, and his clear understanding that material prior art must be disclosed to the USPTO, he failed to disclose Mr. Morris's

1    work on FTSE GWA Indexes to the USPTO with the intent to deceive

2    the USPTO.

3  But, as explained above, this reference **was disclosed** to the PTO.

4       Additionally, RA submitted another description of the FTSE work with

5  GWA within "Worth Weighting For? A Survey and Critique of Alternatively

6  Weighted Indexes" by Schoenfeld and Ginis, Journal of Indexes, May/June 2006

7  ("Schoenfeld") at 16. (Allen Ex. I) The face of the Patents-In-Suit prove the PTO

8  had this reference.  (*See* Dkt. 1, Ex. A p. 29, Ex. B p. 60, Ex. C p. 88).

9       WT's misplaced attack on Mr. Arnott's reputation does not end there.  WT

10  also pleads that Mr. Arnott wrote an article, entitled *An Overwrought Orthodoxy*,

11  that references the Morris FTSE GWA.   *See* Ans. ¶ 130.  But WT's pleading is

12  incomplete.  *An Overwrought Orthodoxy* —which WT admits discloses the Morris

13  FTSE GWA— **was also disclosed** to the PTO during prosecution of the '719 and

14  '740 Patents.  (*See* Dkt. 1, Ex. B p. 57, Ex. C p. 92); (Allen Ex. E and Ex. F).

15  Further, the '502 Patent's application both predates *An Overwrought Orthodoxy* and

16  identifies the '719 Patent as related such that the examiner would be well aware that

17  art pertinent to the '719 Patent could relate to the '502 Patent.

18       Because RA submitted each of these references to the PTO, WT's allegations

19  are facially inaccurate and thus fail to correctly identify the "what" of any wrong-

20  doing and are too implausible to meet the *Twombly* standard.  550 U.S. at 557.

21         **b.**   **WT's First Theory Fails To Plead "Who" Withheld References.**

22

23       WT also alleges the existence of a July 14, 2005 press release ("FTSE GWA

24  Press Release"), Ans. ¶ 129, but WT does not allege that any specific individual had

25  knowledge of this release.  Absent some allegation of "who" knew about the article

26  and intentionally hid it from the PTO, this cannot form the basis of a plausible

27  inequitable conduct claim.  *Exergen Corp*, 575 F.3d at 1329.

28

**c.    WT's First Theory Fails To Plead Facts That Allow A Reasonable Inference Of "But-For" Issuance.**

Because RA provided the Morris FTSE GWA, *An Overwrought Orthodoxy* and Schoenfeld to the PTO, it is logically impossible for WT's pleaded facts to lead to a plausible conclusion that the PTO would not have issued claims "but-for" a withheld reference (because no withholding occurred).

Also, WT does not explain why the FTSE GWA Press Release is not cumulative of these disclosures, or how an examiner would have rejected claims in light of this press release. For example, WT admits that David Morris's earlier work "in 1997 and 2001 on an EAFE GWA Index were cited to the USPTO examiner during prosecution of the patents-in-suit" but fails to address why the FTSE GWA Press Release is not cumulative of these disclosures as well. Ans. ¶ 132. And there is reason for this: the FTSE GWA Press Release is indeed cumulative of David Morris's related work submitted to the PTO including David Morris Global Wealth CalPERS Presentation ("Morris Presentation") and David Morris Global Wealth Allocation, AIMIC Address ("AIMIC"). *See* Dkt. 1, Ex. A p.30, Ex. B p. 59, Ex. C p. 88; Allen Ex. J and Ex. K.

Instead, WT states bare legal conclusions that "Mr. Morris's work on the FTSE GWA Indexes was not cumulative of the references cited during the prosecution" of the Patents-In-Suit. Ans. ¶ 140. This level of detail is insufficient to support an inequitable conduct claim, and WT's first theory of inequitable conduct should therefore be dismissed and struck. *See Exergen*, 575 F.3d at 1329-30 (stating that a pleading was insufficient if it failed to identify the particular claim limitations that are supposedly absent from the information of record as "[s]uch allegations are necessary to explain both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims").

### 2.   WT's Second Theory: Robert Jones Goldman Sachs

#### a.   WT's Second Theory Fails To Explain Who Withheld References.

As a second theory, WT alleges inequitable conduct based on an alleged failure to disclose Robert Jones's Earnings-Weighted Index and GSAM's Earnings-Weighted Index Fund ("Jones GSAM") and three related documents (the "Jones GSAM documents").   Ans. ¶¶ 150-192.  However, WT's pleadings **never** allege "who" knew of and chose to withhold any of the three references that make-up the Jones GSAM documents.   In fact, the pleadings do not even allege that anyone at RA knew of any Jones GSAM documents.   This is fatal to WT's second theory. *Exergen Corp*, 575 F.3d at 1329.

#### b.   WT's Second Theory Fails To Plead Facts Sufficient To Allow A Reasonable Inference That Anyone Deliberately Withheld Any Reference.

WT also fails to allege facts sufficient to allow an inference that anyone intentionally withheld Jones GSAM or the Jones GSAM documents from the PTO. Rather, WT's  principal factual allegation regarding RA's awareness of Jones GSAM is that it is mentioned in the *Overwrought Orthodoxy* article.  However, RA submitted *Overwrought Orthodoxy* to the PTO during the prosecution of the Patents-In-Suit.  *See* Section III(B)(1)(a), above.  Indeed, WT's pleadings admit that RA disclosed to the PTO that: "Robert Jones at Goldman Sachs Asset Management was, so far as I know, the first to [experiment with fundamentally weighted portfolios], reweighting the S&P 500 on the basis of adjusted operations."  *See* Ans. ¶ 184.  And WT never alleges that Mr. Arnott or anyone at RA knew anything more about Jones GSAM than this.

Indeed, WT's factual allegations demonstrate that RA disclosed Jones GSAM rather than hiding it.  These facts cannot give rise to a reasonable inference that anyone deliberately withheld Jones GSAM.  As such, this theory fails.

### c.  WT's Second Theory Fails To Plead Facts That Allow A Reasonable Inference Of "But-For" Issuance.

In addition to the above, WT's second theory also fails to appropriately plead the "how" (i.e., the "but-for" materiality of the allegedly withheld prior art on an element by element basis for claim 1 of the Patents-In-Suit).  In particular, *Exergen* requires the party alleging inequitable conduct to identify how withheld prior art discloses "particular claim limitations, or combination of claim limitations, that are absent from the record.  Such allegations are needed to explain 'why' the withheld information is not cumulative."  *Exergen*, 575 F.3d at 1329-1330.

Here, WT's pleading fails to establish "but for" materiality in two ways.  First, WT spends many paragraphs pleading that the Jones GSAM documents match claims of the asserted patents.  Ans. ¶¶ 158-181.  However, this is inconsequential because WT never alleges that anyone at RA knew about these particular documents.  Second, WT does not plead facts establishing how or why any allegedly withheld Jones GSAM reference is not cumulative to the many references that the PTO cites on the face of each patent-in-suit.  Indeed, just to the contrary, the Jones GSAM documents disclose no more than other references.  *See e.g.*, the Morris Presentation and the AIMIC (Allen Ex. J and Ex. K).  Simply put, WT cannot plead that Mr. Arnott's limited knowledge of Jones GSAM was not cumulative because the *Overwrought Orthodoxy* article, the Morris Presentation and the AIMIC were disclosed to the PTO.  Rather, WT's threadbare allegation that Jones GSAM "is not cumulative of references cited during the prosecution of the applications leading to the Patents-in-suit" combined with WT's observation that RA's patents issued (Ans. ¶ 183) does not meet the *Exergen* / *Therasense* standard.  *See Pfizer, Inc.*, 803 F.Supp.2d at 432.

Because WT's pleading does not explain the "why" or "how" of the alleged inequitable conduct, the Court cannot draw a plausible inference that the PTO

1  would have rejected RA claims "but-for" the alleged wrong-doing, and the claims

2  should be dismissed and struck.

### d. WT's Pleadings Demonstrate No Intent To Deceive.

4  Finally, WT's allegations related to Jones GSAM fail because, as explained

5  above, WT's factual allegations demonstrate that Mr. Arnott candidly publicized his

6  limited knowledge of Jones GSAM in the *Overwrought Orthodoxy* publication

7  submitted to the PTO and the public rather than hiding it.   *See* A. Ans. ¶ 184;

8  *Exergen*, at 1329 n. 5 (citing  *Greenstone* v. *Cambex Corp.*, 975 F.2d 22, 226 (1st

9  Cir. 1992) (declining to infer fraudulent intent where the complaint made clear that

10  the party accused of fraudulent conduct publicized the "practice with a candor that

11  seems inconsistent with knowledge of illegality or fear of a lawsuit.").

### 3. WT's Third Theory: iShares Dow Jones Select Dividend Index Fund

#### a. WT Fails To Plead Facts Sufficient To Allow A Reasonable Inference Of "But-For" Issuance.

15  WT's pleading alleges the existence of allegedly withheld prior art references

16  related to the iShares Dow Jones Select Dividend Index Fund and its underlying

17  index (together "iShares DJSDI references").  Ans. ¶¶ 67-124.  But WT's factual

18  allegations for this theory do not allow a reasonable inference that the PTO would

19  have rejected the RA patent if aware of this art.  This is particularly true because the

20  references are cumulative in at least two respects.

21  First, RA provided the PTO with notice of the iShares DJSDI through its

22  submissions.  In particular, WT admits that references authored by Mr. Arnott are

23  related to iShares DJSDI and allegedly demonstrate that the iShares DJSDI

24  references are material.  *See* Ans. ¶¶ 106-109.  For example, WT states that the

25  *Overwrought Orthodoxy* article describes the alleged prior art as follows:

26  108. In December of 2006, Robert Arnott authored an article for the

27  Institutional Investor entitled "An Overwrought Orthodoxy" that

28  states "[in 2003], Barclays Global Investors launched iShares Dow

1    Jones select dividend index, an exchange-traded fund that reweighs

2    the S&P 900 on the basis of the total dividends paid by each company.

3    This ETF was the first dividend-weighted fund and remains the largest

4    fundamentally reweighted strategy in the world."

5    Ans.  ¶ 108.  Importantly, various references discussing the iShares DJSDI **were**

6    **submitted** and **were considered** by the PTO.  The file histories of the patents-in-

7    suit show that this is so.[4]

8         Second, WT submitted iShares DJSDI references to the PTO during the

9    prosecution of the '719 patent.  *See* Ans. ¶ 102.  WT pleads that, as a third party, it

10   lacked the right to have an examiner consider these references.  But this is incorrect

11   as a matter of law.  Patents and publications submitted by a third party are "brought

12   before the examiner."  37 C.F.R. § 1.99.  The PTO explains that it allows these third

13   party submissions pursuant to the PTO's responsibility to "issue a patent only if it

14   appears that the applicant is entitled to a patent under the law."  United States

15   Patent and Trademark Office, *1134.01 Third Party Submissions Under 37 CFR 1.99*

16   *[R-5] – 1100 Statutory Invention Registration (SIR) and Pre-Grant Publication (PG*

17   *Pub)* (2008), http://www.uspto.gov/web/offices/pac/mpep/documents/

18   1100_1134_01.htm (internal quotes omitted).

19        WT appears to base its pleading on its reading of the Manual of Patent

20   Examining Procedure which states that an applicant "should submit any material

21   information contained in a third-party submission."  Ans. ¶ 104 (citing MPEP

22   1134.01).  However, the MPEP never prevents the examiner from considering third

23   party submissions.  Rather, the third party submissions are allowed to ensure an

24   _____

25   [4]   The Arnott iShares DJSDI references submitted to the <u>PTO</u> include (1) ROBERT
     D. ARNOTT, *An Overwrought Orthodoxy*, Institutional Investor Magazine,
26   December 2006; (2) "Worth Weighting For? A Survey and Critique of
     Alternatively Weighted Indexes" by Schoenfeld and Ginis, Journal of Indexes,
27   May/June 2006; and (3) Arnott, et al., "Fundamental Indexation," Financial
     Analysis Journal, vol. 61, No. 2, pp. 83-89, Mar./Apr. 2005. *See* Dkt. 1, Ex. A
28   p.29 ; Ex. B p.60 ; Ex. C  p. 88;  Allen Ex. E, Ex. F, and Ex. I

applicant is "entitled to a patent under the law," and this purpose could not be served if the PTO ignored such submissions.  Because the PTO had possession of the references at issue and opportunity to review them, WT cannot plausibly plead that any patent would have not been issued "but for" the reference.  *Cf. Solder Removal Co. v. U.S. Int'l Trade Com'n*, 582 F.2d 628, 633, n. 9 (C.C.P.A. 1978) (PTO not citing prior art "does not necessarily mean it was not considered by the examiner, who may have considered it unworthy of citation"); *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991) ("When a reference has been considered by the examiner, it is not controlling how it came to the examiner's attention. …  When a reference was before the examiner . . . it can not be deemed to have been withheld from the examiner").

Because the information before the PTO was complete, WT's pleading "does not identify the particular claim limitations, or combination of claim limitations, that are supposedly absent from the information of record."  *Exergen*, 575 F.3d at 1329.  Nor does WT plead "'how' [the] examiner would have used [the non cumulative] information in assessing the patentability of the claims."  *Id.* at 1330.  Because both WT and RA made the PTO well aware of the iShares Dow Jones Select Dividend Index Fund, WT's pleaded facts do not allow a reasonable inference that the PTO would not have issued claims "but-for" the alleged failure to submit duplicative references.  As such, this theory should be dismissed and struck.

### b.     WT's Allegations Do Not Establish Any Exception To The "But-for" Requirement.

WT also alleges that Mr. Arnott filed a false declaration because that declaration did not disclose his knowledge of the iShares Dow Jones Select Dividend Index and the iShares Dow Jones Select Dividend Index Fund and the SandsEnd Profit-Based 100 US Index.  *See* Ans. ¶¶ 111-113.  However, a mere allegation of withholding prior art cannot constitute "egregious misconduct."  *See Therasense*, 649 F.3d at 1292-3 ("Because neither mere nondisclosure of prior art

references to the PTO nor failure to mention prior art references in an affidavit constitutes egregious misconduct, claims of inequitable conduct that are based on such omissions require proof of but-for materiality"). Thus, WT's "but-for" burden remains, and WT has failed to meet that burden. Therefore, WT's third theory should be dismissed and struck.

### c.      WT Fails To Plead Facts Sufficient To Lead To A Plausible Inference Of Bad Intent.

WT's pleaded facts, and the patent file histories, establish that the PTO had the iShares DJSDI references before it. Moreover, Mr. Arnott's candid acknowledgement of iShares DJSDI in the *Overwrought Orthodoxy* publication submitted to the PTO demonstrates good faith. *Exergen*, at 1329 n. 5. As such, these facts cannot lead to a plausible conclusion that RA intended to hide these references from the PTO. For this additional reason, WT's third theory should be dismissed and struck.

### 4.      WT's Fourth Theory: Allegedly False Joint Inventorship

### a.      One Cannot Plausibly Conclude That The PTO Would Not Have Issued The '502 Or '740 Patent "But-for" Incorrect Inventorship Of The '577 Patent.

WT alleges that Mr. Arnott and Mr. Albrecht falsely claimed to be joint inventors of the application ("the '509 Application") that led to U.S. Patent No. 7,620,577 ("the '577 Patent"). *See* Ans. ¶¶ 258-320. The asserted '502 and '740 Patents claim priority to the '577 Patent. However, RA does not assert the '577 patent in this litigation, and the misconduct WT alleges cannot be a basis to render RA's asserted '502 or '740 Patents unenforceable because the naming of inventors on the '577 Patent did not affect prosecution of these patents.

Inequitable conduct with respect to a parent application will only lead to unenforceability of related patents under a theory of infectious unenforceability "where (1) the applicant engaged in inequitable conduct with respect to the

1   prosecution of an earlier related application in the chain leading to the challenged

2   patent and (2) the inequitable conduct relates to the asserted claims of the patent."

3   *Nilssen v. Osram Sylvania, Inc.*, 440 F.Supp. 2d 884, 900 (N.D. Ill. 2006).  Thus,

4   courts must determine whether there is an "immediate and necessary relation"

5   between the specific inequitable conduct in prosecuting the parent application and

6   the enforcement of the asserted patent.  *Consolidated Aluminum Corp. v. Foseco*

7   *Int'l, Ltd.*, 910 F.2d 804, 810-11 (Fed. Cir. 1990).  "[M]ere relatedness of subject

8   matter" is not enough to meet this standard.  *Id.* at 810-12; *see also, e.g. Schering*

9   *Corp. v. Mylan Pharm.*, No. 09-6383 (JLL), 2012 WL 1473329, at *13 (D.N.J.

10  2012) (incorrect inventorship of parent patent does not taint asserted patent); *Ormco*

11  *Corp. v. Align Tech.*, No. CV 03-16 CAS, 2009 WL 466070, *6 (C.D. Cal. Feb. 23,

12  2009) (inequitable conduct allegations as to one patent lacked sufficient "immediate

13  and necessary relation" to affect patent-in-suit's enforceability).  This reasoning is

14  consistent with *Therasense*: an inequitable conduct claim cannot stand unless the

15  misrepresentation or omission is material such that the PTO would not have

16  allowed the claim absent the misrepresentation or omission.  *Therasense*, 649 F.3d

17  at 1291.

18      Here, WT's false inventorship theory with regard to the '577 Patent lacks

19  even the allegation of an "immediate and necessary relation" between enforcement

20  of the Patents-In-Suit because, for two reasons, the allegation has no effect on

21  whether the PTO issued the Patents-In-Suit.  First, a priority application's

22  correctness of inventorship, validity, or enforceability is simply not a factor in the

23  priority statute.  35 U.S.C. § 120; *see also Encyclopedia Britannica, Inc. v. Alpine*

24  *Elecs. Of Am., Inc.*, 609 F.3d 1345, 1349-50 (Fed. Cir. 2010) (explaining

25  requirements for claiming priority).

26      Second, at the time RA filed the applications leading to the '502 and '740

27  Patents, two other applications that these two patents also claim priority to were still

28  pending.  *See, e.g.,* '502 Patent, Related U.S. Application Data ("Continuation –in-

part of [application leading to '577 Patent] . . . **and** a continuation-in-part of application No. 10/159,610. . . .").  As such, the Patents-In-Suit could still claim priority to these applications and obtain an early priority date even if the '577 Patent and its '509 Application never existed at all.

WT's pleading fails to demonstrate any material difference between claiming priority to the '577 Patent's application and these earlier applications.  Because WT cannot offer facts to support a plausible conclusion that "but-for" the allegedly false inventorship of the '577 Patent the PTO would not have issued the '502 and '740 Patents, this inequitable conduct allegation fails.

### b.   WT's Pleadings And The Patent File Histories Demonstrate Correct Inventorship.

WT's false inventorship allegations also fail because WT does not plead facts sufficient to lead to a reasonable conclusion of actual falsity or bad intent.  Indeed, the facts as pleaded infer the opposite is true for the two reasons below.

First, WT's entire allegation of false inventorship hinges on its statement that "[o]n information and belief, prior to the filing of the '509 Application there were no communications, discussions or collaboration supporting joint conception between Wood and Arnott regarding the subject matter disclosed in that application."  Ans. ¶ 301.  However, facts pleaded in the Amended Answer demonstrate the opposite—Mr. Wood and Mr. Arnott were talking about the subject matter of Fundamental Indexing months before the filing of the '509 application.  At Exhibit A to the Ans., Mr. Arnott writes to Mr. Paul Wood and others:

> Paul and I first met less than two weeks ago.  Before you brought him to my attention, I had never heard of him or of his work.  I initiated a dialogue with him on ways that we might work together to further our mutual interest.  Frankly, I would have expected you to be pleased by Mark's article, helping us to popularize [the Fundamental Indexing] idea. . . .  If this is the way that such discussions will proceed, then

1     there is no point in further discussions. . . .   Paul, I see no need to
2     further our discussions on possible cooperation on Wednesday after
3     all.  Do you?"

4  Ans. Ex. A.  Thus, the e-mail that WT attached to its pleading as an exhibit
5  demonstrates that the two inventors were discussing their work in this time frame.
6  Importantly, the email is dated November 8, 2004—at least 8 months before the
7  filing of the '509 application.

8        Moreover, WT admits that about 2 months after Mr. Arnott's email, Mr.
9  Wood assigned his application to RA.  *See* Ans. ¶ 279.   This allegation further
10 undermines WT's "on information and belief" proposition that Mr. Wood and Mr.
11 Arnott never communicated prior to filing the '509 Application, and thus
12 undermines WT's claim that there is no support for joint inventorship.

13       Second, WT's false inventorship allegations are premised on the notion that
14 the '577 Patent's application specification was merely a "combination of the '610
15 Application, which was solely developed by Paul Wood, and the '404 Application,
16 solely developed by Robert Arnott."  Ans. ¶ 299; *see also id.* at ¶ 300.  But WT
17 does not state that all filed claims were "merely a combination" of the '610 and
18 '404 patent applications.  Nor can it.  Such allegation would contradict the public
19 file histories.  Examination of the '610 Application, '404 Application, and '577
20 Patent's application reveal that originally filed claim 45 of the '577 Patent's
21 application is directed at a computer-implemented method of creating an index
22 where assets are weighted "based on a comparison of said gathered data with a
23 measure of scale of said plurality of assets" —a concept that does not appear in the
24 '610 Application or the '404 Application.   Similarly, originally filed claim 44 also
25 includes concepts not previously found in the '610 or '404 Application.

26       Thus, both WT's pleadings and the public record demonstrate that WT's
27 allegations that (1) Mr. Arnott and Mr. Wood did not communicate, collaborate, or
28 discuss concepts related to Fundamental Indexing and (2) there is complete overlap

1   between the Arnott/Wood application and the separate Wood and Arnott

2   applications are not plausible.  Indeed, they lead to the opposite inferences.  As

3   such, these allegations should be dismissed and struck.  *Twombly*, 550 U.S. at 557

4   (Ultimately, the facts alleged must be sufficient to push the claims "across the line

5   from conceivable to plausible[.]").

6          **c.   WT Does Not Allege False Inventorship Facts**

7            **Sufficient To Support A Plausible Inference Of Bad**
         **Intent.**

8      WT's pleading also fails to support facts that could lead to any inference of

9   bad intent.  Rather, WT hopes that bad intent could be inferred because "the false

10   claim of joint inventorship and the priority claim were made to divert the patent

11   examiner [sic] attention that the fact that the '610 Application was prior art to all

12   claims in these application [sic]."  Ans. ¶ 307.  But this makes no sense.  WT

13   admits that the '610 Application was abandoned for over a year when RA acquired

14   it from Mr. Wood, *Id.* at ¶ 286.  Thus, at the time that RA acquired the '610

15   Application, it was not prior art since it did not issue or publish.  *See* 35 U.S.C. §

16   102 (not listing unpublished applications as potential bar to patentability); 35

17   U.S.C. § 122 (unpublished applications are not published if no longer pending).

18      The '610 Application only became prior art after RA acquired and revived it

19   so that it eventually published.  In other words, rather than committing some

20   elaborate fraud, RA could have chosen not to revive the '610 Application if it was

21   concerned with the '610 Application as prior art.  But RA did the opposite.  Indeed,

22   the '610 Application was even disclosed to the PTO as prior art to the '719 Patent.

23   (*See* Dkt. 1, Ex. B p. 54).  RA cannot have bad intent based on hiding the '610

24   Application when the Application was never hidden.

25      WT also alleges that "by claiming joint inventorship, filing a continuation-in-

26   part application, and relying on the Wood '610 Application for priority, Mr. Arnott

27   could pursue patent applications claiming indexes where the constituent stocks were

28   selected based on fundamental factors."  Ans. ¶ 241-242.  This claim is equally

baseless.  WT ignores that RA, as the owner of the '610 Application, could have filed a continuation-in-part with Wood as the sole inventor.  And, assuming as true WT's allegation that "the '610 Application discloses what the ['577, '502, and '740] patents claim," Ans. ¶ 315, the PTO would have still issued the '577, '502, and '740 Patents even if RA only claimed priority to the '610 Application.  In other words, if Wood was the sole inventor, there was no incentive at all for Arnott and Albrecht to falsely claim joint inventorship.  Thus, WT's pleaded facts relating to false inventorship cannot create a plausible inference of bad intent and should be dismissed and struck.

### d. WT's Allegation of "Egregious" Misconduct Likewise Has No Basis In Law Or Pleaded Facts.

WT pleads that this false inventorship issue constitutes "egregious misconduct" (Ans. ¶ 258), but for the reasons explained above, the facts pleaded by WT do not support this allegation as a matter of law.

### 5. WT's Fifth Theory: "Redefining Indexation"

#### a. WT Fails To Plead Facts Sufficient To Allow A Reasonable Inference Of "But-For" Issuance.

As a final theory, WT alleges that Arnott failed to disclose a June 2004 draft of *Redefining Indexation* to the PTO.  *See* Ans. ¶¶ 318-319.  But this reference was submitted to the PTO twice.  WT submitted it to the PTO in its third-party submission.  Allen Ex. G.  Also, RA disclosed an equivalent September 2004 version of *Redefining Indexation* to the PTO.   Allen Ex. B, Ex. D, and Ex. H.

WT concludes that the PTO would not have allowed RA's patents but-for a failure to disclose this reference, but the facts before the Court show that this reference <u>was</u> in front of the PTO.  As such, this final theory fails and should be dismissed and struck.

### b.   WT Fails To Plead Facts Sufficient To Allow A Plausible Inference Of Bad Intent.

As with many of the WT allegations discussed above, WT's *Redefining Indexation* theory also fails to plead facts that would allow an inference of bad intent.  To the contrary, the facts show that (1) RA provided the September 2004 version of *Redefining Indexation* to the PTO; (2) WT provided the June 2004 version to the PTO; and (3) *Redefining Indexation* post-dates the earliest priority date of all Patents-In-Suit.  *See* Section III(B)(5)(b) above.  Because facts that would prove bad intent are lacking, this allegation should be dismissed.

## IV.   CONCLUSION

For the reasons above, WT's inequitable conduct counterclaim allegations at issue should be dismissed and WT's inequitable conduct affirmative defense allegations at issue should be struck.  Alternatively, to the extent WT has sufficiently pleaded some but not all inequitable conduct theories at issue, the Court should dismiss and strike the paragraphs of each inequitable conduct theory that fails to meet the Federal Circuit's pleading standard.

Dated:  September 4, 2012

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ Natalie J. Morgan*
       David S. Steuer
       Jose C. Villarreal
       Natalie J. Morgan

Attorneys for Plaintiff and Counterdefendant
RESEARCH AFFILIATES, LLC

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on September 4, 2012 to all counsel of record deemed to have consented to electronic service via the Court's CM/ECF system.

Any other counsel of record will be served by electronic mail and regular mail.

*/s/Natalie J. Morgan*
Natalie J. Morgan